**E-FILED**
Thursday, 10 November, 2016 01:40:35 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

NOV 1 0 2016

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) Cause No. 16- 30061 |
| | ) 18 U.S.C. § 1341 |
| v. | ) 18 U.S.C. § 1343 |
| | ) 18 U.S.C. § 641 |
| AARON J. SCHOCK, | ) 18 U.S.C. § 2 |
| | ) 18 U.S.C. §§ 1001(a)(2), (c)(1) |
| Defendant. | ) 18 U.S.C. § 1519 |
| | ) 26 U.S.C. § 7206(1) |
| | ) |
| | ) |

## INDICTMENT

## THE GRAND JURY CHARGES:

### COUNTS 1-8
### 18 U.S.C. § 1343
### (Wire Fraud)

#### I. The Defendant

1.     Defendant Aaron J. Schock (Schock) was a resident of Peoria and a

graduate of Bradley University with a degree in Finance. From 2004 to 2008, he

was a Representative in the Illinois House of Representatives and in 2008 was

elected to the U.S. House of Representatives (House) as a Representative for the

18th Congressional District of Illinois. The 18th Congressional District is within

the Central District of Illinois. Defendant Schock was reelected in 2010, 2012, and

1

2014. He maintained District Congressional offices in Peoria, Springfield, and

Jacksonville, Illinois and a Congressional Office and an apartment in

Washington, DC.

## II. Background

### A.    Members of Congress Are Prohibited From Using Their Official Positions for Personal Gain

2.    The House Ethics Manual recognizes that "public office is a public

trust." To uphold this trust, Members of Congress were subject to various

federal laws, House rules, and standards of conduct, and were prohibited from

using their official positions for personal gain.

### B.    Operation of Congressional Office: Members' Representational Allowance

3.    In their official capacity as Members of Congress, each Member,

including Defendant Schock, exercised almost complete authority and autonomy

over the hiring of personnel for his Congressional office (often called "staffers")

and the spending of funds to support that office.

4.    During each session of Congress, each Member of Congress was

allocated funds to allow the Member to run his or her office and to perform and

support their official and representational duties, both in Washington as well as

in the district from which each Member is elected. This appropriation or

2

allocation of funds was called the "Members' Representational Allowance" or simply, the "MRA."

5. The MRA was funded through fiscal year appropriations and authorized annually by the House of Representatives Committee on House Administration. During each year Defendant Schock was in Congress, each Member's budget was in excess of $1,000,000 per year and was not transferable between legislative years, so any balance did not carry over to the next year. The Chief Administrative Officer (CAO), through the House Finance Office, accounted for this fund, and the Clerk of the House published a quarterly Statement of Disbursements, which listed the MRA expenditures of each Member.

6. The proper uses of federal funds under MRA were set forth in regulations, which were published by the Committee on House Administration and contained within a Members' Congressional Handbook (Handbook). In addition to House regulations, and since the MRA consists solely of federal funds, federal law also governed the use of these funds, including Title 18, United States Code, Section 641, which prohibits any person from embezzling, stealing, or converting to personal use any money or thing of value of the United States, and Section 1001(a), which prohibits any person from making any

3

materially false or fraudulent statement or representation in connection with a
claim for payment or a document required by law, rule, or regulation to be
submitted to the Congress or any office or officer within the legislative branch.

7.     Among the rules and regulations contained in the Handbook
relevant to the MRA were the following:

a.     Ordinary and necessary expenses incurred by the Member or
the Member's employees in support of the conduct of the Member's official and
representational duties to the district from which he or she is elected are
reimbursable in accordance with the regulations contained in the Handbook.
"Ordinary and necessary" means reasonable expenditures in support of official
and representational duties to the district from which he or she is elected that are
consistent with all applicable federal laws, Rules of the House of Representatives
and regulations of the Committee on House Administration.

b.     To be reimbursable with federal funds under the MRA, the
primary purpose of the expense must be official and representational and
incurred in accordance with the Handbook. Specifically:

- The MRA may only be used for official and representational
  expenses.

- The MRA may not be used to pay for any expenses related to
  activities or events that are primarily social in nature.

4

- The MRA may not pay for personal expenses.

- The MRA may not pay for political campaign expenses.

- The MRA may not pay for campaign-related political party expenses.

- Except where authorized by the Committee on Ethics, campaign funds may not pay for a Member's official and representational expenses.

- A Member may not maintain, or have maintained for his use, an unofficial office account for the purpose of defraying or reimbursing ordinary and necessary expenses incurred in support of a Member's official and representational duties.

- A Member may not accept from any private source in-kind support having monetary value for an official activity.

- Unless specifically authorized by an applicable provision of federal laws, House Rules, or Committee Regulations, no Member, relative of the Member, or anyone with whom the Member has a professional or legal relationship may directly benefit from the expenditure of the MRA.

- Each Member is personally responsible for the payments of any official and representational expenses incurred that exceed the provided MRA or that are incurred but are not reimbursable under (the regulations).

5

- Furniture is not reimbursable for the Washington DC, congressional office. In addition, only decorations of "nominal value" are reimbursable.

c.      Disbursements (or payments) from the MRA are made on a reimbursement or direct payment basis and must be supported with specific documentation. To request a reimbursement or payment, each Member must provide a certification as to the accuracy of the charge and its compliance with applicable federal laws, House Rules, and Committee regulations. This certification is on a "voucher" that is submitted to the House Finance Office and contains the following:

> I certify (1) that the above articles have been received in good condition and are of the quality and in the quantity above specified, or the services were performed as stated; (2) that they are in accordance with the orders therefore; (3) that the prices charged are just; (4) that they are for use in my office in the discharge of my duties; and (5) that these are true copies and will be the only submission for payment.

d.      Reimbursements and payments from the MRA may be made only to the Member, the Member's employees, or a vendor providing services to support the operation of the Member's offices.

e.      Ordinary and necessary expenses associated with "official travel" are reimbursable.

6

f. Official travel includes local travel and travel away from home overnight to conduct "official and representational duties."

g. Living expenses and commuting expenses are not reimbursable. "Living expenses" include meals, housing, and other personal expenses incurred at the Member's or employee's residence or duty station. "Commuting expenses" are transportation expenses incurred by the Member or employee while commuting between their residence and duty station.

h. Members are required to file an annual Financial Disclosure Statement.

8. Official travel, paid for with the MRA, could not be for personal, campaign-related political party, or committee purposes. There is an "absolute prohibition" on the use of the MRA for reimbursement for "private travel."

9. As part of the restriction of using government funds for political activity, "official" travel could not originate from or terminate at a campaign event. Furthermore, official travel could not be combined with or related to travel or travel-related expenses paid for with campaign funds.

10. The Government Travel Card was available for a Member and his employees for use for official travel only. Use of the Government Travel Card "for any personal or non-official purchases is prohibited."

7

11. The costs of transportation by a Member or employee using a "privately owned" or "privately leased" vehicle while on official and representational business was reimbursable on a per mile basis. Gasoline purchased for privately owned vehicles is not reimbursable.

12. Each Member was an employing authority for their office; the Member determined the terms and conditions of employment and service for their staff within the regulations set by the government. The terms and conditions must be consistent with applicable federal laws and House Rules. A Member may not retain an employee on the Member's payroll who does not perform official duties commensurate with the compensation received for the offices of the employing authority.

C. **Federal Campaign Funds**

13. The Federal Election Campaign Act of 1971, as amended, Title 52, United States Code, Sections 30101, *et seq.*, (Election Act) applied to the election of candidates for federal office, including the Office of U.S. Congressman, and provides, in part, as follows:

a. The Election Act required the authorized campaign committee of a candidate for federal office to accurately report certain donations and expenditures by that committee to the Federal Election Commission (FEC), an

8

agency of the United States government with jurisdiction to enforce the Election
Act.

   b. The Election Act required the FEC to publicly report accurate
information provided by the campaign committees.

   c. The Election Act, federal regulations, and House rules
prohibited the use of campaign funds for personal use.

14. Defendant Schock established three separate committees between
August of 2007 and October of 2009: "Schock for Congress," "Schock Victory
Committee," and "GOP Generation Y Fund" (hereinafter collectively referred to
as "Committees"). At all times material to this indictment, Defendant Schock
exercised authority and control over the hiring of staff for his political campaign
committees as well as the expenditure of campaign funds on behalf of the
campaigns.

15. Defendant Schock's principal campaign committee, Schock for
Congress (SFC), was established on August 15, 2007, and was the main vehicle
used to fund his personal campaigns for Congress. The Statement of
Organization filed with the FEC listed its principal address to be P.O. Box 10555,
Peoria, IL. SFC maintained bank accounts at CEFCU, Peoria, IL, and SunTrust,
Atlanta, GA. The FEC filing also listed "Mr. Aaron Jon Schock" as the "Name of

9

Candidate," and identified its treasurer as located in Peoria and a successor treasurer as located in Athens, GA. Defendant Schock was an authorized signatory on the SFC bank account.

16.  Defendant Schock also established a Joint Fundraising Committee named "Schock Victory Committee" (SVC) on or about October 20, 2009. Joint Fundraising Committees are typically set up to conduct fundraising activities on behalf of one or more other political committees or unregistered organizations. According to the FEC filings, SVC conducted fundraising activities on behalf of SFC, Gen Y, and others. As of February 2015, SVC listed an address of P.O. Box 9058, Peoria, IL, with a bank account at CEFCU, Peoria, IL. SVC identified its treasurer as being located in Athens, GA.

17.  Defendant Schock established a leadership PAC (Political Action Committee) named "GOP Generation Y Fund" (Gen Y) on April 3, 2008, with the stated purpose to support candidates (not himself) for various federal and nonfederal offices. The Statement of Organization for Gen Y filed with the FEC listed P.O. Box 9055, Peoria, IL as its address with bank accounts at CEFCU, Peoria, IL, and SunTrust, Atlanta, GA. It further listed "Mr. Aaron Jon Schock" as the "Name of Any Connected Organization, Affiliated Committee, Joint

10

Fundraising Representative, or Leadership PAC Sponsor." It also listed its

treasurer as located in Peoria and a successor treasurer as located in Athens, GA.

## III. The Scheme to Defraud

18.     Beginning as early as 2008, and continuing to at least October 2015,

in the Central District of Illinois, and elsewhere, the defendant,

## AARON J. SCHOCK,

knowingly, and with the intent to defraud, devised and participated in, and

caused others to participate in, a scheme and artifice to defraud the United States

of America, Schock's Committees (SFC, SVC, and Gen Y), and others and to

obtain money and property by means of materially false and fraudulent

pretenses, representations, promises, and omissions.

## A. The Goal of the Scheme

19.     The main goal of the scheme to defraud and to obtain money and

property was for Defendant Schock to enrich himself, and others, at his

discretion, by embezzling, stealing, misapplying, and converting without

authority public funds from his MRA and funds from his various Committees for

his own direct personal benefit and for the direct personal benefit of others with

whom he had a professional or personal relationship.

11

## B. Manner and Means of the Scheme

### Fraudulent Mileage Reimbursements

20.    Prior to and following his election to Congress, Defendant Schock

owned a 2005 GMC Envoy. In November 2009, while a Member of Congress, he

purchased a 2010 Chevrolet Tahoe for approximately $56,483, which he financed

through GMAC. He had a monthly car payment of approximately $1,134.10.

21.    As part of the scheme, Defendant Schock repeatedly submitted and

caused to be submitted false and fraudulent mileage reimbursement claims to the

House and to his various Committees for reimbursement of "official" and

"campaign-related" travel that substantially exceeded the amount of the actual

travel, and that even substantially exceeded the overall total number of miles the

vehicle was actually driven.

22.    As part of the scheme, and despite House and FEC standards that

required documentation of the actual number and nature of official and

campaign-related miles driven, Defendant Schock repeatedly submitted and,

through his Congressional and campaign staffs, repeatedly caused to be

submitted, materially false and fraudulent mileage reimbursement claims to the

House and to his Committees that contained false or intentionally incomplete

12

documentation of the amount and nature of the mileage for which he sought payment.

23.     As part of the scheme, Defendant Schock directed and caused employees on his Congressional staff to submit materially false and fraudulent mileage vouchers to the House, with little or no documentation, including directing staff members to cause his mileage reimbursements to average approximately $1,200 per month, which was enough to cover his car payment, but to vary it each month so as to not make it "obvious."

24.     In addition, and during the same time period in which he was receiving fraudulent mileage reimbursements from the House, Defendant Schock repeatedly submitted false and fraudulent mileage reimbursement claims to members of his campaign staff for payment by his Committees to him. Finally, during the same time period in which he was receiving fraudulent mileage reimbursements from the House and his Committees, Defendant Schock also caused the House and his Committees to pay for various fuel expenditures, totaling as much as approximately $7,000 for the years 2008 to 2014.

25.     In 2008, Defendant Schock was a member of the Illinois House of Representatives and received mileage reimbursements from the Illinois House and was also a candidate for U.S. Representative. As part of the scheme, and

from as early as 2008, and continuing to about October 2014, Defendant Schock repeatedly submitted and caused to be submitted false and fraudulent claims for mileage reimbursements to the House and his Committees, which resulted in approximately $86,352.59 in total payments to him from the House and approximately $52,310.54 in total payments from his Committees, for total mileage payments of approximately $138,663.13.

26. As part of the scheme, and even assuming all of the miles driven on Defendant Schock's vehicles were official and campaign-related miles, and absolutely no personal miles were driven at all during this period of time, Defendant Schock caused the House and his Committees to reimburse him for approximately 150,000 miles more than the vehicles for which he sought reimbursement were actually driven.

27. As a further part of the scheme, in July 2014, Defendant Schock traded-in his personal 2010 Chevrolet Tahoe and purchased a new 2015 Chevrolet Tahoe. In doing so, he paid for the 2015 Tahoe with SFC funds, but caused the 2015 Tahoe to be titled in Defendant Schock's name. Despite this, on or about August 14, 2014, Defendant Schock caused SFC to issue him a mileage reimbursement check for $9,433.20, and on or about September 3, 2014, Defendant Schock caused Gen Y to issue him a mileage reimbursement check for

14

$8,921.36. Additionally, he made no effort to reimburse SFC for any personal use of the 2015 Tahoe, as required by the FEC. Finally, Defendant Schock caused two additional and false mileage reimbursement claims to be submitted to and paid by the House for $1,150 and $1,218.

28.     As part of the scheme and to conceal and cover it up, Defendant Schock caused his Committees, SFC and Gen Y, and their treasurer to file false reports with the FEC, falsely reporting the payments to Defendant Schock as actual "mileage reimbursement" expenses.

**Fraudulent Claims for Reimbursement for the Purchase of Camera Equipment**

29.     As part of the scheme, Defendant Schock fraudulently caused the House to reimburse him for his purchase of $29,021.45 in camera equipment from B & H Photo in New York for his use and the use of a Congressional and campaign staff member, who was also Defendant Schock's personal photographer and videographer.

30.     Specifically, on or about September 1, 2014, Defendant Schock hired an individual to work on Defendant Schock's Congressional and campaign staff, including to do work as his personal photographer and videographer. Within weeks of that hiring, on or about September 24, 2014, Defendant Schock, his Political Director, and the staff member ordered and purchased, during an

15

interstate telephone call, camera equipment from B & H Photo in New York at a cost of $29,021.45. The equipment was paid for using Defendant Schock's personal credit card, and shipped via UPS, Next Day Air, from B & H Photo in New York, to Schock's Congressional Office in Peoria.

31.    On or about November 7, 2014, and after payment for the camera equipment on Defendant Schock's credit card became due, Defendant Schock instructed the staff member to create and submit to Defendant Schock's Congressional office a false invoice for "multimedia services" in the amount of $29,021.45, the exact cost of the camera equipment. Following Defendant Schock's instruction, the staff member created an invoice, falsely reflecting "Multimedia Services" in the amount of $29,021.45 provided to "Aaron Schock, 100 NE Monroe, Suite 100, Peoria, Illinois 61602," which was the address of Schock's Congressional Office in Peoria. The invoice listed these services as being performed between the dates of September 1, 2014, to December 27, 2014, a time period that had not yet fully occurred, and one that followed the hiring of the staff member as a federal employee. Defendant Schock caused this invoice to be sent via an interstate email communication from the staff member in Peoria to Defendant Schock.

32.    On or about November 10, 2014, Defendant Schock sent an interstate

e-mail communication to the staff member, further instructing him to "change

the project date to August 1, 2014, through October 31, 2014 [a]nd send back to

me ASAP!." This period still included time during which the staff member was a

federal employee. The staff member again followed Defendant Schock's

instruction, and submitted an additional false invoice, which Defendant Schock

then forwarded to his Executive Assistant in Washington DC, and instructed the

Executive Assistant to "get this paid ASAP."

33.    On or about November 12, 2014, Defendant Schock's Executive

Assistant in Washington sent an interstate email communication to the

Congressional and campaign staff member, instructing him to submit a third

"invoice for the dates 07/01/2014 to 08/31/14," which was for a period during

which the staff member was not a federal employee and might be represented to

have been a contractor or vendor with Defendant Schock's Congressional office.

The staff member again complied, and submitted the revised invoice via an

interstate e-mail communication to Defendant Schock's Executive Assistant in

Washington DC.

34.    On or about November 12, 2014, Defendant Schock caused his

Executive Assistant to submit a voucher to the House, for payment to the staff

17

member through Defendant Schock's MRA account, and to attach the third-revised invoice, falsely representing that the services provided by the staff member were "Web Dev, HST, EMAIL & RLTD SERV." Despite the fact that the staff member never provided such services, Defendant Schock caused the voucher to be submitted under his name and certified as accurate.

35.    As part of the scheme, and based on the representations in the false voucher and accompanying invoice Defendant Schock caused to be submitted to the House, the House authorized a payment of $29,021.45 in federal funds on or about December 15, 2014, to the staff member. The funds were later deposited in the staff member's bank account, and later used by the staff member to make direct payments to Defendant Schock's personal credit card account for the purchase of the camera equipment.

**Purchase of Vehicle for District Office Chief of Staff**

36.    As a further part of the scheme, on or about September 12, 2014, Defendant Schock caused SFC, his principal campaign committee, to purchase a 2014 Ford Fusion for $27,533.41 for his District Chief of Staff in Peoria, and to pay for the District Chief of Staff's fuel, insurance, and car rental expenses, knowing that it would be used for few, if any, campaign events.  At no time was the

18

District Chief of Staff an employee of SFC. As a result, Defendant Schock caused a loss to SFC.

a. On or about September 1, 2014, Defendant Schock hired a friend as his District Chief of Staff in Peoria. As part of the hiring, Defendant Schock committed that he would provide a car to the individual, despite the fact that federal law and FEC guidelines prohibit the use of campaign funds for personal use.

b. To conceal and cover up his actions, Defendant Schock caused SFC to file a report with the FEC, falsely representing the car purchase as a "transportation expense" of SFC.

**November 2014 trip to Chicago Bears Game**

37. In or about November 2014, Defendant Schock was offered several skybox tickets for a Chicago Bears football game in Chicago at no cost to himself. He invited others, including two staff members, to attend the game with him. Defendant Schock then hired the pilot of a private plane to fly the group from Peoria to Chicago.

38. Following their arrival in Chicago, Defendant Schock, his staffers, and the pilot traveled by Uber to a Chicago restaurant for dinner and then rented five hotel rooms. The next day, the group attended the football game in the

19

skybox, returned to the airport, and were flown by the pilot back to Peoria. The total costs for the weekend trip were approximately $3,293.96.

39.     As part of the scheme, Defendant Schock caused the House, through the use of his government travel card, submission of false vouchers for payment on the travel card, and direct payment to the pilot to pay for the flight expenses of $1,190, pilot meal expenses of $47, and Uber expenses of approximately $248 for the Chicago trip with federal funds, as if they were legitimate expenses of his official office.

40.     As a part of the scheme, Defendant Schock caused SVC, through payment to his personal credit card, to pay for the restaurant expense of $1,271.41 and hotel expenses of $536.95 for the Chicago trip with campaign funds, as if they were legitimate campaign expenses.

41.     As a part of the scheme and to conceal and cover it up, Defendant Schock caused SVC to file a false report with the FEC, falsely representing that the expenses associated with the Chicago trip were for "JFC [Joint Fundraising Committee] Event Catering" and "JFC Lodging" expenses, as if they were legitimate campaign-related expenses.

20

**Other Private Airplane Expenses**

42.  Defendant Schock repeatedly used the services of a private airplane and helicopter and private pilot at a much greater cost rather than fly on a commercial airline. He then paid for the cost of these trips, including personal trips, with federal funds or campaign funds or not at all.

43.  As a further part of the scheme, Defendant Schock used campaign funds of SFC and SVC to pay part of a personal vacation travel expense. In or about August 2013, he arranged to meet a friend at Dulles airport in Washington, D.C., where they departed for a personal vacation, booked through American Express Travel, in Europe. Because of delays in the commercial flights from Peoria, Defendant Schock was at risk of missing a connecting flight to D.C., so he retained the services of a private aircraft company to fly him to Dulles airport at a cost of $8,054.42. He later instructed his political director to pay this expense, split between SFC and SVC funds, even though the expense was purely personal and for his own convenience.

44.  As a part of the scheme and to conceal and cover it up, Defendant Schock caused SFC and SVC to file false reports with the FEC, falsely representing that the travel expense associated with this flight was for

21

"Transportation" and "JFC Airfare" expenses, as if it were a legitimate
campaign-related expense.

**Super Bowl and World Series Tickets**

45. Prior to entering Congress, Defendant Schock periodically earned
money as a ticket broker. While in Congress, and between 2009 and 2013,
Defendant Schock purchased tickets for the Super Bowl and World Series, which
he then resold for a profit. For example, in 2009, Defendant Schock purchased six
World Series tickets for $900, which he then sold for $2,100, making a profit of
$1,200. In 2011, Defendant Schock purchased 16 World Series tickets for $4,800,
which he then sold for $7,200, making a profit of $2,400. In 2012, Defendant
Schock purchased four Super Bowl tickets for $3,625, which he then sold for
$16,250, making a profit of $12,625. In 2013, Defendant Schock purchased four
Super Bowl tickets for $3,825, which he then sold for $6,400, making a profit of
$2,575. In 2013, Defendant Schock purchased 24 World Series tickets for $6,200,
which he then sold for $9,825, making a profit of $3,625.

### 2014 Super Bowl Tickets

46. As part of the scheme, in January 2014, Defendant Schock purchased
four Super Bowl tickets for $10,025 and caused SVC to pay for such tickets by an
electronic payment from SVC's bank account in Peoria to Defendant Schock's

22

personal credit card account. As part of the scheme, Defendant Schock thereafter sold the tickets to a ticket broker in California for $12,000, making a profit of $1,975. He then kept the entire $12,000 from the sale of the tickets as profit without reimbursing SVC for the cost.

47. As part of the scheme, and to conceal and cover it up, Defendant Schock caused SVC to file a false report with the FEC, falsely representing the purchase of the Super Bowl tickets, which Defendant Schock personally sold for a profit, as "JFC [Joint Fundraising Committee] Event Tickets."

2015 Super Bowl Tickets

48. As part of the scheme, in January 2015, Defendant Schock caused a staff member to purchase four Super Bowl tickets for $10,050, two in the name of Defendant Schock and two in the name of another individual.

49. As part of the scheme, and similar to 2014, Defendant Schock caused one of his Committees, this time SFC, to pay for the tickets by personally writing "SFC fundraising" next to the charges for the tickets on his credit card account statement. He thereafter sold the tickets to a ticket broker for $18,000, making a profit of $7,950, and resulting in a total benefit to Defendant Schock of $18,000.

50. As part of the scheme and to conceal and cover it up, and only after the initiation of media scrutiny of his House and campaign expenditures and

23

after he had sold the tickets for a profit, Defendant Schock reimbursed SFC for the tickets by making an offsetting payment to his personal credit card the following month. He also failed to report the original expenditure by SFC on his disclosure reports to the FEC.

**Payment of Former Staffer's Legal Fees (and Reimbursement with Campaign Funds)**

51. In late 2013, Defendant Schock accused a former staffer of inappropriately accessing his friend's social media account and falsely advised the former staffer that the FBI and Capitol Police were investigating the matter. As a result of Defendant Schock's accusation and false representation of a law enforcement investigation, the former staffer retained legal counsel and incurred legal fees of more than $10,000, which were paid by the former staffer's father. Defendant Schock later acknowledged that his representation of a law enforcement investigation was false, and he agreed, after being confronted by the former staffer's father, to reimburse the staffer's father for $7,500 of the legal fees.

52. As part of the scheme, on or about February 23, 2014, Defendant Schock wrote a check in the amount of $7,500, payable to the former staffer's father for reimbursement of attorney's fees.

24

53. As part of the scheme, on or about April 21, 2014, Defendant Schock caused his Political Director to issue a check from Gen Y in the amount of $7,500 made payable to "Aaron J. Schock" to reimburse himself for the money he paid to the former staffer's father weeks earlier.

54. As part of the scheme, and to conceal and cover it up, Defendant Schock caused Gen Y to file a false report with the FEC, falsely reporting that the $7,500 payment to Defendant Schock was for payment to a Washington DC attorney for "PAC Legal Fees."

55. As part of the scheme, and to conceal and cover it up, Defendant Schock caused Gen Y to pay legal expenses that he personally incurred and to file additional false reports with the FEC, falsely reporting that the payment of such expenses was for "PAC Legal Fees."

**SFC Purchase of 2015 Chevrolet Tahoe**

56. As part of the scheme, Defendant Schock caused SFC to purchase a 2015 Chevrolet Tahoe titled in his name, resulting in an additional loss to SFC.

57. As part of the scheme, on or about July 18, 2014, Defendant Schock caused SFC to purchase for him a new 2015 Chevrolet Tahoe at a total cost to SFC of $73,896.96. To accomplish the purchase, Defendant Schock caused SFC to purchase the 2010 Tahoe from Defendant Schock for $31,621.99. He then caused

25

SFC to trade in the 2010 Tahoe with only a $26,000 used car or trade-in allowance and wrote a SFC check to the dealership for $73,896.96 for the entire purchase of the 2015 Tahoe, thus causing a loss to SFC. Despite this, Defendant Schock caused the 2015 Tahoe to be titled in the name of Aaron Schock.

58. As part of the scheme, and to conceal and cover it up, Defendant Schock caused SFC to file a false report with the FEC, falsely reporting that the entire $73,896.96 payment for the purchase of the 2015 Tahoe was for a "transportation expense" of SFC rather than for the purchase of a vehicle for the exclusive use of Defendant Schock.

59. As part of the scheme, and following the purchase of the 2015 Tahoe and during a period in which Defendant Schock no longer had a personal vehicle that he had actually paid for, he caused two additional and false mileage reimbursement claims to be submitted to and paid by the House for $1,150 and $1,218 and, as described previously, caused two additional mileage reimbursement claims to be submitted to and paid by SFC and Gen Y for $9,433.20 and $8,921.36. Defendant Schock did not reimburse SFC and Gen Y for either of these payments.

26

**2010 Apartment and Cannon Office Remodeling and 2014 Rayburn Office Remodeling**

60. Members of Congress are provided with a House office in Washington DC in one of the House office buildings (Cannon, Longworth, and Rayburn). Under the regulations in the Handbook, furniture, including rugs, carpet, draperies, repairs, etc. is supplied and maintained by the House CAO. In addition, only decorating expenses of "nominal value" are reimbursable by the MRA.

61. In 2010, Defendant Schock hired an Illinois decorator/designer to redecorate and provide furnishings for his Peoria apartment at a cost of approximately $31,723/96, including the installation of $2,200 in stereo equipment, and his Cannon office at a cost of approximately $21,737.07, for a total cost of approximately $53,455.03.

62. As part of the scheme, Defendant Schock caused the 2010 redecoration and furnishing of his apartment and Cannon office, but personally paid only $15,000 in total for such benefits. He further caused SFC to pay approximately $3,168 for travel expenses for the Illinois designer/decorator and $2,200 for stereo equipment, which was installed in his apartment.

27

63. In November 2014, Defendant Schock hired the same Illinois decorator/designer to redecorate and provide furnishings for his Rayburn office at a total cost of approximately $40,000, including the purchase of a $5,000 chandelier.

64. As part of the scheme, Defendant Schock caused the 2014 redecoration and furnishing of his Rayburn office, and caused vouchers and claims to be submitted to the House totaling $25,000 to be paid to the Illinois decorator/designer. As part of the submission of the vouchers and claims, Defendant Schock, through his Executive Assistant, made false representations that the claims were "for services to assist the member in setting up our district and DC offices" and "includes using materials from our district and rearranging/designing/structuring the space to best suit the member and staff's needs."

65. As part of the scheme, Defendant Schock caused his three Committees (SFC, SVC, and Gen Y) to pay a total of approximately $8,263 in additional costs relating to carpentry, paint, and travel and lodging expenses for the Illinois decorator/designer, who provided no product or service to these Committees.

28

66.     As part of the scheme, and in an attempt to conceal and cover it up, and immediately following the public disclosure of the office redecoration in early-February 2015, Defendant Schock requested a meeting with House officials, during which he falsely represented to them that his Executive Assistant should never have submitted the claims, and acknowledged that the redecoration/design expenses were "personal" expenses. He further asked the House officials if the payments to the Illinois decorator/designer would be disclosed to the public in the House Statement of Disbursements if he reimbursed the MRA.

**Fraudulent Bonuses/Mileage Reimbursements to House/Campaign Staff**

67.     As part of the scheme, Defendant Schock caused excess bonuses to be paid to Congressional and campaign staff members from House and campaign funds, some of which were in the form of false mileage reimbursement claims.

68.     In another instance, Defendant Schock caused a fraudulent bonus of $6,000 to be paid to his Chief of Staff in excess of that employee's pay limit by first causing the bonus to be paid to his Executive Assistant and then directing the Executive Assistant to divert the funds to Defendant Schock's Chief of Staff,

29

with whom Defendant Schock was living and to whom Defendant Schock owed money for rent.

## Misuse of and Theft of Funds from Payments to Government Travel Card and Theft of Campaign Funds

69. As part of the scheme, and specifically between November 2010 and January 2015, Defendant Schock repeatedly misused the government travel card and embezzled and caused the misapplication and conversion of federal funds from House payments to the government travel card through the payment of personal travel and other expenses for himself, including expenses for transporting himself for a haircut in Bethesda, Maryland, and to a workout facility in Miami Beach, Florida, and for a friend, and others, including his staffer/photographer and his District Chief of Staff and her husband.

70. As part of the scheme, Defendant Schock repeatedly embezzled and converted to his personal use campaign funds from SFC, SVC, and Gen Y to cover his personal travel, meal, lodging, and other expenses, including as much as $7,000 in travel expenses that he incurred following his resignation from Congress on March 31, 2015. As one example, he caused SFC to pay for various expenses while he attended the American Country Music Awards Show in Dallas, Texas, in April 2015, less than one month following his resignation.

71.     As a further part of the scheme, and to conceal and cover it up,

Defendant Schock caused his Committees to file false reports with the FEC,

falsely reporting the expenses as legitimate campaign expenses.

**Concealment**

72.     As part of the scheme, and to conceal and cover it up, Defendant

Schock generated income to himself, which he materially omitted from his

annual financial disclosure forms.

73.     As a result of his scheme, Defendant Schock caused a loss of more

than $100,000.

31

## IV. Executions of the Scheme

74.    On or about the dates listed below, in the Central District of Illinois

and elsewhere, for each count and as described below, and for the purpose of

executing and attempting to execute the above-described scheme to defraud and

to obtain money and property, the defendant,

### AARON J. SCHOCK,

knowingly caused the following writings, signs, signals and sounds to be

transmitted by means of wire communications in interstate commerce:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 1 (Wire Fraud) | January 21, 2012 | Interstate Wire Transfer of $1,292.85 to Schock's CEFCU account in Peoria for a mileage claim paid by the House |
| 2 (Wire Fraud) | July 9, 2012 | Interstate Wire Transfer of $1,428.00 to Schock's CEFCU account in Peoria for a mileage claim paid by the House |
| 3 (Wire Fraud) | September 9, 2013 | Interstate Wire Transfer of $1,925.00 to Schock's CEFCU account in Peoria for a mileage claim paid by the House |

32

| | | |
|---|---|---|
| 4 (Wire Fraud) | April 17, 2014 | Interstate Wire Transfer of $1,313.76 to Schock's CEFCU account in Peoria for a mileage claim paid by the House |
| 5 (Wire Fraud) | October 14, 2014 | Interstate Wire Transfer of $1,218.00 to Schock's CEFCU account in Peoria for a mileage claim paid by the House |
| 6 (Wire Fraud) | December 7, 2014 | SVC interstate electronic payment to Schock's American Express account for payment of November 2014 Chicago expenses |
| 7 (Wire Fraud) | February 3, 2014 | SVC interstate electronic payment to Schock's American Express account for purchase of 2014 Super Bowl tickets |
| 8 (Wire Fraud) | December 4, 2014 | House interstate payment of $15,000 to Illinois designer/decorator |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 9
## 18 U.S.C. § 1343
## (Wire Fraud)

1.      Paragraphs 1 through 74 of Counts 1 through 8 of this Indictment are re-alleged and incorporated herein by reference.

2.      Beginning in 2011, Defendant Schock hosted an annual "Congressman Aaron Schock Washington, DC Fly-In" in which constituents traveled to Washington, at their own expense, and attended various meetings with political leaders arranged by Defendant Schock and his staff. As part of the solicitation for the fly-in events, Defendant Schock publicly distributed an advertisement, in which he represented that fly-in participants would be charged a "Fly-in Conference Fee," which covered two days of events, meals, and program materials. At no time did Defendant Schock disclose to the public or fly-in participants that he intended to personally profit from the payment of excess registration fees.

3.      As part of administering the collection of registration fees and payment of fly-in expenses, Defendant Schock asked a friend to establish a bank account in Florida under the fictitious name of "Global Travel International." He then caused staff members to deposit fly-in funds into, and pay fly-in expenses out of, the account.

34

4. Following the June 2011 fly-in event, Defendant Schock, on or about September 9, 2011, caused $4,482.21 in excess fly-in event funds to be paid to him personally. In so doing, he violated the House Rules, which prohibited him from using his official position for personal gain and which required him to return any excess funds to the fly-in participants or donate such funds to charity. Defendant Schock also failed to disclose this additional income on his annual financial disclosure form.

5. In or about January 2014, after the Florida account was closed, Defendant Schock asked another friend in Illinois to utilize her account to administer receipt of fly-in fees and payment of fly-in expenses.

6. As part of the scheme, following the July 2014 fly-in event, Defendant Schock, on or about December 16, 2014, attempted to personally profit again from the fly-in event by submitting a false and fraudulent invoice in the amount of $11,000 for "Services Rendered" in the name of his limited liability corporation, Menards Peoria LLC, for payment from excess fly-in funds. In doing so, he directed that a check for $11,000 be mailed to him at his residence in Peoria.

35

7. On or about December 16, 2014, in the Central District of Illinois and elsewhere, for the purpose of executing and attempting to execute the above-described scheme to defraud and to obtain money and property, the defendant,

**AARON J. SCHOCK,**

knowingly caused writings, signs, signals and sounds to be transmitted by means of wire communications in interstate commerce, namely, Defendant Schock sent an interstate email communication containing an $11,000 false invoice and a request for payment of fly-in funds to be paid directly to him.

All in violation of Title 18, United States Code, Sections 1343 and 2.

36

## COUNT 10
## 18 U.S.C. § 1341
## (Mail Fraud)

1.      Paragraphs 1 through 74 of Counts 1 through 8 of this Indictment are re-alleged and incorporated herein by reference.

2.      On or about September 25, 2014, in the Central District of Illinois and elsewhere, for the purpose of executing and attempting to execute the above-described scheme to defraud and to obtain money and property, the defendant,

### AARON J. SCHOCK,

knowingly caused to be delivered by UPS, a private or commercial interstate carrier, according to the directions provided, a shipment/mailing, from B & H Photo in New York, to Defendant Schock's Congressional Office in Peoria, Illinois

All in violation of Title 18, United States Code, Sections 1341 and 2.

37

## COUNT 11
### 18 U.S.C. § 641
### (Theft of Government Funds)

1.      Paragraphs 1 through 74 of Counts 1 through 8 of this Indictment

are re-alleged and incorporated herein by reference.

2.      From in or about 2010, and continuing to on or about March 31,

2015, in the Central District of Illinois and elsewhere, the defendant,

## AARON J. SCHOCK,

did knowingly embezzle, steal, purloin, and convert to the use of another more

than $1,000 of money of the United States.

All in violation of Title 18, United States Code, Sections 641 and 2.

38

## COUNT 12
## 18 U.S.C. §§ 1001(a)(2), (c)(1)
## (False Statement)

1.    Paragraphs 1 through 74 of Counts 1 through 8 of this Indictment are re-alleged and incorporated herein by reference.

2.    On or about November 13, 2014, in the Central District of Illinois and elsewhere, the defendant,

## AARON J. SCHOCK,

did knowingly and willfully cause the making of a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the legislative branch of the Government of the United States, namely, an administrative matter and claim for payment in, and a document required by law, rule, or regulation to be submitted to, the U.S. House of Representatives and an office and officer thereof. Specifically, Defendant Schock caused the submission of a voucher for payment of $29,021.45 and accompanying invoice for payment to a staff member for "WEB DEV HST, EMAIL & RELTD SERV" when, in truth and fact, the expense was to reimburse Defendant Schock for the purchase of $29,021.45 in camera equipment.

All in violation of Title 18, United States Code, Sections 1001(a)(2), (c)(1), and 2.

39

## COUNT 13
## 18 U.S.C. §§ 1001(a)(2), (c)(1)
## (False Statement)

1.    Paragraphs 1 through 74 of Counts 1 through 8 of this Indictment
are re-alleged and incorporated herein by reference.

2.    On or about November 21, 2014, in the Central District of Illinois
and elsewhere, the defendant,

### AARON J. SCHOCK,

did knowingly and willfully cause the making of a materially false, fictitious, and
fraudulent statement and representation in a matter within the jurisdiction of the
legislative branch of the Government of the United States, namely, an
administrative matter and claim for payment in, and a document required by
law, rule, or regulation to be submitted to, the U.S. House of Representatives and
an office and officer thereof. Specifically, Defendant Schock caused the
submission of a voucher for payment of $15,000 and accompanying invoice for
payment to an Illinois designer/decorator for "NON-TECHNOLOGY SERVICE
CONTR" and the making of related oral and written statements when, in truth

and fact, the expense was to pay for Defendant Schock's personal expenses associated with the design and furnishing of his Rayburn Congressional office in Washington DC.

All in violation of Title 18, United States Code, Sections 1001(a)(2), (c)(1), and 2.

## COUNT 14
## 18 U.S.C. § 1519
## (Falsification of FEC filing)

1.    Paragraphs 1 through 74 of Counts 1 through 8 of this Indictment are re-alleged and incorporated herein by reference.

2.    On or about April 15, 2014, in the Central District of Illinois and elsewhere, the defendant,

## AARON J. SCHOCK,

knowingly caused one or more materially false entries to be made in the records of Schock Victory Committee and in a report filed with the FEC, with the intent to impede, obstruct, or influence the proper administration of a matter within the jurisdiction of the FEC and in relation to and contemplation of such matter, including the fact that Defendant Schock caused Schock Victory Committee's records and the FEC filing to falsely report that a payment of $10,025 to the NFL was a "JFC Event Tickets" expense of SVC, and that a payment of $3,861.92 was a "JFC Airfare" expense of SVC.

All in violation of Title 18, United States Code, Sections 1519 and 2.

42

## COUNT 15
## 18 U.S.C. § 1519
## (Falsification of FEC filing)

1.    Paragraphs 1 through 74 of Counts 1 through 8 of this Indictment are re-alleged and incorporated herein by reference.

2.    On or about May 20, 2014, in the Central District of Illinois and elsewhere, the defendant,

## AARON J. SCHOCK,

knowingly caused one or more materially false entries to be made in the records of GOP Generation Y Fund and in a report filed with the FEC, with the intent to impede, obstruct, or influence the proper administration of a matter within the jurisdiction of the FEC and in relation to and contemplation of such matter, including the fact that Defendant Schock caused GOP Generation Y Fund's records and the FEC filing to falsely report that a payment of \$7,500 to Defendant Schock and a Washington DC law firm was for a "PAC Legal Fees" expense of GOP Generation Y Fund.

All in violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT 16
### 18 U.S.C. § 1519
### (Falsification of FEC filing)

1. Paragraphs 1 through 74 of Counts 1 through 8 of this Indictment are re-alleged and incorporated herein by reference.

2. On or about August 14, 2014, in the Central District of Illinois and elsewhere, the defendant,

### AARON J. SCHOCK,

knowingly caused one or more materially false entries to be made in the records of Schock For Congress and in a report filed with the FEC, with the intent to impede, obstruct, or influence the proper administration of a matter within the jurisdiction of the FEC and in relation to and contemplation of such matter, including the fact that Defendant Schock caused Schock For Congress's records and the FEC filing to falsely report that a payment of $4,192.50 was a "Transportation" expense of Schock For Congress.

All in violation of Title 18, United States Code, Sections 1519 and 2.

44

## COUNT 17
## 18 U.S.C. § 1519
## (Falsification of FEC filing)

1. Paragraphs 1 through 74 of Counts 1 through 8 of this Indictment are re-alleged and incorporated herein by reference.

2. On or about October 15, 2014, in the Central District of Illinois and elsewhere, the defendant,

## AARON J. SCHOCK,

knowingly caused one or more materially false entries to be made in the records of Schock For Congress and in a report filed with the FEC, with the intent to impede, obstruct, or influence the proper administration of a matter within the jurisdiction of the FEC and in relation to and contemplation of such matter, including the fact that Defendant Schock caused Schock For Congress's records and the FEC filing to falsely report that a payment for the purchase of the 2015 Chevrolet Tahoe for Defendant Schock in the amount of $73,896.96 and the payment for a vehicle for his District Chief of Staff in the amount of $27,533.41 was a "transportation expense" of SFC, and that a payment to Defendant Schock in the amount of $9,433.20 was a "mileage reimbursement" expense of SFC.

All in violation of Title 18, United States Code, Sections 1519 and 2.

45

## COUNT 18
## 18 U.S.C. § 1519
## (Falsification of FEC filing)

1.    Paragraphs 1 through 74 of Counts 1 through 8 of this Indictment
are re-alleged and incorporated herein by reference.

2.    On or about October 20, 2014, in the Central District of Illinois and
elsewhere, the defendant,

## AARON J. SCHOCK,

knowingly caused one or more materially false entries to be made in the records
of GOP Generation Y Fund and in a report filed with the FEC, with the intent to
impede, obstruct, or influence the proper administration of a matter within the
jurisdiction of the FEC and in relation to and contemplation of such matter,
including the fact that Defendant Schock caused GOP Generation Y Fund's
records and the FEC filing to falsely report that a payment to him in the amount
of $8,921.36 was a "PAC mileage reimbursement" expense of GOP Generation Y
Fund.

All in violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT 19
## 26 U.S.C. § 7206(1)
## (Filing a False Federal Tax Return)

On or about July 30, 2012, in the Central District of Illinois and elsewhere, the defendant,

## AARON J. SCHOCK,

did willfully make and subscribe an Amended United States Individual Income Tax Return, Form 1040X, for the calendar year 2010, which return was verified by a written declaration that it was made under the penalties of perjury and which he did not believe to be true and correct as to every material matter. That income tax return, which was filed with the Internal Revenue Service, reported adjusted gross income of $153,707, as reported on line 1, when, as he then and there well knew. he received additional income that Defendant Schock failed to include on line 1, or report elsewhere on the return.

All in violation of Title 26, United States Code, Section 7206(1).

47

## COUNT 20
## 26 U.S.C. § 7206(1)
## (Filing a False Federal Tax Return)

On or about July 6, 2012, in the Central District of Illinois and elsewhere, the defendant,

## AARON J. SCHOCK,

did willfully make and subscribe a United States Individual Income Tax Return, Form 1040, for the calendar year 2011, which return was verified by a written declaration that it was made under the penalties of perjury and which he did not believe to be true and correct as to every material matter. That income tax return, which was filed with the Internal Revenue Service, reported total income of $153,335, as reported on line 22, when, as he then and there well knew, he received additional income that Defendant Schock failed to include on line 22, or report elsewhere on the return.

All in violation of Title 26, United States Code, Section 7206(1).

## COUNT 21
## 26 U.S.C. § 7206(1)
## (Filing a False Federal Tax Return)

On or about October 15, 2013, in the Central District of Illinois and elsewhere, the defendant,

## AARON J. SCHOCK,

did willfully make and subscribe a United States Individual Income Tax Return, Form 1040, for the calendar year 2012, which return was verified by a written declaration that it was made under the penalties of perjury and which he did not believe to be true and correct as to every material matter. That income tax return, which was filed with the Internal Revenue Service, reported total income of $152,762, as reported on line 22, when, as he then and there well knew, he received additional income that Defendant Schock failed to include on line 22, or report elsewhere on the return.

All in violation of Title 26, United States Code, Section 7206(1).

49

## COUNT 22
## 26 U.S.C. § 7206(1)
### (Filing a False Federal Tax Return)

On or about April 14, 2014, in the Central District of Illinois and elsewhere,

the defendant,

## AARON J. SCHOCK,

did willfully make and subscribe a United States Individual Income Tax Return,

Form 1040, for the calendar year 2013, which return was verified by a written

declaration that it was made under the penalties of perjury and which he did not

believe to be true and correct as to every material matter. That income tax return,

which was filed with the Internal Revenue Service, reported total income of

$181,238, as reported on line 22, when, as he then and there well knew, he

received additional income that Defendant Schock failed to include on line 22, or

report elsewhere on the return.

All in violation of Title 26, United States Code, Section 7206(1).

## COUNT 23
## 26 U.S.C. § 7206(1)
### (Filing a False Federal Tax Return)

On or about October 6, 2015, in the Central District of Illinois and elsewhere, the defendant,

### AARON J. SCHOCK,

did willfully make and subscribe a United States Individual Income Tax Return, Form 1040, for the calendar year 2014, which return was verified by a written declaration that it was made under the penalties of perjury and which he did not believe to be true and correct as to every material matter. That income tax return, which was filed with the Internal Revenue Service, reported total income of $188,619, as reported on line 22, when, as he then and there well knew, he received additional income that Defendant Schock failed to include on line 22, or report elsewhere on the return.

All in violation of Title 26, United States Code, Section 7206(1).

51

<u>**COUNT 24**</u>
**26 U.S.C. § 7206(1)**
**(Filing a False Federal Tax Return)**

On or about April 15, 2016, in the Central District of Illinois and elsewhere, the defendant,

**AARON J. SCHOCK,**

did wilfully make and subscribe a United States Individual Income Tax Return, Form 1040, for the calendar year 2015, which return was verified by a written declaration that it was made under the penalties of perjury and which he did not believe to be true and correct as to every material matter. That income tax return, which was filed with the Internal Revenue Service, reported total income of $142,771, as reported on line 22, when, as he then and there well knew, he received additional income that Defendant Schock failed to include on line 22, or report elsewhere on the return.

All in violation of Title 26, United States Code, Section 7206(1).

A TRUE BILL,
s/ Foreperson

s/ James A. Lewis

FOREPERSON

_____
JAMES A. LEWIS
UNITED STATES ATTORNEY
(TAB:PDH)