**E-FILED**
Tuesday, 28 March, 2017 05:04:00 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>AARON J. SCHOCK,<br><br>Defendant. | Case No. 16-cr-30061 |

**DEFENDANT AARON J. SCHOCK'S MEMORANDUM IN SUPPORT OF MOTION FOR DISCOVERY OF GRAND JURY MATERIALS**

COMES NOW Defendant Aaron J. Schock, by and through counsel, and respectfully submits this Memorandum in Support of his Motion for Discovery of Grand Jury Materials. For the reasons given below, disclosure is appropriate because grounds may exist to dismiss the Indictment based on matters that occurred before the grand jury.

**INTRODUCTION**

Under normal circumstances, a defendant is not entitled to recordings or transcripts of the prosecutor's legal instructions or other statements made to the grand jury outside the presence of a grand jury witness. But the circumstances in this case are anything but normal.

The charges in this case are built on a house of cards. At their base are allegations regarding the requirements for official reimbursements for official expenses of members of the U.S. House of Representatives and for how campaign expenses are routinely reported to the Federal Election Commission ("FEC"). These are not standards of conduct that have been delineated by a legislative body with the definiteness and precision that must attach to provisions of criminal law. Rather, they are, at best, akin to regulations, the terms of which are inherently subject to competing interpretation and debate. To craft an indictment, the government has, on top of these standards,

alleged that by failing to meet these underlying requirements Mr. Schock – knowingly and intentionally – committed fraud and false statement offenses.

If, as the defense has already seen evidence to indicate, the grand jury was – intentionally or not – misinformed or misled as to what those requirements are, the house of cards falls because the allegations of criminal law violations can only stand if supported by established underlying standards for the relevant reimbursements and reporting obligations. Indeed, even telling or suggesting to the grand jury that there are, in fact, hard and fast rules governing such reimbursements and reporting, when in truth there are none, would have great legal significance in this case.[1] By this motion, Mr. Schock submits both a predicate for and a request to be informed of what the grand jury was told of the "law" upon which the charging house of cards is built.

Examination of transcripts the government has produced to Mr. Schock of numerous witnesses before the grand jury reveals that the prosecutor either directly, or through government agent witnesses, made several statements during grand jury testimony that display a fundamental misunderstanding of House Rules, the House standards of conduct and federal campaign finance laws and regulations. As a result, though in the usual case the prosecutor's instructions to the grand jury are not fodder for discovery, they must be here, as there is a firm foundation for inquiry into whether the grand jury was erroneously instructed on the legal standards on which the Indictment is constructed.

Moreover, there is a factual basis for inquiry regarding whether the grand jury impermissibly considered the fact that Mr. Schock did not appear to testify. Following a grand

[1] Not the least significant would be a demonstration that the "rules" for MRA reimbursement and standards for FEC reporting are creations of the prosecutors, presenting what are inherently flexible and ambiguous requirements as if they were established mandates sufficient to provide the notice due process demands before criminal liability can be imposed.

juror's discharge after Mr. Schock was indicted, the juror spoke to an individual (unknown to the defense at the time of that conversation) and stated that the prosecutor informed the grand jury that it had asked Mr. Schock to appear. The grand juror further told this individual that Mr. Schock had never shown up. This information raises at least two very serious concerns: First, were the grand jurors appropriately instructed that they could not draw any adverse inference from Mr. Schock's decision to exercise his Fifth Amendment rights? Second, even assuming for the sake of argument that they were so instructed, the grand juror's statements raises the risk that the grand jury nevertheless impermissibly considered Mr. Schock's decision not to testify.[2]

For these reasons, Mr. Schock moves this Court to order the disclosure of those portions of the second grand jury's instructions specified in his Motion. In the alternative, Mr. Schock requests that the Court review those materials *in camera* and disclose to Mr. Schock any materials that could support a motion to dismiss the Indictment.

## ARGUMENT

### I. Mr. Schock May Obtain Disclosure of the Grand Jury Colloquies to Determine Whether a Ground Exists to Dismiss the Indictment

Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) provides that the Court may order disclosure of materials otherwise protected by grand jury secrecy where a criminal defendant "shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." In order to obtain grand jury materials, a defendant must demonstrate "a 'compelling necessity' or 'a particularized need.'" *United States v. Lisinski*, 728 F.2d 887, 893

[2] As discussed further below, Mr. Schock's counsel have been mindful not to question a grand juror about grand jury proceedings. Accordingly, Mr. Schock's counsel secured an affidavit from the individual who heard this statement from the grand juror. The information is of necessity second-hand at this point but Mr. Schock respectfully submits that the information is such that it merits further inquiry by the Court and relief as requested herein.

(7th Cir. 1984) (quoting *Matter of Grand Jury Proceedings, Miller Brewing Co.*, 687 F.2d 1079, 1088 (7th Cir. 1982)); *see also United States v. Puglia*, 8 F.3d 478, 480 (7th Cir. 1993). A defendant satisfies his burden under Rule 6(e)(3)(E)(ii) by showing "that the information 'is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that the request is structured to cover only material so needed.'" *United States v. Campbell*, 324 F.3d 497, 489-99 (7th Cir. 2003) (quoting *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211 (1979)). These factors operate on a sliding scale; "as secrecy considerations become less relevant, so too does the burden lessen." *West v. United States*, No. 08 CR 669, 2010 WL 1408926 at *3 (N.D. Ill. Apr. 5, 2010).

A defendant demonstrates that the grand jury materials are necessary to avoid a possible injustice by showing that grounds may exist to dismiss the indictment. *West*, 2010 WL at *4. "Where the defendant seeks disclosure based on alleged prosecutorial misconduct before the grand jury, he must show that the alleged misconduct would compel dismissal of the indictment." *United States v. Buske*, No. 09-CR-65, 2010 WL 3023364 at *2 (E.D. Wis. July 29, 2010). "As part of its supervisory powers, a federal court may dismiss an indictment where the function of the grand jury has been impaired by unfair or improper prosecutorial conduct." *United States v. Perez-Reyes*, 753 F. Supp. 723, 725 (N.D. Ill. 1990); *see United States v. Breslin*, 916 F. Supp. 438, 442, 446 (E.D. Pa. 1996) (dismissing indictment based on "cumulative effect" of misconduct discovered in grand jury colloquies). In determining whether the function of the grand jury has been impaired, the question is whether "the circumstances 'significantly infringed on the ability of the grand jury to exercise independent judgment.'" *United States v. Lamantia*, 59 F.3d 705, 707 (7th Cir. 1995) (quoting *United States v. Edmonson*, 962 F.2d 1535, 1539 (10th Cir. 1992)). Prosecutorial misconduct before the grand jury warrants dismissal of the indictment where the misconduct

prejudices the defendant, which is demonstrated by a showing that the misconduct either "substantially influenced the grand jury's decision to indict" or prompts "grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988).

A prosecutor's failure to properly instruct the grand jury on a pertinent point of law may warrant dismissal of an indictment for prejudicial misconduct. "As a legal advisor to the grand jury, the prosecutor must give the grand jury sufficient information concerning the relevant law 'to enable it intelligently to decide whether a crime has been committed.'" *United States v. Twersky*, No. S2 92 Cr. 1082 (SWK), 1994 WL 319367 at *4 (S.D.N.Y. June 29, 1994) (quoting *People v. Calbud, Inc.*, 402 N.E.2d 1140, 1143 (N.Y. 1980)). "[W]here a prosecutor's legal instruction to the grand jury seriously misstates the applicable law, the indictment is subject to dismissal if the misstatement casts 'grave doubt that the decision to indict was free from the substantial influence' of the erroneous instruction." *United States v. Stevens*, 771 F. Supp. 2d 556, 567 (D. Md. 2011) (quoting *United States v. Peralta*, 763 F. Supp. 14, 21 (S.D.N.Y. 1991) (dismissing indictment for "misleading statements of law")); *see also United States v. Anderson*, 61 F.3d 1290, 1296-97 (7th Cir. 1995) (weighing claim that prosecutor's instruction to grand jury "had the effect of misinforming the jury on the applicable law").

## II. The Prosecutor Repeatedly Misstated Rules of Law Before the Grand Jury Through Questioning of Fact Witnesses, Including in Agent Testimony

The government has to date provided Mr. Schock with various transcripts of witness testimony before the two grand juries that considered charges against Mr. Schock. Review of these transcripts confirm that the prosecutor often deferred legal questions that arose during witness testimony until after the witness was excused. *See, e.g.*, Transcript of Testimony of Kimberly Edge at 138-39 (GJ_TRANSCRIPT_00009645-46), Transcript of Testimony of David Harmon at

25-27 (GJ_TRANSCRIPT_00000101-103). This is not unusual of course; Mr. Schock references it here because it supports the conclusion – consistent with usual practice – that the prosecutor provided legal instruction to the grand jury outside the presence of witnesses.

Examination of the transcripts of witness testimony, however, reveals that the prosecutor misstated legal or other allegedly pertinent standards at various points in the grand jury. As a preliminary matter, before addressing these misstatements specifically, Mr. Schock notes that the Indictment charges him in various counts with criminal offenses found in Title 18. But the Indictment repeatedly references in its introductory allegations and elsewhere certain provisions of the House Rules, the House Ethics Manual, and FEC requirements. Thus, the *prosecution* has asserted the relevance of these additional materials to the case; it presumably instructed the grand jury about them; and the indictment returned in fact references them repeatedly.[3]

### A. Erroneous Legal Statements by the Prosecutor Regarding Permissible Uses of Campaign Funds

The Indictment charges Mr. Schock with a scheme to defraud his campaign committees, including his leadership PAC, by converting campaign funds to his personal use. These allegations are in turn premised on how the prosecutor interpreted the relevant provisions of the Federal Election Campaign Act ("FECA") regarding what constitutes personal use. Indictment at 11. Thus, any misstatement of the law by the prosecutor on these points is clearly central to the actual charges the grand jury returned in the Indictment. *See* Indictment at 11 (alleging as a goal of the scheme the conversion of funds from campaign committees to Mr. Schock's direct personal

[3] Mr. Schock does not concede that the House Rules, the House Ethics Manual, or FEC standards (or any other non-Title 18 source cited in the indictment) are appropriately referenced or relied on in the Indictment. Whether or not these sources were appropriate for inclusion in the Indictment is not the issue for this Motion; the issue for this Motion is that *if* the government intended to rely on these sources in its Indictment and corresponding instructions to the grand jury, it was at least incumbent on the government to describe them accurately.

benefit.”).[4] As specified below, the prosecutor made misstatements of the law on this topic in the course of questioning witnesses in the grand jury. Mr. Schock is entitled to know what legal instructions the prosecutor gave the grand jury regarding the line between permissible and impermissible uses of campaign funds.

The prosecutor’s questioning of Karen Haney, Mr. Schock’s campaign manager, and Kimberly Edge, an FBI analyst, illustrates the inaccurate picture of the law that the prosecutor provided to the grand jury.

**1. Testimony of Karen Haney**

In Ms. Haney’s testimony, the prosecutor asked her if she knew what the “irrespective test” was. Transcript of Testimony of Karen Haney at 33 (GJ_TRANSCRIPT_00004040). That test is used by the FEC to determine whether a given expense is related to a candidate’s official duties or their campaign. Ms. Haney admitted that she did not. *Id.* The prosecutor then went on to summarize the test, but did so in a way that sent a misleading message to the grand jury. The prosecutor asserted:

> “The irrespective test is that if you have an expense that you would have incurred irrespective of whether or not you’re a member of Congress, that’s a personal expense.” *Id.* The prosecutor then, after a pause, altered that statement by asserting “it could likely be a personal expense.” *Id.*

As an example, the prosecutor stated that if there was a fundraising event at a ski resort, unless the fundraiser “was on the ski lift as we were going up to the top of the mountain,” the expenses could be considered personal use. *Id.* at 34 (GJ_TRANSCRIPT_00004041). Ms. Haney resisted the prosecutor’s characterization, leading the prosecutor to repeatedly cut off her attempts to answer. *Id.* The prosecutor cited to the FEC’s Campaign Guide, noting that it listed

[4] That scheme is an essential element of Counts 1-10. The Indictment also alleges in Counts 12-13 that Mr. Schock took funds for his own personal use.

particular items as per se personal use expenses, and then asked Ms. Haney if she could "identify anything specifically within the federal election law or its regulations . . . that would justify buying ski lift tickets with campaign funds." *Id.* at 45 (GJ_TRANSCRIPT_00004052). Ms. Haney attempted to answer, but was immediately cut off by the prosecutor demanding she cite chapter and verse. *Id.* Ms. Haney eventually stated she believed the purchase could be justified if the tickets were purchased as part of a fundraiser. *Id.* The prosecutor was incorrect, and as explained below Mr. Haney was correct.

**2. Testimony of Kimberly Edge**

The prosecutor used the testimony of FBI Analyst Edge, who was not an attorney or expert, to state the basics of campaign finance law and to reiterate to the grand jury its position as to how the "irrespective of" test should be applied. The prosecutor again summarized the "irrespective of" test for the grand jury, and Analyst Edge, this time asserting that "[u]nder the irrespective test, personal use is any use of funds in a campaign account of a candidate or former candidate to fulfill a commitment, obligation, or expense of any person that would exist irrespective of the candidate's campaign or responsibilities as a federal officeholder." Tr. of the Testimony of Kimberly Edge at 49 (GJ_TRANSCRIPT_00009556). The prosecutor then applied this test to Mr. Schock's legal fees, stating that a "candidate can use campaign funds to pay legal fees so long as those legal fees involve a matter arising out of his status as a congressman." *Id.* at 133 (GJ_TRANSCRIPT_00009640). The prosecutor asked Analyst Edge a specific question: whether legal fees paid to a law firm for a matter involving a dispute with Mr. Schock's former staffer were personal use. *Id.* Analyst Edge testified that yes, those fees were separate from payment of legal fees arising from Mr. Schock's Congressional position, and that "the argument could be made that the . . . legal fees would exist because that was a personal matter that really didn't arise from his

candidacy at all." *Id.* Analyst Edge then stated that those legal fees had been represented as belonging to Mr. Schock's leadership PAC, Gen Y.[5] *Id.*

The prosecutor had previously questioned Analyst Edge about a particular kind of campaign committee, the leadership PAC. The prosecutor suggested that there was no prohibition on using leadership PAC funds for personal use, but Analyst Edge testified that "there have been things said in print that" leadership PAC funds cannot be used for personal use, but that the FEC may have taken a contrary position. *Id.* at 17 (GJ_TRANSCRIPT_00009524). Rather than correcting Analyst Edge or providing a definitive instruction, the prosecutor elicited testimony that leadership PACs still have to file truthful reports with the FEC. *Id.*

### 3. The Prosecutor's Statement of the Law was Erroneous

The prosecutor's definition of the "irrespective of" test shifted between the testimony of Ms. Haney and Analyst Edge, and the examples of its application were erroneous. The fundamental principle underlying campaign finance law is that "candidates have wide discretion over the use of campaign funds." Final Rule: Expenditures; Reports by Political Committees; Personal Use of Campaign Funds, 60 Fed. Reg. 7,862, 7,867 (Feb. 9, 1995) ("Final Rule"). The prosecutor was correct that FECA prohibits the use of campaign funds for personal use, 52 U.S.C. § 30114(b)(1), and enumerates a category of expenses that are personal use per se. *Id.* at § 30114(b)(2). The FEC has also adopted the "irrespective of" test in its regulations. 11 C.F.R. § 113.1(g). However, those regulations also state that the FEC will determine "on a case-by-case basis" whether any expenses that are not per se personal use are nevertheless impermissible. *Id.*

[5] Count 15 of the Indictment alleges that Gen Y reported this expense to the FEC as "PAC Legal Fees." Indictment at 43. This disclosure accurately reports that Gen Y paid legal fees. Moreover, as will be explained below, there was no personal use restriction on these funds and, even if there was, the payment of legal fees for a dispute with a former staff member is not personal use *per se* and would not have arisen in the absence of Mr. Schock's status as a Member of Congress.

at § 113.1(g)(ii). Thus, outside of the category of per se personal use expenses (it is undisputed that these categories are not at issue in this case), there is no bright line rule as to whether an expense is personal or permissible. As a result of the prosecutor's conflicting and misleading instructions, Mr. Schock is entitled to information relevant to whether the grand jury understood the complex web of statutes, regulations, and guidance that governed its decision to indict him. The prosecutor's characterizations of the law in its questioning veered between a bright line rule and the position that it was "possible" that a given expense was impermissible.

The prosecutor's view that items like ski tickets cannot be legitimate campaign expenses was dead wrong. Ms. Haney was correct on the law, whereas it is apparent throughout the investigation and grand jury proceedings that the prosecutor proceeded on the erroneous basis that there must be active fundraising or the like for something to be an event the expenses for which can be legitimately expended as a campaign committee expense. The relevant provisions are far more expansive than that in making allowance for campaign expenditures. In adopting its regulations governing the permissible use of campaign funds, the FEC explicitly rejected an approach that would require it to "draw conclusions as to which relationship [personal or campaign related] is more direct or significant." Final Rule: Expenditures; Reports by Political Committees; Personal Use of Campaign Funds, 60 Fed. Reg. 7,862, 7,864 (Feb. 9, 1995). The FEC has been "reluctant to make these kinds of subjective determinations," and therefore adopted a rule in order to "reduce piecemeal resolution of personal use issues and . . . provide more prospective guidance to the regulated community." *Id.* Thus, the FEC rejected an approach that would require an "explicit solicitation of contributions" or that guests be present for an entertainment expense to be permitted under FECA. *Id.* at 7,866. Instead, the FEC stated that "the rules do not require an explicit solicitation of contributions or make distinctions based on who participates in the activity."

*Id.* The FEC declined to adopt a more restrictive rule along the lines of the government's apparent view of campaign finance law, because it would constitute "a significant intrusion into how candidates and officeholders conduct campaign business." *Id.*[6] Thus, Ms. Haney was correct and the prosecutor was wrong. The prosecutor's subsequent questioning of Analyst Edge reinforced this error.

Analyst Edge's testimony, supported by the prosecutor's questioning, was also misleading regarding whether Mr. Schock could use his campaign funds for legal fees. The grand jury was properly instructed that campaign funds may be used to pay for legal fees, and for the ordinary and necessary expenses incurred in connection with a Congressman's office. *See* 52 U.S.C. § 30114(a)(2); 11 C.F.R. § 113.1(g)(ii)(A); Final Rule, 60 Fed. Reg. at 7,868. Among those expenses that the FEC has recognized as permissible are legal fees that a committee incurs as an employer of its staff. Final Rule, 60 Fed. Reg. at 7,868. There is no basis for concluding that such a rule would not apply to legal fees incurred by the Congressman as an employer of his staff. In addition, FEC regulations specifically provide that campaign funds may be expended in connection

---

[6] As an example, in 2014, Friends of Dick Durbin spent over $10,000 on NHL tickets for fundraisers. Friends of Dick Durbin Committee, Year-End Report of Receipts and Disbursements, Itemized Disbursements (Nov. 25, 2014 and Dec. 19, 2014). The Steve Israel for Congress Committee spent $15,000 at Madison Square Garden for "Catering, Facility Rental & Fundraising Event Tickets." Steve Israel for Congress Committee, Year-End Report of Receipts and Disbursements, Itemized Disbursements (Dec. 22, 2014). Walden for Congress paid $400 to the Deer Valley Resort in Park City, Utah for event tickets. Walden for Congress, July Quarterly Report of Receipt and Disbursements, Itemized Disbursements (Apr. 5, 2013). Tim D'Annunzio for Congress spent $680 on skydiving tickets, and it is unlikely that he solicited campaign contributions during his descent to the earth. Tim D'Annunzio for Congress, October Quarterly Report of Receipts and Disbursements, Itemized Disbursements (Sept. 15, 2012). More pertinent to the prosecutor's example, the Collins for Congress committee paid $640 for lift tickets in 2014, and the Mary Bono Mack Committee paid $1,517 for lift tickets in 2007. *See* Collins for Congress, April Quarterly Report of Receipts and Disbursements, Itemized Disbursements (Jan. 10, 2016); Mary Bono Mack Committee, April Quarterly Report of Receipts and Disbursements, Itemized Disbursements (January 11, 2007).

with the candidate's "duties as a Federal officeholder." 11 C.F.R. § 113.1(g)(ii). The FEC has interpreted these rules to permit campaign funds to be used for the legal expenses of Congressional staffers. *See* Visclosky for Congress Advisory Opinion, AO 2009-20, 2009 WL 2850351 at *2 (FEC Aug. 28, 2009). There is nothing in the "irrespective of" test that would exclude legal fees incurred in a dispute with a former staffer from being related to Mr. Schock's duties as a federal officeholder; but for his status as Member of Congress, Mr. Schock would not have come into conflict with his former staffer. Thus, Analyst Edge's categorical statement that the legal expenses at issue were separate from Mr. Schock's Congressional duties was just plain wrong as well as misleading as to the law, even with the qualification. Mr. Schock is entitled to know the ultimate instruction the prosecutor gave to the grand jury.

The prosecutor, through witness testimony, also misled the grand jury as to whether a leadership PAC could expend funds for personal use. Specifically, Analyst Edge stated "there have been things said in print that they can't" (what "print" is unclear), while allowing that the FEC might take a different approach. Tr. of the Testimony of Kimberly Edge at 17, (GJ_TRANSCRIPT_00009524). Indeed, the FEC has unequivocally stated that, although the FECA prohibits a candidate or his authorized committee from using campaign funds for personal use, "no corresponding provision covers individuals who convert contributions received by . . . leadership PACs . . . to their own personal use." FEC, Legislative Recommendation of the Federal Election Commission 2013, 12 (Dec. 17, 2013). The agent's testimony, if uncorrected by the prosecutor, and particularly if supported by the prosecutor in his instructions to the grand jury, suggested to the grand jury that the transaction, which is charged in the Indictment, was illegal when in fact it was not.

### B. Erroneous Legal Statements Regarding the Fly-In Count

The prosecutor also misstated the law in a manner that was highly prejudicial in its extended grand jury questioning of Agent James Peacock regarding Mr. Schock's "Fly-In" conference. Mr. Schock is charged in Count 9 of the Indictment with allegedly submitting a false invoice and directing that funds left over from the Fly-In's budget be sent to him. Indictment at 34-36. Although the Indictment alleged that Mr. Schock violated the House's rules, as with the counts related to Mr. Schock's campaign committees, the actual charge against Mr. Schock is fraud. *Id.* Nevertheless, the inescapable conclusion from the transcript of the proceedings is that the prosecutor instructed the grand jury that it could conclude Mr. Schock's conduct was illegal because it allegedly violated House rules.

One set of rules the prosecutor cited was the Ethics Manual, which provides guidance regarding how Members should treat excess registration fees charged for an event. Transcript of Testimony of James Peacock at 13 (GJ_TRANSCRIPT_00010613); Committee on Standards of Official Conduct, House Ethics Manual 343-44 (2008) ("Ethics Manual"). Although the prosecutor accurately labeled the Ethics Manual as "guidance" early on in its questioning, *id.*, the prosecutor went on to elicit extended testimony and quotations from the Ethics Manual that clearly gave the impression to the grand jury that the Ethics Manual is a set of rules that are binding on Mr. Schock. It is not. Unlike the actual House Rules, for violation of which a Member may disciplined, the Manual is a self-designated "educational resource to assist" Members. Ethics Manual, Preface.

Nonetheless, the prosecutor directed Agent Peacock to quote from or discuss his interpretation of the Ethics Manual for three pages of grand jury testimony. Transcript of Testimony of James Peacock at 13-15 (GJ_TRANSCRIPT_00010613-15). Moreover, the

prosecutor's leading questions repeatedly suggested that the Ethics Manual bound Mr. Schock: "And Page 344 of the ethics manual twice tells the member . . . that any surplus generated from the operation of such an account must be – must be returned or donated to charity; is that right?" *Id.* at 15 (GJ_TRANSCRIPT_000106125). It is understandable that the prosecutor relied on the Ethics Manual so heavily, for it is apparently the only document the prosecutor could find that discusses registration fees. Yet the Ethics Manual is not a rule that bound Mr. Schock and the prosecutor misstated the law by suggesting to the contrary.

The other document that the prosecutor emphasized in this colloquy was the Member's Congressional Handbook ("Handbook"). *See, e.g., id.* at 11 (GJ_TRANSCRIPT_00010611). However, the Handbook does not prescribe rules that govern the conduct related to the Fly-In. The Handbook only applies to a Member's use of the Member's Representational Allowance ("MRA"). The Indictment does not allege, and there is no dispute on this point, that Mr. Schock used his MRA funds in connection with the Fly-In or any reimbursements related to the event. Therefore, the prosecutor again misstated the law by quoting from the Handbook and suggesting that Mr. Schock violated it.

Mr. Schock's concern with the prosecutor's instruction to the grand jury is not idle. This is not a case where a prosecutor's legal instruction on an ancillary point could be wrong but the charge itself would remain unaffected. Count 9 does not disclose any apparent theory of fraud (which is the actual charge) other than that Mr. Schock violated the House Ethics Manual or the Handbook. This case is highly unusual in that so much of the Indictment is dependent on alleged standards supplied by sources outside Title 18; indeed, the sources of law are largely standards of the prosecutor's creation. But, since the government chose to fashion its indictment in this manner,

it has made its legal instructions to the grand jury on these matters relevant and discoverable in light of the firm basis to believe the grand jury was wrongly instructed on these points.

## III. The Prosecutor's Instructions Related to Mr. Schock's Right not to Testify

Mr. Schock was entitled to invoke his Fifth Amendment right not to testify before the grand jury, and no adverse inference about guilt could be drawn from Mr. Schock's exercise of that Fifth Amendment right. *See United States v. Picketts*, 655 F.2d 837, 842 (7th Cir. 1981). Mr. Schock in fact invoked this right in the face of a grand jury subpoena. Needless to say, Mr. Schock did not appear before the grand jury to offer his testimony. Nevertheless, Mr. Schock has become aware of evidence that the prosecutor told the grand jury that he had asked Mr. Schock to appear, and that at least one grand juror then noted that Mr. Schock did not appear. This evidence comes in the form of an affidavit executed and attached hereto by an individual who heard a grand juror describe these matters after the grand jury returned its Indictment. Ex. A.

A prosecutor's commentary on a defendant's invocation of that right may be grounds for dismissal, because such comments are "an impermissible attempt to infringe on the ability of the grand jury to exercise its own independent judgment in determining whether there was probable cause." *United States v. Lopez-Gutierrez,* 83 F.3d 1235, 1246 (10th Cir. 1996); *see United States v. Slough*, 679 F. Supp. 2d 55, 62 (D.D.C. 2010) (noting that "gratuitous remarks about the defendants' failure to appear before the grand jury . . . may have justified dismissal of the indictment"). In the same vein, a prosecutor may not "harangu[e]" a "witness concerning his invocation of the fifth amendment." *United States v. Duff*, 529 F. Supp. 148, 155 (N.D. Ill. 1981).

The affidavit provided to Mr. Schock raises a substantial question of what the grand jurors were told by the prosecutor regarding Mr. Schock's decision not to testify. The context of the grand juror's statement indicates that the grand jury may have considered Mr. Schock's decision

not to appear before the grand jury as evidence of his guilt. Even if the prosecutor did not explicitly draw that inference, a failure to properly instruct the jury regarding its duty *not* to draw that inference could have invited the same impermissible inference. Imagine if at trial a prosecutor stated in closing to the jury that "you know, the defendant had an absolute right to testify in this trial" (a true statement) and then left it for the jurors to reflect on the fact that the defendant had not testified. Such a statement would not be countenanced at trial, and it cannot be countenanced before the grand jury, which is *fully reliant on the prosecutor to instruct it as to the law*. If a grand jury's decision to indict was affected by the defendant's exercise of his Fifth Amendment rights, that is certainly grounds for dismissal of the Indictment. Therefore, Mr. Schock is entitled to the disclosure of the grand jury colloquies to determine precisely what the prosecutor said with respect to the exercise of his Fifth Amendment rights.

## IV. Mr. Schock's Narrowly-Tailored Request and Demonstration of Need Overcomes the Interest in Continued Secrecy

The grounds identified above are sufficient for this Court to authorize the disclosure of matters occurring before the grand jury. A request for access to grand jury materials under Rule 6(e)(3)(C)(ii) should be structured "to cover only the material purportedly needed" to substantiate the ground to dismiss the indictment. *United States v. Balogun*, 971 F. Supp. 1215, 1232 (N.D. Ill. 1997). The rule does not permit "a general fishing expedition into the grand jury proceedings." *Id.* Mr. Schock's request is narrowly tailored and focused on the potentially prejudicial misconduct that occurred before the grand jury. This narrow request is sufficient to warrant disclosure, especially given that the interests in grand jury secrecy, while remaining in force, have been diminished by the conclusion of the grand jury and the production of the transcripts of testimony before the grand jury.

The Supreme Court has identified a number of reasons for grand jury secrecy:

> (1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before the grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no possibility of guilt.

*Douglas Oil Co. of Cal.*, 441 U.S. at 219 n.10 (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681-82 n.6 (1958)) (alteration omitted). Further, "[t]he need for grand jury secrecy is diminished once the grand jury has fulfilled its duties." *United States v. Burge*, No. 08 CR 846, 2014 WL 201833 at *3 (N.D. Ill. Jan. 17, 2014).

Now that the grand jury has returned its Indictment, significant proceedings before the grand jury have already been disclosed to the defense, and in light of Mr. Schock's demonstrated need for grand jury materials, grand jury secrecy may be lifted in connection with Mr. Schock's request. That request is narrowly tailored and will not reveal the identity of the grand jurors; the request is aimed solely at the conduct of the prosecutor before the grand jury. The disclosure of colloquies between the prosecutor and the grand jury, with a focus on the prosecutor's legal instructions to the grand jury, could not impair the grand jury's investigative function because those colloquies do not implicate witness testimony or the anonymity of the grand jurors. Further, any materials produced would be subject to this Court's protective order. *See* Protective Order, Jan. 25, 2017, ECF No. 51. Mr. Schock also notes that the government has already turned over substantial grand jury materials to the defense, including transcripts of the proceedings, so any impact of the additional disclosure of the prosecutor's colloquies with the grand jurors would have on grand jury secrecy would be marginal, at most. *See West*, 2010 WL at *5 (noting that the need

for secrecy was "diminished given that the district judge already allowed the disclosure" of a witness's testimony). Indeed, the only "interest" protected by withholding the colloquies is the government's interest in avoiding scrutiny of its conduct before the grand jury.

## CONCLUSION

For the reasons stated above, Aaron J. Schock respectfully requests that the Court grant his Motion. In the alternative, Mr. Schock respectfully requests that the Court conduct an *in camera* review of the grand jury materials.

Dated: March 28, 2017

Respectfully submitted,

*/s/ George J. Terwilliger III*

George J. Terwilliger III
Robert J. Bittman
Benjamin L. Hatch
Nicholas B. Lewis
**MCGUIREWOODS LLP**
2001 K Street N.W., Suite 400
Washington, D.C. 20006-1040
Tel: 202.857.2473
Fax: 202.828.2965
Email: gterwilliger@mcguirewoods.com

*/s/ Christina M. Egan*

Christina M. Egan
**MCGUIREWOODS LLP**
77 West Wacker Drive
Suite 4100
Chicago, IL 60601-1818
Tel: 312.750.8644
Fax: 312.698.4502
Email: cegan@mcguirewoods.com

*/s/ Jeffrey B. Lang*

Jeffrey B. Lang
**LANE & WATERMAN LLP**
220 N. Main Street, Suite 600
Davenport, Iowa 52801-1987
Tel: 563.333.6647
Fax: 563.324.1616
Email: jlang@L-WLaw.com

*Counsel for Aaron J. Schock*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record at their respective email addresses disclosed on the pleadings on this 28th day of March, 2017.

*/s/ George J. Terwilliger*

George J. Terwilliger