E-FILED
Tuesday, 01 August, 2017  02:36:00 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 16-cr-30061 |
| | ) | |
| AARON J. SCHOCK, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT AARON J. SCHOCK'S MEMORANDUM IN SUPPORT OF HIS
MOTION TO DISMISS THE INDICTMENT FOR PROSECUTORIAL MISCONDUCT
OR, IN THE ALTERNATIVE, TO BAR THE USE OF EVIDENCE TAINTED BY
<u>MISCONDUCT</u>**

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

RELEVANT BACKGROUND .......................................................................... 3

ARGUMENT ....................................................................................................... 6

I.    Legal Standards ............................................................................................. 9

    A.    Dismissal of indictments for misconduct is rare, but critical to preserving the grand jury's constitutional purpose when necessary ........................................ 9

    B.    When weighing the effect of misconduct on the grand jury's independence, the Court should consider the cumulative, prejudicial effects of that misconduct ................................................................................... 16

    C.    Violations of a defendant's Fifth and Sixth Amendment Rights warrants suppression of evidence derived from the government's misconduct ................ 18

II.    The Prosecutor Routinely Misstated or Omitted Material Facts, and Misstated the Law, to the Grand Jury and Witnesses, Tainting Both. .................................................. 20

    A.    The knowing provision of false or misleading evidence constitutes actionable prosecutorial misconduct ....................................................... 21

    B.    The government in this case has combined both avenues of misrepresentation to mislead the grand jury. ..................................... 24

        1.    The prosecutor systematically intimidated Karen Haney and presented her with false facts which materially influenced her grand jury testimony ................................................................ 26

            a.    The prosecutor misled Ms. Haney and the grand jury about Mr. Schock's bank statements in a faulty attempt to demonstrate intent regarding deposit of Super Bowl ticket proceeds ......................................................... 30

            b.    The prosecutor falsely told Ms. Haney that Mr. Schock had "caused" Schock for Congress to pay off his vehicle loan balance despite the government's knowledge that the car dealership had already explained it was their mistake ................ 36

            c.    The government has taken numerous actions that have had the effect of intimidating Ms. Haney, which steps, combined with the other misconduct in regard to her as a witness, improperly influenced her testimony ............................. 41

            d.    Perfecting the influence on the witness's testimony: after intimidating and providing Ms. Haney with false, negative information about Mr. Schock, the government sought to establish that her opinion of Mr. Schock had changed ............... 47

i

2.      The prosecutor threatened Sarah Rogers, provided her with false facts, and misled her on the law................................................................ 48

    a.    The government subjected Ms. Rogers to hostile grand jury appearances instead of proffer sessions because the prosecutor did not want her attorney to participate .................... 48

    b.    Ms. Rogers provided exculpatory evidence regarding Mr. Schock, which was met by the prosecutor's dismissiveness ....... 51

    c.    The prosecutor threatened Ms. Rogers with obstruction of justice because of her confusion about his questions.................. 55

    d.    The prosecutor presented Ms. Rogers with false facts that impugned Mr. Schock................................................................ 58

    e.    Mr. Bass misled Ms. Rogers regarding campaign finance laws in a manner that cast doubt on permissible conduct........... 61

    f.    Mr. Bass concluded his dealings with Ms. Rogers by planting a seed that she would be blamed for conduct at issue here................................................................................ 64

3.      Mr. Bass similarly misled other witnesses or provided witnesses with negative information about Mr. Schock outside of their knowledge. ............................................................................... 65

C.    Mr. Schock was prejudiced as a result of the government's misconduct before the grand jury ............................................................................... 68

1.      The prosecutor deliberately misled the grand jury as to the most crucial element in this case: Mr. Schock's intent .................................... 69

2.      The prosecutor intimidated and harassed witnesses ............................. 72

3.      The cumulative effect of the prosecutor's misconduct warrants dismissal, and has tainted favorable witnesses for trial .......................... 73

III.    The Prosecutor and Federal Agents Have Repeatedly Asked Irrelevant and Highly-Invasive Questions about Mr. Schock's Sexual Orientation and Relationships........................................................................................................ 76

CONCLUSION............................................................................................................. 83

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 16-cr-30061 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| AARON J. SCHOCK, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT AARON J. SCHOCK'S MEMORANDUM IN SUPPORT OF HIS
MOTION TO DISMISS THE INDICTMENT FOR PROSECUTORIAL MISCONDUCT
OR, IN THE ALTERNATIVE, TO BAR THE USE OF EVIDENCE TAINTED BY
<u>MISCONDUCT</u>**

Aaron J. Schock respectfully submits this Memorandum in Support of His Motion to
Dismiss the Indictment for Prosecutorial Misconduct or, in the Alternative, to Bar the Use of
Evidence Tainted by Misconduct.

## INTRODUCTION

It is important that we note at the outset, especially where several of the undersigned
counsel are former federal prosecutors, that we recognize, believe, and applaud the fact that the
vast majority of Assistant U.S. Attorneys and other federal prosecutors conduct themselves
honorably, performing their duties with keen attention to ethical conduct and in recognition of the
need to wield the extraordinary powers they have in a most responsible fashion. Indeed,
recognition of that fact makes it all the more important that the conduct in this matter be reported
and addressed, and that its legacy effect on the cause of justice in this matter be vindicated.

It is therefore with great reluctance, and only after the accumulation of experiences in this
matter detailed herein, that Mr. Schock brings this motion to dismiss the Indictment based on
prosecutorial misconduct. That record discloses the case to be a sorry example of one of the most

1

fundamental abuses of prosecutorial authority that can occur: targeting an individual for indictment and then proceeding to find some basis for charging him.  It took misconduct that fatally tainted the independence of the grand jury to make that happen in this case.

While the factual underpinnings of this Motion and Memorandum are somewhat complex and necessarily detailed, our position regarding dismissal on account of prosecutorial misconduct affecting the grand jury's decision is simple and straightforward: this Indictment should be dismissed because of two fundamental patterns of government misconduct that prejudiced the grand jury proceedings:

1. The prosecutor made repeated false, misleading, and erroneous statements of fact concerning conduct by Mr. Schock to witnesses both before the grand jury and outside its presence that had the effect of unalterably influencing the testimony of key witnesses and influencing the grand jury in its consideration of the case.

2. The prosecutor engaged in other misconduct that violated the constitutional rights of Mr. Schock, and others, that produced evidence used before the grand jury directly and indirectly, and that gives rise to "grave doubts" as to whether the decision to indict was unaffected by this collective misconduct.

To be clear, Mr. Schock does not ask this court to supervise the prosecutor's decisions and actions as though it were the U.S. Attorney.  The focus of this motion is not the prosecution's over-zealousness, per se, but rather the effect of that over-zealousness on witnesses and the grand jury, in derogation of Mr. Schock's constitutional rights.  As a result of that over-zealousness, this Indictment was effectively preordained, and the grand jury's limited but critical independence was compromised by the conduct of the government.

We begin below by describing how this investigation began, which provides relevant context to assess the government's subsequent conduct.  Within the argument section that follows, we recite relevant law and set forth a detailed discussion of the two patterns of misconduct summarized above.  Due to the fact-intensive nature of specific issues raised throughout this Memorandum, we provide detailed facts within the argument sections.[1]

Ultimately, we move this court for an order dismissing the Indictment that resulted from this misconduct.  In the alternative, we move the court to preclude the testimony of two witnesses from the government's case in chief.  As we detail herein, the prosecutor engaged in a practice of informing these and other witnesses favorable to Mr. Schock of "facts" outside those witnesses' knowledge.  These "facts" were uniformly ones that falsely, unfairly, and repeatedly portrayed Mr. Schock as dishonest and of bad character, and, even worse, the represented "facts" were false or misleading half-truths.  Facts should flow from witnesses, not to them.  The effect of the prosecutor's unrelentingly negative and misleading reverse factual flow was to discourage and negatively shape the testimony of witnesses favorable to Mr. Schock.  As an alternative to dismissal, the exclusion of these two witnesses from the government's case-in-chief would thus be at least a partial fitting and appropriate remedy.

### RELEVANT BACKGROUND

In March 2015, Mr. Schock resigned following media scrutiny into the use of taxpayer and campaign funds.  That same month, based on those unproven media allegations, the U.S. Attorney's Office for the Central District of Illinois ("USAO") opened an investigation into Mr.

---

[1] We are constrained to note that there have been repeated instances of troubling conduct outside the presence of the grand jury.  We have not included extensive details of such conduct herein in light of the Seventh Circuit's view of allegations of "outrageous" conduct, but we can provide such details if the Court desires.

Schock.  Over the next twenty months, and through the use of two federal grand juries, the USAO—with the assistance of more than two dozen federal agents from the FBI, the IRS, the FDIC, the U.S. Postal Service, and the Illinois State Police—investigated Mr. Schock's personal, political, and professional life, from business activities that he conducted as a teenager through his present, post-congressional employment.

There was no obvious crime apparent from the media allegations in early 2015.  The media reported about Mr. Schock's business dealings (which have not been charged) and about spending by Mr. Schock's congressional office and his campaign committees.  None of those reports, as harsh as they were, suggested any crimes had been committed; as even the media acknowledged, the reporting raised questions that did not rise to the level of prima facie allegations of illegal conduct.  Nevertheless, the government readily seized on these reports as a pretext for a grand jury investigation.

As FBI Agent David Harmon confirmed during his April 9, 2015 grand jury testimony (the first session of testimony in this investigation), law enforcement agencies began investigating "as media reports were emerging about former Congressman Schock's spending and questions that the media had posed."[2]  He further confirmed that this investigation was "expedited very rapidly" after Mr. Schock announced his resignation.[3]  Indeed, law enforcement officials had leaked details of their investigation to the media on March 20th, just three days after Mr. Schock announced his resignation, and confirmed that Mr. Schock was the government's focus.  For example, CNN reported:  "The FBI and the federal prosecutors in Illinois are investigating whether Rep. Aaron Schock broke the law in accounting for campaign expenses, according to people familiar with the

---

[2] Transcript of Testimony of David Harmon, Apr. 9, 2015, 3:1-4 (GJ_TRANSCRIPT_00000077).
[3] *Id.* at 16:20-23.

matter."[4]   The Chicago Tribune likewise reported that federal investigators had opened an investigation "into the activities of U.S. Rep. Aaron Schock that will include an examination of the Illinois congressman's expenses and campaign fund, a federal law enforcement official said Friday."  That same law enforcement official, obviously trolling for allegations, made it clear that the scope of the investigation would be as broad as possible:

> "We will follow up on every allegation we pick up," said the official, who spoke on condition of anonymity. . . . Investigators are focusing on Schock's House office expense account, expenditures by his re-election campaign and his personal investments aided by longtime political donors, the official said.[5]

This continued throughout the investigation.  Nearly a year later in February 2016, IRS Special Agent James Peacock advised a witness that "he was working at the direction of Assistant United States Attorney Tim Bass and that they were required to investigate the allegations that were reported about Mr. Schock in the news."[6]

Yet while the subject matter of the investigation was as broad as could be, its target was as narrow as possible.  It was only Aaron Schock.  During questioning of U.S. Postal Inspector Basil Demczak during the first grand jury session, the prosecutor received Agent Demczak's confirmation that "at least at the outset, the focus of the investigation obviously was on Mr. Schock."[7]  This continued to be true no matter where the evidence led.  Agent Demczak confirmed

---

[4] Evan Perez and Jeff Zeleny, *First on CNN:  FBI, federal prosecutors investigating Aaron Schock*, CNN.com (Mar. 20, 2015), http://www.cnn.com/2015/03/20/politics/aaron-schock-federal-investigation/ (last visited July 27, 2017).

[5] Richard Serrano and Katherine Skiba, *Schock said to be focus of federal inquiry; Subpoenas and grand jury are in works, sources say*, 2015 WLNR 8398936, CHICAGO TRIBUNE (Mar. 21, 2015).

[6] Dep't of Treasury, Memorandum of Interview of Frederick Rapp, Feb. 5, 2016, ¶ 2 (AGENT_RPT_00000618).

[7] Transcript of Testimony of Basil Demczak, Apr. 9, 2015, 7:23-25 (GJ_TRANSCRIPT_00000029).

on April 9th that as a result of the initial investigation, particularly information from the government's confidential informant, five staff members were "include[d] within the investigation."[8] Yet less than one month later, the government had conferred immunity on all five of those staff members—as well as several other staffers—*without having spoken to any of them in a substantive proffer session or having heard any testimony from them.*

In addition, it appears that the prosecutor already had the Indictment's charges in sight during that initial grand jury session despite having not heard testimony from anyone other than the government's Confidential Informant (who admitted he had no information regarding the allegations reported in the media) and despite the fact the government had received only a handful of documents:   "And so among the potential criminal violations that are implicated in the investigation, would they include wire fraud, mail fraud, theft of government funds, and campaign violations, all associated with using taxpayer or campaign funds for personal use?"   The agent agreed.[9]   The Indictment, returned more than eighteen months later, reflects each of these charges, except that the government has chosen to charge the alleged campaign finance violations under a novel (and deeply flawed) theory of anticipatory obstruction.

## ARGUMENT

This has been an investigation of a man in search of a crime.  The prosecutor and agents have dug into every aspect of Mr. Schock's life by any means necessary.  No topic has been off limits.  The federal government has even delved, repeatedly, into the most intimate details of his life, *including repeated inquiries to witnesses into who he has slept with and whether he is gay.*

---

[8] *Id.* at 8:3-16.
[9] Transcript of Testimony of David Harmon, Apr. 9, 2015, 13:25 – 14:6 (GJ_TRANSCRIPT_00000077).

Misconduct has permeated this investigation from inception to present. As detailed extensively herein, the prosecutor and federal agents acting at his direction or under his supervision have repeatedly engaged in conduct that by any reasonable and objective measure improperly influenced the grand jury in its decision to indict Mr. Schock, thus causing irreparable prejudice requiring dismissal of the Indictment. In addition, the government's conduct tainted and, in effect, destroyed critical exculpatory evidence that, at the very least, warrants suppression of the evidence the government obtained as a result of its misconduct.

More specifically, during this investigation, the government:

- Recruited a staffer to be a confidential informant who covertly recorded Mr. Schock, a sitting Member of Congress, in his District Office and elsewhere; covertly recorded staff members represented by counsel; misrepresented himself as represented by the same attorney representing those staff members; attempted at the government's direction to steal privileged documents; and covertly stole documents and more than 10,000 emails that were the personal property of Mr. Schock as a Member of Congress;

- Repeatedly misrepresented facts and law in a manner that falsely impugned Mr. Schock's conduct and character before witnesses and the grand jury;

- Abused and intimidated witnesses, particularly those providing exculpatory evidence regarding Mr. Schock;

- Interfered with attorney-client relationships (including by excluding several witnesses' chosen counsel from proffers for the express purpose of preventing information from being shared with the defense), sought and obtained privileged documents and attorney work product, and presented privileged information to the grand jury;

- Directed and conducted unconstitutional searches and seizures, including illegal searches and seizures of Mr. Schock's office and documents and an illegal search of Mr. Schock's personal possessions;

- Repeatedly accused Mr. Schock in public filings of "deception and defiance" to and of judicial authority and attempted to incarcerate Mr. Schock for raising well-recognized Fifth Amendment privileges that the Court subsequently vindicated;

- Misrepresented facts and law to the Court, including Supreme Court authority in a failed attempt to convince the Court that Mr. Schock could not assert his

constitutional privileges and falsely accusing Mr. Schock or his legal team of leaking sealed materials that the government itself had publicly filed;

- Attempted to violate other rights and privileges of Mr. Schock, including threatening his First Amendment rights through a motion for a gag order, and his Sixth Amendment rights through an attempt to restrain his use of campaign funds;

- Obtained and executed a highly-invasive and wholly-unnecessary search warrant on Schock for Congress despite the fact that its counsel had advised the government that a fulsome production of documents was forthcoming in days (and in fact the material sought was at a commercial establishment to duplicate for production);

- Later obtained and executed a search warrant on the personal email account of a staffer despite her timely compliance, through counsel, with a grand jury subpoena for her documents and despite her repeated, prompt provision of additional documents and information when the government requested it;

- Failed to disclose or omitted exculpatory or impeachment evidence from government reports in violation of *Brady* and *Giglio* obligations; and

- Continued to harass Mr. Schock *through invasive questioning of witnesses about Mr. Schock's sexual orientation and relationships* and through continued investigation post-indictment, including of new witnesses and of Mr. Schock's current employer and business partners.

Although some of this troubling conduct occurred in court or otherwise outside the jury room, much of it occurred before the grand jury's eyes and ears.

Indeed, the most insidious and prejudicial conduct, as detailed herein, involved the prosecutor's repeated presentation of false or misleading facts and incorrect statements of the law to key witnesses before the grand jury, and thus, to the grand jury itself. This not only influenced the grand jury, but equally problematic, it irreversibly embedded false impressions about Mr. Schock's conduct and character in the minds of key witnesses. This prejudiced not only their grand jury testimony, it also prejudices any future testimony at trial. What has been done cannot be undone: it is like dye dropped in water.

This conduct no doubt improperly influenced the grand jury, leaving as it did the indelible but false impression that Mr. Schock was a bad guy who needed to be "got."  That is not hyperbole. The grand jury itself ultimately began to mirror the government's obsessive and aggressive targeting of Mr. Schock, and Mr. Schock alone.  In a telling exchange during the January 19, 2016 grand jury testimony of IRS Special Agent James Peacock, a grand juror asked if the IRS's investigation was a "separate case" from the grand jury investigation, leading to this discussion:

> Grand Juror:  Now, is this a totally different case than our case?  I mean, you put them together, but if we can't do anything with him, can the IRS still go after him and get him?
>
> A:  Yes.
>
> Grand Juror:  So if – you know, like Al Capone, *if we don't get him*, then the IRS can take him down?
>
> A:  Yes.[10]

Such a statement is shocking, but unsurprising given all that has occurred.  And in the end, the grand jury, relying on the unreliable evidence presented to it by means of rampant misconduct, received the indictment hand-crafted by the prosecutor and voted to take Mr. Schock down.

## I.    Legal Standards

### A.    Dismissal of indictments for misconduct is rare, but critical to preserving the grand jury's constitutional purpose when necessary

This motion seeks an extraordinary remedy.  But this is an extraordinary case.  Allegations of prosecutorial misconduct are rare.  And rightly so.  As noted above, the overwhelming majority of prosecutors adhere to the highest ethical standards in the pursuit of justice.  As the Supreme Court has famously expressed, an attorney for the United States is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as

---

[10] Redacted Transcript of Testimony of James Peacock, Jan. 19, 2016, 92:18, 93:1 (emphasis added). (GJ_TRANSCRIPT_00005285).

compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S 78, 88 (1935). This notion has likewise been enshrined in American Bar Association standards, confirming the special function and duty of prosecutors to pursue justice rather than victory at all costs:

> The primary duty of the prosecutor is to seek justice within the bounds of the law, not merely to convict. The prosecutor serves the public interest and should act with integrity and balanced judgment to increase public safety both by pursuing appropriate criminal charges of appropriate severity, and by exercising discretion to not pursue criminal charges in appropriate circumstances. The prosecutor should seek to protect the innocent and convict the guilty, consider the interests of victims and witnesses, and respect the constitutional and legal rights of all persons, including suspects and defendants.[11]

Such standards likewise recognize that "[i]n light of the prosecutor's public responsibilities, the prosecutor has a heightened duty of candor to the courts and in fulfilling other professional obligations."[12]

When a prosecutor violates these standards, the results devastate individual liberty. Prosecutors wield immense power, particularly during the investigatory phase and through the use of a grand jury cloaked in secrecy. As former Attorney General and Justice Robert Jackson articulated long ago, the greatest danger of the abuse of prosecutorial power arises when a prosecutor picks a man and then searches for a crime to pin on him:

> If the prosecutor is obliged to choose his cases, it follows that he can choose his defendants. Therein is the most dangerous power of the prosecutor: that he will pick people that he thinks he should get, rather than pick cases that need to be

---

[11] ABA Criminal Justice Standards for the Prosecution Function, 3-1.2(b), *Functions and Duties of the Prosecutor* (4th ed.). All United States Attorneys are urged to know the Standards because courts routinely rely upon them to adjudicate criminal justice issues. *See* U.S. Attorney's Manual § 9-2.101.

[12] *Functions and Duties of the Prosecutor* at 3-1.4(a), *The Prosecutor's Heightened Duty of Candor* (4th ed.).

prosecuted.  With the law books filled with a great assortment of crimes, a prosecutor stands a fair chance of finding at least a technical violation of some act on the part of almost anyone.  In such a case, *it is not a question of discovering the commission of a crime and then looking for the man who has committed it, it is a question of picking the man and then searching the law books, or putting investigators to work, to pin some offense on him.  It is in this realm . . . that the greatest danger of abuse of prosecuting power lies.*[13]

These words apply with full force here.  The prosecutor did not discover a crime and attempt to determine who committed it.  He picked Aaron Schock and set out to pin an offense on him.

Mr. Schock recognizes that, in general, "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits."  *Costello v. United States*, 350 U.S. 359, 363 (1956).  Moreover, the grand jury is "functional[ly] independen[t] from the Judicial Branch," and courts are therefore "reluctant to invoke the judiciary supervisory power as a basis for prescribing modes of grand jury procedure."  *United States v. Williams*, 504 U.S. 36, 48-50 (1992).  For instance, "an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence."  *United States v. Calandra*, 414 U.S. 338, 345 (1974).  Nevertheless, where circumstances arise that demonstrate that the prosecutor interfered with the normal and unbiased functioning of the grand jury, courts have intervened to ensure that the Fifth Amendment's guarantee that a defendant be indicted by an unbiased grand jury is not rendered a nullity.  *See, e.g.*, *United States v. Hogan*, 712 F.2d 757, 761 (2d Cir. 1983); *United States v. Samango*, 607 F.2d 877, 884 (9th Cir. 1979); *United States v. Breslin*, 916 F. Supp. 438, 442-46 (E.D. Pa. 1996); *United States v. Lawson*, 502 F. Supp. 158, 172 (D. Md. 1980); *United States v. Leeper*, No. 06-CR-58A, 2006 WL 1455485, at *2–3 (W.D.N.Y. May 22, 2006).  Moreover,

---

[13] The Honorable Robert H. Jackson, Attorney General of the United States, *The Federal Prosecutor*, An Address Delivered at the Second Annual Conference of United States Attorneys (Apr. 1, 1940) (emphasis added).

11

"[d]ismissing an indictment to punish the government for its misconduct . . . entails no implicit second-guessing of the grand jury and thus steers clear of the prohibition of *Williams*." *United States v. Strouse*, 286 F.3d 767, 773 (5th Cir. 2002).

Thus, we recognize that dismissal of an indictment is a rare and extraordinary remedy – but it is a remedy that exists and remains viable for good reason. A district court should invoke its "supervisory power" over the grand jury "to dismiss an indictment because of misconduct before the grand jury," where prosecutors have violated "one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions.'" *Williams*, 504 U.S. at 46 (quoting *United States v. Mechanik*, 475 U.S. 66, 74 (1986) (O'Connor, J., concurring in judgment)).

The Fifth Amendment's Grand Jury Clause—guaranteeing a right to an indictment by an independent and impartial panel only—is undoubtedly one such rule. Thus, where a defendant establishes that a prosecutor's misconduct either "substantially influenced the grand jury's decision to indict," or raises "grave doubt that the decision to indict was free from [such] substantial influence," the law is clear that "dismissal of the indictment is appropriate." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (quotations omitted); *see also Strouse*, 286 F.3d at 771 (courts "have authority to enforce the Grand Jury Clause by ensuring that grand juries act independently from the executive"); *United States v. Anderson*, 61 F.3d 1290, 1296 (7th Cir. 1995) (citing *Bank of Nova Scotia* for the proposition that, as a "general rule," a defendant must demonstrate prejudice to warrant dismissal of an indictment for misconduct before the grand jury); *United States v. Martinez*, No. 08-CR-69S-12,4, 2010 WL 56052, at *2 (W.D.N.Y. Jan. 3, 2010) ("Where appropriate, violations of the Fifth Amendment's guarantee to an independent and impartial Grand Jury may be remedied by dismissal of the Indictment.").

As the Supreme Court has noted, the Grand Jury Clause "presupposes" the panel's critical independence. *Williams*, 504 U.S. at 49. It guarantees that "[n]o person shall be held to answer for [an] infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. And "[w]hen the framers of the Bill of Rights" penned these words, "they were not engaging in a mere verbal exercise." *United States v. Estepa*, 471 F.2d 1132, 1136 (2d Cir. 1972). Rather, "the Founders thought the grand jury so essential to basic liberties" that they enshrined it in the Constitution that would govern their new nation. *Calandra*, 414 U.S. at 343. In doing so, they sought to preserve the common-law tradition of "an investigative body acting independently of either prosecuting attorney or judge." *United States v. Dionisio*, 410 U.S. 1, 16-18 (1973) (quotation marks omitted). Indeed, "the whole theory of its function is that it belongs to no branch of the institutional Government, serving as a kind of buffer or referee between the Government and the people." *Williams*, 504 U.S. at 47; *see also United States v. Brito*, 907 F.2d 392, 394 (2d Cir. 1990) ("Historically, the grand jury has 'serve[d] the invaluable function in our society of standing between the accuser and the accused.'") (quoting *Wood v. Georgia*, 370 U.S. 375, 390 (1962)) (alterations in original); *United States v. ITT Blackburn Co., a Div. of ITT*, 824 F.2d 628, 630 (8th Cir. 1987) ("The purpose of the grand jury is to remove from prosecutors the power to initiate prosecutions for felonies and instead to place that power with a group of citizens acting independently of either prosecuting attorney or judge.") (quotation marks omitted); *United States v. Koschtschuk*, No. 09-CR-0096 SM, 2011 WL 3295817, at *4 (W.D.N.Y. Aug. 1, 2011) ("As contemplated by the Fifth Amendment, it is the grand jury—not the government—which calls the shots."). Simply put, the "prosecutor may not circumvent this safeguard by overreaching conduct that deprives the grand jury of autonomous and unbiased judgment." *United States v. Al Mudarris*, 695 F.2d 1182, 1185 (9th Cir. 1983).

13

While the modern grand jury retains this "functional independence," *Williams*, 504 U.S. at 48, it now falls almost entirely to federal prosecutors to direct the process—by presenting evidence, explaining the law, answering questions, and drafting the indictment. The grand jury "must lean heavily upon the United States Attorney as its investigator and legal advisor to present to it such evidence as it needs for its performance of its function and to furnish it with controlling legal principles." *United States v. Ciambrone*, 601 F.2d 616, 622 (2d Cir. 1979).

With this role comes risks. Courts have noted that "prosecutors, by virtue of [this] position, have gained such influence over grand juries that these bodies' historic independence has been eroded." *Hogan*, 712 F.2d at 759; *United States v. Hill*, No. S 88 CR. 154(MJL), 1989 WL 47288, at *2 (S.D.N.Y. Mar. 22, 1989) (noting "growing concern over maintaining the grand jury's independent and impartial role"). As Judge Friendly observed, "the prosecutor has the dual role of pressing for an indictment and of being the grand jury's adviser." *Ciambrone*, 601 F.2d at 628 (Friendly, J., Dissenting). And "[i]n case of conflict, the latter duty must take precedence." *Id.* What is more, Judge Friendly continued, "[t]he Ex parte character of grand jury proceedings makes it peculiarly important for a federal prosecutor to remember that, in the familiar phrase, the interest of the United States 'in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Id.* at 628-29 (quoting *Berger*, 295 U.S. at 88). As the "canonical statement in this field" has it, "while a prosecutor 'may strike hard blows, he is not at liberty to strike foul ones.'" *United States v. Turner*, 651 F.3d 743, 752 (7th Cir. 2011) (quoting *Berger*, 295 U.S. at 88). This is as true before the grand jury as it is in open court.

By and large, prosecutors adhere to these lofty standards. But occasionally they do not. Federal prosecutors are by no means immune from the temptation to cut corners in pursuit of a goal. That they are frequently "motivated more by zeal for the government's position than by

malice toward defendants," *Koschtschuk*, 2011 WL 3295817, at *3, is no matter.  Indeed, "[t]he greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding."  *Olmstead v. United States*, 277 U.S. 438, 479 (1928) (Brandeis, J., dissenting).  And "[i]f the grand jury is to accomplish either of its functions, independent determination of probable cause that a crime has been committed and protection of citizens against unfounded prosecutions, limits must be set on the manipulation of grand juries by over-zealous prosecutors."  *Samango*, 607 F.2d at 882.

Courts must enforce these limits—by dismissing an indictment secured by a prosecutor's misdeeds.  To be sure, in both *Bank of Nova Scotia* and *Williams*, the Supreme Court carefully delineated the scope of a district court's authority in this area, again with a view towards preserving the independent function of the grand jury.  *See Williams*, 504 U.S. at 49-50.  But in neither case did the Court consign district courts to "impoten[cy] in the face of grand jury improprieties." *United States v. Lamantia*, 59 F.3d 705, 707 (7th Cir. 1995).  Rather, they must reserve the power for when the defendant has suffered prejudice.  And "[b]ased on the[] principles established by the Supreme Court," the Seventh Circuit has held that such "'prejudice' occurs when the alleged violation had a substantial effect on the grand jury's decision to indict or when it was quite doubtful that the decision to indict was free from that violation's considerable influence."  *United States v. Brooks*, 125 F.3d 484, 498 (7th Cir. 1997).

In the years since *Bank of Nova Scotia* and *Williams*, courts have not hesitated to apply this extraordinary remedy when extraordinary circumstances demand it.  In *United States v. Breslin*, 916 F. Supp. at 442, for instance, the court cataloged specific instances of conduct that could compromise the independent determinations of the grand jury and noted that it was "deeply concerned by the misconduct from the first day the grand jury met continuing through the day the

15

superseding indictment was presented." *Id.* at 446.  The court dismissed the indictment, noting that such "grave interference with the independent functioning of the grand jury" compels a district court "to exercise its supervisory role if . . . the Fifth Amendment's guarantee of indictment by grand jury continues to have any modern meaning." *Id.* at 446-47.

### B.   When weighing the effect of misconduct on the grand jury's independence, the Court should consider the cumulative, prejudicial effects of that misconduct

While the precise nature of a prosecutor's misconduct varies widely from case to case, the central consideration is whether the prosecutor's misconduct threatened to overwhelm the grand jury's independence.  The government cannot escape the consequences of its misconduct by arguing that each instance of misconduct must be weighed separately on the scale of prejudice; the Court should consider the "cumulative effect" of the prosecutor's misconduct "in determining whether the grand jury's independent role in returning the indictment was usurped." *United States v. Turner*, 620 F. Supp. 525, 527-28 (D. Col. 1985) *aff'd*, 799 F.2d 627 (10th Cir. 1986); *see also Hill*, 1989 WL 47288, at *3 (holding that in "determining whether to dismiss an indictment, the court is free to view such instances of misconduct cumulatively").

As the *Breslin* court observed, it may be the case that "one, or perhaps some, of the . . . instances of misconduct would not, alone, justify dismissal of the indictment," nevertheless the "cumulative effect of the many instances of misconduct can fairly be said to have 'substantially influenced the grand jury's decision to indict.'" *Breslin*, 916 F. Supp. at 446.  Other courts have followed suit, demonstrating that prejudice must be assessed in light of the impact of the prosecutor's misconduct as a whole.  *See Samango*, 607 F.2d at 884 ("The cumulative effect of the above errors and indiscretions, none of which alone might have been enough to tip the scales, operated to the defendants' prejudice by producing a biased grand jury."); *United States v. Peralta*, 763 F. Supp. 14, 21 (S.D.N.Y. 1991) (holding that "defendants were seriously prejudiced by the

cumulative effect of the government's misleading statements of law"); *United States v. Roberts*, 481 F. Supp. 1385, 1389 (C.D. Cal. 1980) (holding that "the 'cumulative effect' of the prosecutor's actions deprived defendants of due process and operated to bias the Grand Jury.").

In another case, the court in *United States v. Aguilar* dismissed an indictment in light of multiple instances of misconduct.  831 F. Supp. 2d 1180 (C.D. Cal. 2011).  Expressing its "deep regret," the court noted that it was

> compelled to find that the Government team allowed a key FBI agent to testify untruthfully before the grand jury, inserted material falsehoods into affidavits submitted to magistrate judges in support of applications for search warrants and seizure warrants, improperly reviewed e-mail communications between one Defendant and her lawyer, recklessly failed to comply with its discovery obligations, posed questions to certain witnesses in violation of the Court's rulings, engaged in questionable behavior during closing argument and even made misrepresentations to the Court.

*Id.* at 1182.  The Government's "pattern of invidious conduct," the court noted, painted "an unusual and extreme picture of a prosecution gone badly awry."  *Id.* at 1185.  This misconduct, which began "even before the jury was selected and continu[ed] throughout trial," gave rise to prejudice the court deemed "palpable."  *Id.* at 1207.  The court dismissed the indictment as a result.

In sum, dismissal of an indictment for prejudicial prosecutorial misconduct is essential to preserving an appropriate level of the constitutionally mandated independent functioning of the grand jury, which, in turn, secures a putative defendant's due process rights.  It is not often invoked—nor should it be.  Rather, it is reserved for extraordinary cases.  This is such an extraordinary case.  As the Fifth Circuit has noted, courts "may . . . and indeed on occasion . . . must, use [their] supervisory power to safeguard the integrity of the grand jury process."  *Strouse*, 286 F.3d at 771.  Such are the stakes facing this Court.

**C.      Violations of a defendant's Fifth and Sixth Amendment Rights warrants suppression of evidence derived from the government's misconduct**

Where the government obtains evidence in violation of a defendant's Fifth Amendment due process rights, "[s]uppression is an appropriate remedy where the court can identify and isolate" such evidence. *United States v. Marshank*, 777 F. Supp. 1507, 1522 (N.D. Cal. 1991). In suppressing illegally obtain evidence, the "prosecution is thus denied 'the fruits of its transgression' and the due process right to a fair trial is preserved." *Id.* (quoting *United States v. Rogers*, 751 F.2d 1074, 1078 (9th Cir. 1985)).

While Mr. Schock submits that, in this case, "it is simply impossible to excise the taint of the government's constitutional transgressions from the prosecution" itself, thus warranting dismissal of the Indictment, to the extent the Court concludes that a lesser remedy is appropriate it should consider excluding Karen Haney and Sarah Rogers (discussed below) from the government's case-in-chief, as their testimony has been tainted by the government's constitutional violations. This conduct violates a defendant's Sixth Amendment right to present a defense and the Fifth Amendment due process right prohibiting the bad faith destruction of evidence.

A criminal defendant is "unquestionably entitled to 'a meaningful opportunity to present a complete defense.'" *United States v. Alayeto*, 628 F.3d 917, 922 (7th Cir. 2010). "A fundamental element of due process is the right of the accused to present witnesses in his own defense." *United States v. Johnson*, 437 F.3d 665, 677 (7th Cir. 2006). The right to present a defense may be violated when the government makes a favorable witness unavailable to testify. For instance, the government violates a defendant's right to present a complete defense when it deports a witness that it knows would have been material and favorable to the defense. *See United States v. Leal-Del Carmen*, 697 F.3d 964, 969-72 (9th Cir. 2012).

18

In the same vein, the tainting of a witness's testimony through undue manipulation is akin to the bad faith destruction of evidence.  The Supreme Court recognized a remedy for this misconduct in *California v. Trombetta*, 467 U.S. 479 (1984) and *Arizona v. Youngblood*, 488 U.S. 51 (1988).  In the Seventh Circuit, a defendant's Fifth Amendment due process rights are violated "if (1) the [government] acted in bad faith; (2) the exculpatory value of the evidence was apparent before it was destroyed; and (3) the evidence was of such nature that the [defendant] was unable to obtain comparable evidence by other reasonably available means." *McCarthy v. Pollard*, 656 F.3d 478, 485 (7th Cir. 2011).  A defendant demonstrates bad faith by showing "official animus" or a "conscious effort to suppress exculpatory evidence" on the part of the government.  *United States v. Bell*, 819 F.3d 310, 317 (7th Cir. 2016).  Once a due process violation is established, the decision to suppress the evidence or dismiss the indictment turns on the prejudice to the defendant's right to a fair trial.  *See United States v. Bohl*, 25 F.3d 904, 914 (10th Cir. 1994).

The remedy for a due process violation recognized in *Youngblood* is analogous to other areas of the law that protect a witness's memory.  For instance, "[d]efendants have a due process right not to be subject to unreasonably suggestive identification procedures that create a 'substantial likelihood of irreparable misidentification.'" *United States v. Miller*, 795 F.3d 619, 628 (7th Cir. 2015) (quoting *Neil v. Biggers*, 409 U.S. 188, 198 (1972)).  "A pretrial confrontation conducted in a manner which is 'so unnecessarily suggestive and conducive to irreparable mistaken identification' denies an accused due process of law, and a subsequent in-court identification is inadmissible if there is a 'very substantial likelihood of irreparable misidentification.'" *U.S. ex. rel. Hudson v. Brierton*, 699 F.2d 917, 923 (7th Cir. 1983) (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967) and *Neil*, 409 U.S. at 198) (internal citation omitted).

19

Moreover, under the federal obstruction of justice statute, "[w]hoever knowingly . . . engages in misleading conduct toward another person, with intent to . . . influence . . . the testimony of any person in an official proceeding . . . shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1512(b).  Courts have recognized that the obstruction statute can be violated where the natural and probable consequences of misleading conduct would be to influence the testimony of a witness.  *See United States v. Hull*, 456 F.3rd 133, 142 (3d Cir. 2006).  Our point here is not to accuse the prosecutors of any crime, but to underscore that the law recognizes that misleading conduct can influence the testimony of witnesses.  And as such, what is sauce for the goose must be sauce for the gander.  If a defendant would be prohibited under penalty of imprisonment for manipulating a witness's memory with the intent to influence a proceeding, surely it is misconduct for the prosecutor to do so as well.

## II.   The Prosecutor Routinely Misstated or Omitted Material Facts, and Misstated the Law, to the Grand Jury and Witnesses, Tainting Both

The prosecutor, Assistant U.S. Attorney Tim Bass, and the USAO engaged in a wide variety of troubling misconduct throughout its investigation of Mr. Schock.  Although some of the conduct occurred outside the walls of the grand jury, much of it, including perhaps the most pernicious conduct, took place directly before the grand jurors – namely, the prosecutor's repeated presentation of false or highly misleading facts and statements of law to witnesses testifying before the grand jury.

Providing key witnesses with false facts that impugn a defendant has the obvious effect of prejudicing those witnesses against the defendant.  As discussed herein, the prosecutor engaged in such conduct with various witnesses, including two key witnesses who had initially presented favorable testimony towards Mr. Schock.  By implanting false facts and impressions within the

20

minds of these witnesses, and by extension the minds of the grand jurors, the prosecutor has tainted

them and irreversibly prejudiced Mr. Schock's rights to an unbiased grand jury or a fair trial.

### A.    The knowing provision of false or misleading evidence constitutes actionable prosecutorial misconduct

The prosecutor's knowing presentation of false or misleading evidence to the grand jury is

the quintessential example of misconduct.  *See Samango*, 607 F.2d at 882 (describing the

"deliberate introduction of perjured testimony" as "perhaps the most flagrant example of

misconduct").  As the Seventh Circuit has stated, "[t]he government's knowing use of false

testimony violates due process," which may form the basis for a finding that the defendant was

prejudiced by the government's misconduct.  *United States v. Useni*, 516 F.3d 634, 656 (7th Cir.

2008).  Although the Supreme Court has recognized that a prosecutor need not provide exculpatory

evidence to the grand jury, *see Williams*, 504 U.S. at 51-52, it is equally plain that "a prosecutor

may not deliberately mislead a grand jury or instill false impressions to it in an effort to obtain an

indictment."  *United States v. Red Elk*, 955 F. Supp. 1170, 1182 (D.S.D. 1997).  As has long been

recognized, the introduction of misleading testimony by the government or its agents, especially

when the evidence is designed to impugn the defendant in front of the grand jury, can "pollute[]

the waters of justice," making dismissal "necessary, to protect the integrity of the judicial process."

*United States v. Asdrubal-Herrera*, 470 F. Supp. 939, 943 (N.D. Ill. 1979) (quoting *Mesarosh v.

United States*, 352 U.S. 1, 14 (1956) and *United States v. Leibowitz*, 420 F.2d 39, 42 (2d Cir.

1969)) (quotation marks omitted).

The prejudicial effect of materially misleading evidence is demonstrated by the

government's presentation to the grand jury in *United States v. Aguilar*, which the court

characterized as "an unusual and extreme picture of a prosecution gone badly awry."  831 F. Supp.

2d at 1185.  The government, through the testimony of its agent before the grand jury, made

21

misleading and false statements regarding matters that were "indisputably material," including making up a witness's statement, relying about the classification of a commission and the balance of funds in an account.  *Id.* at 1189-90.  While serious enough on its own, this misconduct was compounded by the government's response to the allegations of misconduct, which "forced [defendants] to devote enormous effort to responding to and redressing serious and prejudicial wrongs, while at the same time having to defend themselves against the charges."  *Id.* at 1207.

The government cannot evade the due process requirements that compel it to present a case to the grand jury in a way that preserves its independent judgment by appealing to the rule that the government need not present exculpatory evidence.  As demonstrated by *United States v. Lawson*, 502 F. Supp. 158, the government's privilege to present its side of the story to the grand jury does not entitle it to simply ignore exculpatory evidence that renders its presentation misleading.  Of critical importance in *Lawson* was the defendant's intent in writing illegitimate prescriptions.  *Id.* at 161.  The government obtained records that corroborated a key part of the defendant's story and that demonstrated he took steps to verify that the prescriptions were bona fide.  *Id.* at 162.  Nevertheless, when interviewing a witness whose testimony was also corroborated by the records, the prosecutor "embarked upon a grueling cross-examination [of the witnesses] apparently designed to give the jurors the impression that" the witness was simply trying to cover for the defendant.  *Id.*  Indeed, "the prosecutor attempted to create the impression that [the] records established" that the verification attempt was never made.  *Id.* at 162 n.7.  The court agreed with the defendant that this line of questioning "was an affirmative attempt both to discredit" the witness "and to turn exculpatory evidence into inculpatory evidence," holding that "the prosecutor's questions . . . were deliberately misleading and calculated to create a false impression on the grand jury."  *Id.* at 162-63.  Indeed, the government was forced to concede the impropriety of the

prosecutor's actions, and he was no longer associated with the case.  *Id.* at 163, 172-73.  As a result of this misconduct, the court dismissed the indictment.  *Id.* at 172.

In addition to misleading statements regarding the evidence against the defendant, courts have dismissed indictments where the prosecutor presented misleading evidence with the intention to portray the defendant in a negative light.  It is axiomatic that a prosecutor cannot "inflame or otherwise improperly influence grand jurors against any person."  *United States v. Gold*, 470 F. Supp. 1336, 1346 (N.D. Ill. 1979).  In *United States v. Hogan*, the prosecutor engaged in "inflammatory rhetoric" (becoming an unsworn witness in the process) to the effect that the defendant engaged in other criminal acts and "was a real hoodlum."  712 F.2d at 761.  As a panel of the Eleventh Circuit observed, "[d]erogatory statements about the character of a defendant or statements about other crimes a defendant may have committed are improper because they have a tendency to inflame the grand jury-thereby infringing on the grand jury's obligation to find probable cause based on competent evidence."  *United States v. Sigma Int'l, Inc.*, 244 F.3d 841, 872 (11th Cir. 2001).[14]

Even where courts have failed to find prejudice, they have been critical of the government's use of misleading statements.  In *United States v. Al Mudarris*, the Ninth Circuit chastised the government, holding that "[a] prosecutor may not, by making prejudicial remarks to sway the grand jury, deny an accused the right to have his indictment tested by its independent judgment." 695 F.2d at 1186.  Courts have not been critical only of inflammatory rhetoric regarding criminal conduct; in *United States v. Sears, Roebuck and Co.*, the court criticized the government for failing

---

[14] The *Sigma International* case has a curious procedural history.  The full Eleventh Circuit voted to take the case en banc, thus vacating the opinion.  291 F.3d 765 (11th Cir. 2002).  However, before en banc proceedings were held, the parties agreed to a plea deal.  Thus, the panel's decision, although vacated, stands as the last statement by the Eleventh Circuit on the matter.

to control the statements of a witness who was permitted "to range far afield and to discourse with patriotic rhetoric on the quality of American workmanship and the devastating effect of Japanese products on the American economy."  719 F.2d 1386, 1389-90 (9th Cir. 1983).

**B.    The government in this case has combined both avenues of misrepresentation to mislead the grand jury**

Throughout this investigation, including before the grand jury, the prosecutor and federal agents routinely provided fact witnesses with information not previously known to the witnesses concerning Mr. Schock's conduct and/or intent.  Much of that information was false, misleading and/or surmise.  Supplying neutral fact witnesses with material facts outside their knowledge and then asking them for opinions based on that new information is questionable enough, but the prosecutor's repeated provision to key fact witnesses—who had given testimony favorable and exculpatory as to Mr. Schock—of false or misleading information outside their personal knowledge is misconduct because it has the obvious effect of improperly influencing their testimony before the grand jury.

Such misconduct has an insidious and irreversibly prejudicial effect.  The government has charged Mr. Schock with intentionally converting funds to his personal use.  As is typical of congressional offices and campaigns and as the evidence before the grand jury showed, staffers processed the actual transactions at issue.  The government, however, accuses Mr. Schock of intentionally causing these transactions to occur in a manner that personally benefited him.  Testimony by staffers regarding these transactions and any circumstantial evidence of intent is therefore crucial to the determination of whether Mr. Schock had criminal intent to submit false or fraudulent documents.   Accordingly, if the government implanted false impressions in the minds of these key witnesses, then their opinions and recollections of Mr. Schock would be influenced and thereby irreparably altered.  This would not only have prejudiced the grand jury (who also

heard and potentially relied upon false information), it would deprive Mr. Schock a fair trial due to the bias instilled in key witnesses.

The prosecutor's habit of presenting new, and oftentimes false, information to witnesses, and its pernicious effects are most apparent and troubling in the case of Karen Haney, who served as political director of Mr. Schock's campaign organizations, and Sarah Rogers, who served as Mr. Schock's third Executive Assistant in his congressional office.  These two witnesses played a role in processing most of the transactions at issue in the Indictment.  As such, they are central witnesses in this case.[15]  As detailed below, over the course of more than a year, the prosecutor systematically took steps that intimidated these witnesses and exposed them, directly, to false information about Mr. Schock.  The following pattern is evident for both:

- The prosecutor refused proffer sessions before calling them to the grand jury for the express purpose of preventing their counsel from gaining information;

- In these open-ended, meandering early grand jury appearances, the witnesses provided exculpatory evidence regarding Mr. Schock, especially as to his knowledge and intent;

- The prosecutor responded by questioning the truthfulness and honesty of the witnesses and by confronting them with charged questions and threats, including for obstruction of justice;

- The prosecutor followed initial grand jury sessions by repeatedly calling these witnesses for proffer sessions and additional grand jury appearances (five days of grand jury testimony in Ms. Haney's case and four for Ms. Rogers), and by being abusive to them during testimony;

- The prosecutor continued to freeze out their chosen counsel to limit his hearing of the information from his own clients during proffer sessions;

- The prosecutor confronted both witnesses with questions regarding whether he or the government had intimidated them, attempting but failing to lock them into stating that they had not been intimidated or threatened;

---

[15] Indeed, the government has expressly stated that Ms. Haney "will also be an important witness for the government at trial."  Gov't Reply at 9, Docket No. 82.

- The prosecutor presented both witnesses with false or misleading facts and misstatements of law related to events outside their personal knowledge that presented Mr. Schock in a negative light on material fact issues concerning his conduct; and

- After all these steps, at least in the case of Ms. Haney, the prosecutor asked her if her opinion of Mr. Schock had changed "knowing all the information she has been given and the misapplication by Schock" that he had presented to her.[16]

This is the anatomy of improperly influencing a witness.  Below we provide a detailed recitation of the evidence as to each of these two witnesses.

### 1.    The prosecutor systematically intimidated Karen Haney and presented her with false facts that materially influenced her grand jury testimony

Over the course of this investigation, the government has required Ms. Haney to testify before the grand jury on five separate days.  It requested three substantive proffer sessions and had numerous other interactions with her.  The prosecutor directed one illegal search within her home of Mr. Schock's personal property that Ms. Haney was storing for him.  The government obtained and executed a search warrant on the offices of Schock for Congress, of which Ms. Haney was the political director.  It even confronted her in the grand jury (and thus without her lawyer present) about complaints she raised regarding the government's treatment of her.

The government's mistreatment of Ms. Haney began in earnest during her grand jury testimony in June of 2015.  During that testimony, Mr. Bass questioned Ms. Haney regarding the process of reviewing and paying the billing statements for Mr. Schock's American Express card, which was used for multiple purposes by multiple people, including campaign and political-related purchases by one or more political committees, thus making it necessary upon receipt of a monthly invoice to assign an individual expenditure to its correct purpose.  After Ms. Haney testified that the process of reviewing the bill was difficult because Mr. Schock and other involved staffers using

---

[16] U.S. Postal Inspector, Memorandum of Interview of Karen Haney, Nov. 2, 2016 (AGENT_RPT_00001006, at 1012).

the card were very busy, Mr. Bass responded by asking whether that difficulty meant that Mr. Schock was not doing everything he could to ensure proper use of campaign funds.  Ms. Haney said that she thought he had done so, and resisted Mr. Bass's false equivalency, explaining that the difficulty in getting answers from busy people did not mean there was impermissible use.  Mr. Bass followed Ms. Haney's responses with aggressive questioning and sought to cast doubt on her testimony due to her "loyalty" to Mr. Schock:

> Q:  Based on what you've said about difficulty and everything else, did Aaron Schock do all he could do to ensure that campaign funds were not used to pay his personal expenses?[17]
>
> A:  Yes.
>
> Q:  You think he did?
>
> A:  Yes.
>
> Q:  How do you reconcile saying that with talking about the difficulty that you had in compiling this information?
>
> A:  Well, there's a difference.  Just because – and to be clear, I am no fan of the American Express bill.  Okay?  But just because I had difficulty obtaining information from Aaron because of his schedule or Sarah [Rogers] because of her schedule and the fact that she can't talk to me when she's on House time, right, so I have to wait until the evening or some time early in the morning, doesn't carry over to whether or not the charges came from the appropriate accounts.
>
> Q:  Well, why are you – I've asked you a number of questions up to the last one –
>
> A:  Yeah
>
> Q:  -- where you pause and you said it was difficult or I had trouble getting – I didn't get receipts from certain people, beginning with Mr. Schock, or you struck out.  But when I asked you did Mr. Schock do everything he could do to ensure that

---

[17] It is significant in this context to note that in attempting to influence Ms. Haney's testimony in the line of questioning that follows, the prosecutor is seeking to influence her expressed opinion of Mr. Schock, thus appearing to be a means to get a witness who knows Mr. Schock to, through her opinion, impugn his character before the grand jury. While the grand jury may receive otherwise impermissible opinion evidence, the context in which the prosecutor sought it reveals his purpose to influence witness testimony.

campaign funds were not used to pay personal expenses, you immediately and
unequivocally say yes.  Why do you unequivocally say yes to that question?

A:  I know there's a number of expenses that I've seen on the American Express
bills that he's marked as personal that could arguably have been campaign expenses
that he could have charged to the campaign that he didn't.  I wouldn't be able to
articulate those right now because I don't know off the top of my head, but I could
go through, you know, month by month. . . [18]

Following Ms. Haney's testimony, which was clearly exculpatory regarding Mr. Schock's

intent regarding the use of campaign funds, Mr. Bass challenged Ms. Haney for several pages of

testimony.  As his chief example to test her view of the permissibility of Mr. Schock's

expenditures, Mr. Bass asked how a payment for ski lift tickets would not be personal.  Ms. Haney

responded that it would not be personal if it was connected to a fundraiser.  Even though Ms.

Haney was legally correct that lift tickets purchased in connection with a fundraiser held at a ski

resort are perfectly permissible,[19] Mr. Bass falsely implied that it was illegal:  "unless the campaign

---

[18]  Transcript of Testimony of Karen Haney, July 10, 2015, 29:14–31:3
(GJ_TRANSCRIPT_00004008).

[19]  *See* Final Rule: Expenditures; Reports by Political Committees; Personal Use of Campaign
Funds, 60 Fed. Reg. 7,862, 7,864-66 (Feb. 9, 1995) (noting that entertainment expenses are
permissible under FECA and that "the rules do not require an explicit solicitation of contributions
or make distinctions based on who participates in the activity.").  The campaign committees of
Senators and Members of Congress have routinely charged expenses for fundraisers that are
connected to events such as skiing, golf, sporting events, concerts and the like.  As an example, in
2014, Friends of Dick Durbin spent over $10,000 on NHL tickets for fundraisers.  Friends of Dick
Durbin Committee, Year-End Report of Receipts and Disbursements, Itemized Disbursements
(Nov. 25, 2014 and Dec. 19, 2014).  The Steve Israel for Congress Committee spent $15,000 at
Madison Square Garden for "Catering, Facility Rental & Fundraising Event Tickets."  Steve Israel
for Congress Committee, Year-End Report of Receipts and Disbursements, Itemized
Disbursements (Dec. 22, 2014).  Walden for Congress paid $400 to the Deer Valley Resort in Park
City, Utah for event tickets.  Walden for Congress, July Quarterly Report of Receipt and
Disbursements, Itemized Disbursements (Apr. 5, 2013).  Tim D'Annunzio for Congress spent
$680 on skydiving tickets.  Tim D'Annunzio for Congress, October Quarterly Report of Receipts
and Disbursements, Itemized Disbursements (Sept. 15, 2012).  More pertinent to the prosecutor's
example, the Collins for Congress committee paid $640 for lift tickets in 2014 and the Mary Bono
Mack Committee paid $1,517 for lift tickets in 2007.  *See* Collins for Congress, April Quarterly
Report of Receipts and Disbursements, Itemized Disbursements (Jan. 10 & 11, 2016); Mary Bono

fundraiser was on the ski lift as we were going up to the top of the mountain, wouldn't – wouldn't skiing potentially be a personal expense as opposed to a campaign expense?"[20]

When Ms. Haney equivocated in response to Mr. Bass's incorrect view of the law, he questioned the basis for her earlier answer about Mr. Schock doing everything to ensure compliance, and implied that her only basis for doing so is "loyalty":

Q:  [W]ouldn't skiing potentially be a personal expense as opposed to a campaign expense?

A:  I don't really know how that –

Q:  So then isn't that the appropriate answer to whether Mr. Schock did everything that he could do is, as opposed to yes, I don't know?

A:  I'm sorry.  Could you –

Q:  Wouldn't the appropriate answer to my question about whether or not Mr. Schock did all he could do to ensure that personal expenses were not paid for with campaign funds be I don't know rather than yes?

A:  But I believe that he did.

Q:  And so then my question to you again, why do you believe that?  What information do you – are you basing that on?  *Other than just what appears to be loyalty to him, why do you believe that*?

A:  Well, as I said, there's other expenses that arguably could have been charged to the campaign that weren't.  Because I know that Aaron has never done anything for me to – for him to violate my trust with him, nor have any of the other employees.  And besides that, there's also another level to where the bills go after me, which is PDS.  So, ultimately, right, they're compliance.  They – their job is to have full knowledge of FEC laws.  And if there was something in there that they were concerned was not considered an authorized expense, then they would say something.[21]

---

Mack Committee, April Quarterly Report of Receipts and Disbursements, Itemized Disbursements (January 11, 2007).

[20] Transcript of Testimony of Karen Haney, July 10, 2015, 34:12 – 15 (GJ_TRANSCRIPT_00004008).

[21] *Id.* at 34:14 - 35:18 (emphasis added).

Over the next 15-plus months, Mr. Bass and government agents interviewed Ms. Haney three more times and called her back to the grand jury. As discussed below, through these additional encounters, they informed Ms. Haney of numerous events that were outside her personal knowledge and of which she was not previously aware. Much of this information was negative regarding Mr. Schock, and more concerning, some of the information—related to conduct that is charged in the Indictment—was false or highly misleading at best.

> a.   The prosecutor misled Ms. Haney and the grand jury about Mr. Schock's bank statements in a faulty attempt to demonstrate intent regarding deposit of Super Bowl ticket proceeds

The government has charged Mr. Schock with wire fraud and falsifying FEC records by allegedly causing Schock Victory Committee to pay for Super Bowl tickets in 2014, while Mr. Schock personally deposited the proceeds from selling those tickets. *See* Indictment, Counts 7 & 14. Separately, the government has charged Mr. Schock with falsifying FEC records by allegedly causing his leadership PAC, GOP Generation Y Fund, to disclose legal fees it paid related to a dispute with a former staffer as "PAC Legal Fees."

During the grand jury proceedings, the prosecutor repeatedly attempted to draw a false connection between these separate transactions in order to raise an inference of intent. The government's theory was that Mr. Schock sold the 2014 Super Bowl tickets and kept the proceeds because he did not have sufficient funds in his bank account at the time to fund a pre-existing obligation: namely, his agreement to pay legal fees incurred by his former Executive Assistant Jeannie Etchart. As discussed below, the very records the government showed witnesses to demonstrate its conclusion that the funds were needed to cover the check for fees showed *precisely the opposite*. But the government misled the grand jury and witnesses before it by failing to show witnesses the entire record (one full page). Mr. Bass instead showed only the select portion that suited his purpose. As a result, he presented Ms. Haney—and several other witnesses—with false

evidence that falsely implied a motivation for Mr. Schock to retain the proceeds of the ticket sale, when in fact the alleged premise for so concluding was factually wrong.

   As evidence of this alleged connection, the prosecutor repeatedly presented the grand jury and witnesses before it like Ms. Haney with the following screen-shot of Mr. Schock's bank statement from February and early March of 2014 in order to show that Mr. Schock only had $1,791.76 in his checking account as of February 10th, and therefore *needed* to deposit the $12,500 from the ticket sales on February 15th, in order to have enough cash to fund his $7,500 legal fees obligation, which he paid over two weeks later on March 4th.



**GJ_TRANSCRIPT_00002183 CEFCU_3_00000023**

The presentation of this snippet of the bank statement was false and misleading.  The same statement, *on the very same page, and directly above that snippet*, confirmed that Mr. Schock had over $130,000 in his bank account at the time:

31

Savings Account Number
Annual Percentage Yield Earned    .15% FOR THE PERIOD 02/01/2014 - 02/28/2014
YTD Dividends                32.44
Joint Member    Janice M Anseth

| Previous Balance | | | 02/08 | 133,326.41 |
| ACH Transaction | ACH ALLY | -1,134.10 | 02/24 | 132,192.31 |
| DIVIDEND CREDIT | | +15.32 | 02/28 | 132,207.63 |

Checking Account Number

| Total Overdraft Fees | This Stmt | .00 | This Year | .00 | Last Year | .00 |
| Total Returned Items Fees | This Stmt | .00 | This Year | .00 | Last Year | .00 |

Joint Member    Janice M Anseth

| Previous Balance | | | | 02/08 | 1,782.52 |
| ACH Transaction | | ACH US HOUSE OF REPR | +534.24 | 02/10 | 2,316.76 |
| Check | 1747 | | -525.00 | 02/10 | 1,791.76 |
| Deposit | | M248533-7900 N UNIVERSITY PEORIA | +12,150.00 | 02/15 | 13,941.76 |
| ACH Transaction | | ACH BETTER BANKS | -2,474.58 | 02/18 | 11,467.18 |
| ACH Transaction | | ACH CC OF PEORIA | -429.00 | 02/19 | 11,038.18 |
| Check | 1749 | | -525.00 | 02/20 | 10,513.18 |
| ACH Transaction | | ACH US HOUSE OF REPR | +1,265.60 | 02/22 | 11,778.78 |
| Check | 1752 | | -143.95 | 02/27 | 11,634.83 |
| ACH Transaction | | ACH HOUSE OF REP -MI | +7,961.42 | 02/28 | 19,596.25 |
| ACH Transaction | | ACH BETTER BANKS | -2,474.58 | 03/03 | 17,121.67 |
| ACH Transaction | | ACH AMEX EPAYMENT | -2,678.83 | 03/04 | 14,442.84 |
| ACH Transaction | | ACH CITI AUTOPAY | -281.33 | 03/04 | 14,161.51 |
| Check | 1756 | | -7,500.00 | 03/04 | 6,661.51 |

*Id.*

Moreover, even a cursory review of Mr. Schock's bank statements demonstrates that his savings account (which had $132,207.63 at the end of February) routinely and automatically covered overdrafts in his checking account, including three times the very next month,[22] and a total of at least *twenty-eight times* in bank statements the government has obtained from multiple sources.[23]

The prosecutor and government agents nevertheless presented Ms. Haney with this misleading information in a proffer session and then again before the grand jury. During an April 2016 proffer session with Karen Haney, the prosecutor and/or his agents apparently presented this

---

[22] *See* AS_PROD_00000207 (bank statement for March 2014 reflecting overdraft coverage on March 18, 19, and 20).

[23] *See, e.g.*, AS_PROD_00000108 (one instance); AS_PROD_00000112 (one instance); AS_PROD_00000114 (one instance); AS_PROD_00000134 (one instance); AS_PROD_00000142 (two instances); AS_PROD_00000153 (two instances); AS_PROD_00000168 (nine instances); AS_PROD_00000207 (three instances); AS_PROD_00000214 (one instance); AS_PROD_00000216 (three instances); AS_PROD_00000222 (one instance); and AS_PROD_00000257 (three instances).

false connection between Mr. Schock's sale of Super Bowl tickets to his payment of Jeannie Etchart's legal fees to Ms. Haney and confirmed that she was "unaware" of it.  The report states:

> HANEY was unaware that SCHOCK deposited the $12,000.00 in proceeds from the sale of the tickets to the broker into his personal account and *then used $7,500.00 of the deposited proceeds to pay JOHN ETCHART for legal fees.*[24]

Fewer than two months later, in front of the grand jury and the now-Acting United States Attorney who sat in on Ms. Haney's testimony, Mr. Bass again falsely connected the deposit of the 2014 Super Bowl ticket proceeds and the payment of legal fees by showing her the misleading snippet of Mr. Schock's bank statement.[25]   He did this through a pain-staking 21 pages of testimony, wherein he repeatedly established that:  (1) Ms. Haney had no knowledge of the sale of the tickets or any use of the proceeds, (2) she had no knowledge of the underlying dispute related to the legal fees, (3) he knew that she did not know these things, and (4) he had told her these things during prior interviews.

Mr. Bass began the inquiry by discussing Mr. Schock's purchase and sale of sporting event tickets.  At the outset, he specifically observed that he had spoken with Ms. Haney about these topics during prior proffer sessions and that he knew she was unaware of the details:  "And would this have been one of the areas where you were – *became aware of information that you had not*

---

[24] FBI Form FD-302 Revised Memorandum of Interview of Karen Haney, Apr. 21, 2016 (AGENT_RPT_0000155) (emphasis added).
[25] *See* Transcript of Testimony of Karen Haney, June 1, 2016, 41-61 (GJ_TRANSCRIPT_00001971).

*previously been aware of?*"[26]  He then twice confirmed that she also *did not know* that Mr. Schock

sold tickets or that he deposited the proceeds into his bank account.[27]

Mr. Bass pivoted to ask questions related to the legal fees.  After Ms. Haney confirmed

that she did *not* know anything about the underlying dispute related to those fees.  Mr. Bass

presented Ms. Haney with Mr. Schock's bank statement:

> Q:  So in the – shortly after the sale – the deposit of the – do you see the balance in
> the CEFCU account just before the deposit of the sale of the Super Bowl tickets?
> 1791.76 I believe is the total.  Do you see that?
>
> A:  *I'll trust what you say*.  I feel like I need to get glasses because I cannot even
> read that but – okay.
>
> Q:  Is that better?
>
> A:  You're looking at the bottom number?
>
> Q:  I'm looking at the red circle – the black circled number.
>
> A:  Oh.[28]

Ms. Haney's response makes clear that the prosecutor was presenting the bank statement on some

kind of projector.  She even had to "trust" what he was telling her because she could not read what

was on the screen until he apparently zoomed in even further.  Mr. Bass next directed her to the

deposit shown on that bank statement:

> Q:  On 2/10 the balance in the account was 1791.76.  Do you see that?
>
> A:  Yes, I see that.

---

[26] *Id.* at 41:17 – 42:1 (emphasis added); *see id.* at 46:11-17 (reconfirming "so there's no
misunderstanding" that Ms. Haney was "unaware of . . . how the tickets were purchased or who
purchased them").

[27] *See id.* at 46:22-47:13.  A page later, he confirmed this yet again: "[P]rior to us asking you about
these matters, you were previously unaware of them; is that right? A:  That's right." *Id.* at 48:8-
11.

[28] *Id.* at 52:7-19 (emphasis added).

Q:  And then when the deposit of the Super Bowl ticket proceeds is made on February 15th, the balance is now 13,941.76?

A:  Yes.[29]

After Mr. Bass "assume[d]" Ms. Haney was "also unaware" of Ms. Etchart's hiring of counsel, and that she was "unaware of this whole matter," Mr. Bass linked the tickets and legal fees:

Q:  And at the time then that Mr. Schock wrote that check, *again this is the balance*, he would not have had enough money in his bank account to cover that $7500 check.  Do you see that?

A:  Yes.

Q:  But when he deposited the sale of the Super Bowl tickets proceeds, now he has enough funds in the account to cover the $7500 check.  Do you see that?

A:  Yes.[30]

After showing her this, Mr. Bass referred to their earlier proffer session and said, "this is where there were certain times during the interview *where you kind of had a realization of things that you had not previously been aware of*."[31]

Finally, Mr. Bass repeated "the whole chronology" in a 28-line narrative statement, yet again connecting the sale of tickets to the payment of legal fees, stating:  "He then sells the tickets for a profit, deposits the proceeds of those tickets in his account, which then allows him to cover

---

[29] *Id.* at 52:20-54:1.

[30] *Id.* at 54:25-55:9 (emphasis added).

[31] *Id.* at 58:6-9 (emphasis added); *see also* FBI Form 302, Revised Memorandum of Interview of Karen Haney at 1, April 21, 2016, AGENT_RPT_0000155 ("HANEY was unaware that SCHOCK deposited the $12,000.00 in proceeds from the sale of the tickets to the broker into his personal account and then used $7,500.00 of the deposited proceeds to pay JOHN ETCHART for legal fees.").

the $7500 check to Mr. Etchart, which he then comes to you and says now can you reimburse me

out of the Gen Y account that $7500."[32]

In sum, through proffer sessions and grand jury testimony, Mr. Bass made Ms. Haney

"*aware of information then that you had not previously been aware of.*"[33]  In Mr. Bass's own

words, providing this information to Ms. Haney allowed her to have "*a realization of things that*

*you had not previously been aware of.*" [34]  But this new information was highly misleading, and

her "realization" was therefore false, and would have the obvious effect of influencing the

witness's testimony by providing this percipient witness with "facts" of which she was previously

unaware.  That this information was coming from a figure of authority, representing the full force

of the primary criminal enforcement arm of the federal government, is significant to the analysis

of its effect.  Mr. Bass, the federal prosecutor, implanted within the mind of Ms. Haney, and by

extension in the grand jury receiving her testimony, a false impression that Mr. Schock had a

motivation to convert the monies to his own use.

This was no one-off mistake.  Mr. Bass repeatedly presented Ms. Haney with information

outside her knowledge, including information the government knew to be false or misleading.

> **b.**  **The prosecutor falsely told Ms. Haney that Mr. Schock had "caused" Schock for Congress to pay off his vehicle loan balance despite the government's knowledge that the car dealership had already explained it was their mistake**

Within the Indictment's description of Mr. Schock's so-called scheme to defraud, the

government accuses Mr. Schock of causing Schock for Congress to incur a loss in an automobile

---

[32]  Transcript of Testimony of Karen Haney, June 1, 2016 at 59:20-60:22 (GJ_Transcript_00001971).

[33]  *Id.* at 41:10 – 42:1 (emphasis added).

[34]  *Id.* at 58:6-9 (emphasis added).

transaction wherein Mr. Schock sold his personally-owned 2010 Chevrolet Tahoe, and the campaign purchased a 2015 Chevrolet Tahoe.[35]  Although the Indictment is short on details, the loss referred to resulted from how an existing loan balance on the 2010 Tahoe was paid off during the transaction.

During the grand jury investigation, the government implied to witnesses like Ms. Haney that Mr. Schock directed this payoff to occur this way.  This was false.  As explained below, while making these representations, the government—including the prosecutor—possessed evidence from Jeff Green, the car dealership's owner, explaining that the dealership had made a mistake that resulted in the payoff being funded from the campaign.  It therefore reflects another instance of the prosecutor influencing the testimony of a key witness with false or misleading information.

Because Mr. Schock had traded in a personally owned vehicle in connection with the campaign's purchase of the new vehicle, the value of the trade in was due him, less payment for any outstanding lien on the trade-in.  During a May 26, 2015 proffer session, Mr. Green alerted the government that a mistake had been made in this transaction.  The government's memorandum reports:  "Green was asked why Schock's personal loan of $5,621.99 was also paid off in addition to receiving the $26,000 check, considering his 2010 Tahoe was only worth a total of $26,000.  Green stated 'looks like we screwed up big time.'"[36]

A few weeks later, on June 17, 2015, through counsel, Mr. Green further explained what happened via a letter to one of the government agents and with a copy to the prosecutor.  The agent had requested documents related to this transaction as well as "any information Jeff [Green] would

---

[35] *See* Indictment ¶ 57, Docket No. 1.

[36] FDIC, Memorandum of Interview of Jeffrey Green, May 26, 2015, at 2 (AGENT_RPT_00000581).

have on who at the dealership discussed the payment of $26,000 to Aaron Schock and the pay-off

of the loan."[37]  Counsel responded that documents had already been provided and continued:

> The other people involved in the transaction were David Angevine, who is still
> employed at Green Chevrolet, and Michael Hammer, who is not.  *Further review
> of the documents make it apparent that a mistake had been made in the transaction
> in that the payoff amount of $5,621.99 should have been subtracted rather than
> added to the payoff.*[38]

In the interim between the government's receipt of the letter from Mr. Green alerting it to

the dealer's mistake and its follow-up interviews with dealership employees about the mistake,

however, the prosecutor had presented to Ms. Haney, as a fact, that Mr. Schock had caused the

campaign to pay off the loan.  The prosecutor and agents first discussed this issue with her during

an April 21, 2016 proffer session.  The report confirms that Ms. Haney "was unaware" of this

information:  "HANEY advised that she was unaware that some of the funds from the campaign

check written to purchase the 2015 Tahoe were used to pay off a loan balance of SCHOCK."[39]

---

[37] Letter from Lee Smith, Esq:  to Bernie Coleman, cc:  Tim Bass at 2 (June 17, 2015) (AGENT_EML_00000388 at -0390).

[38] *Id.* (emphasis added). The government failed to follow-up with anyone at the dealership about this information *for over a year*.  Although the government interviewed Mr. Green again in September 2015, the report of that interview does not reflect any discussion of that transaction (although as noted in Mr. Green's testimony below, he has testified that he had mentioned this mistake "[e]very time we've met," thus exculpatory information was omitted from the September 2015 report of interview, *see* Transcript of Testimony of Jeff Green, June 22, 2016, 44:5-13 (GJ_TRANSCRIPT_00001131); FDIC, Memorandum of Interview of Jeff Green, Sept. 10, 2015 (AGENT_RPT_00001029)).  The government finally interviewed Green Chevrolet employee David Angevine and General Manager Anthony Ficociello in June of 2016 (the last month the grand jury was sitting).  And the prosecutor finally asked Mr. Green to explain the transaction to the grand jury in the middle of June 2016, just days before the government initially intended to indict Mr. Schock.

[39] FBI Form FD-302, Revised Memorandum of Interview of Karen Haney, Apr. 21, 2016, at 2 (AGENT_RPT_00000155 at -0156).

The prosecutor then questioned Ms. Haney about the transaction during her June 2016 grand jury testimony.  There, in the presence of the now-Acting United States Attorney, Mr. Bass directly attributed the payoff to Mr. Schock:

> Q:  Did you know that as part of – not at the time, obviously, since you weren't involved, but later did you know that as a result of that transaction Mr. Schock *caused* Schock For Congress not only to buy the new Tahoe but also to pay off the balance of $5600 on his old Tahoe?
>
> A:  No.  It was my understanding the campaign paid for the car.  I didn't know anything else was tacked onto it.[40]

Mr. Bass later reconfirmed with Ms. Haney that she did not know about this:  "Again, I'm assuming that you were aware of none of this."[41]

Later that month, that is, *after* advising a key witness that Mr. Schock had caused the payoff to occur the way that implicated Mr. Schock, the government finally followed-up with Mr. Green and spoke for the first time with the dealership employees involved in this transaction.  Each confirmed the dealership made the mistake.  General Manager Anthony Ficociello told government investigators:

> The $26,000 that was paid to SCHOCK should have been reduced by the amount of the payoff to Ally Financial.  The amounts were handled as two payoffs. Angevine thought SCHOCK had two payoffs.  *Obviously the dealership did not ask the right questions.*[42]

---

[40] Transcript of Testimony of Karen Haney, June 1, 2016, 100:25–101:8 (emphasis added) (GJ_TRANSCRIPT_00001971).

[41] *Id.* at 102:8-9.

[42] Dep't of Treasury, Memorandum of Interview of Anthony Ficoccello at ¶ 7, June 14, 2016 (emphasis added) (AGENT_RPT_00000714).

When the prosecutor asked Finance Manager Dave Angevine before the grand jury why he kept "talking about what could have, should have, or might have" happened, Mr. Angevine responded: "Part of it is I feel bad because I know I added the payoff."[43]

Mr. Bass finally questioned Mr. Green extensively about the transaction before the grand jury on June 22, 2016, some three weeks after he had told Ms. Haney that Mr. Schock had caused the campaign to pay off the loan. Mr. Green explained how the mistake occurred, reminding the prosecutor that he had explained this to the government on several prior occasions:

> Q: Now, you referenced the fact that there was a mistake, and you say now that you think that this 5,621.90 – 5,621.99, the payoff, should have been deducted from the 26,000 to Mr. Schock?
>
> A: No. On this piece of paper that you've got here in Dave Angevine's writing, they should have subtracted 26,000 from – well, 5,621 from the 26- to come up with that number instead of adding to it. So that's where the opposite – this is David Angevine, who was yesterday, his writing.
>
> Q: So that's what – that's what you're saying now, and you've mentioned this—
>
> A: Every time we've met, yes.
>
> Q: -- that the amount of money that – the amount of the check that was written to Mr. Schock should have been $5,621.99 less. That's what you're saying; right?
>
> A: Correct.[44]

Thus, in June 2016, the government finally confirmed what Mr. Green had indicated in May 2015 and his counsel had stated in June 2015: the payoff was a mistake.

Despite all of this, *the government persists in charging Mr. Schock with causing this transaction*. Returning full circle to Karen Haney, the prosecutor and the government again raised this transaction—that she was not involved in—during a November 2016 proffer session. There

---

[43] Transcript of Testimony of David Angevine 38:15-21, June 21, 2016 (GJ_TRANSCRIPT_00001518).

[44] Transcript of Testimony of Jeffrey Green, June 22, 2016, 44:1-18 (GJ_TRANSCRIPT_00001131).

is no indication that the government advised her that Mr. Green or the dealership employees had

confirmed it was a dealership mistake.  Instead, the report reflects that the government's newfound

theory was that Mr. Schock never told anyone it had been a mistake:

> Haney said she did not know that Schock had a balance on the old Tahoe and she
> did not know Schock received a $26,000 check from the $73,000 that was paid by
> the campaign. Haney also did not know that there was a payoff made on the loan
> for the old Tahoe. *Haney was never told it was a mistake for paying off the loan.*
> *Schock never advised Haney of a mistake and he never reimbursed the campaign.*[45]

There is also no indication that Mr. Bass presented Ms. Haney with any evidence indicating that

Mr. Schock had ever realized that a mistake had been made.

This omission was misleading as well, as Mr. Green had explained during his grand jury

testimony both how and *when* the mistake was discovered, explaining that after government agents

had first questioned him regarding the transaction (*i.e.*, long after Mr. Schock had resigned and the

investigation had commenced), Mr. Green and his employees reviewed the transaction and found

the mistake:  "So we're going through the numbers, and that's when I spotted that this 5,621 should

have been subtracted and not added.  And then everybody just – we were, like, 'Oh, my gosh.'  So

that's when I told your guys."[46]

> ### c.  The government has taken numerous actions that have had the effect of intimidating Ms. Haney, which steps, combined with the other misconduct in regard to her as a witness, improperly influenced her testimony

Between Ms. Haney's initial grand jury appearances in 2015 and her final proffer session

in November 2016, the government had numerous interactions with Ms. Haney under contentious

---

[45] U.S. Postal Inspector Memorandum of Interview of Karen Haney, Nov. 2, 2016 (emphasis added) (AGENT_RPT_00001006 at -1009).

[46] Transcript of Testimony of Jeffrey Green, June 22, 2016, 46:14-18 (GJ_TRANSCRIPT_00001131); *see id.* at 46:19-24 (confirming this was after the government requested that Mr. Green produce records).

circumstances that would intimidate any witness, including illegal searches and potential

infringements of her attorney-client relationship. Her treatment bespeaks precisely the distinction

of which Justice Berger warned between prosecutors' hard blows and foul ones.[47] For example:

- Ms. Haney, as she confirmed to the grand jury and as discussed further below, believed that she was not permitted to tell her lawyer, Mr. Coffield, about matters discussed during proffer sessions that he did not participate in (which was at the government's direction);

- The government repeatedly threatened Ms. Haney with prosecution in connection with her grand jury testimony when she gave truthful testimony not to the prosecutor's liking (also hiding behind a representation that it was "the grand jury" that was contemplating revoking her immunity, for example);[48]

- Government agents executed a search warrant on Schock for Congress in Peoria, during which Ms. Haney was directed to come to the campaign office to provide access to the office and storage units, on a day the prosecutor knew her attorney was otherwise engaged in Springfield representing another witness in connection with grand jury proceedings in this matter;

- An FBI agent appeared at her house unannounced one morning saying he was directed by the prosecutor to search boxes belonging to Mr. Schock without receiving prior permission from Ms. Haney's counsel (and never receiving any consent from Mr. Schock or his counsel for the search of sealed boxes); and

- Subjected her repeatedly to proffer sessions covering the same topics.

Tellingly, and as detailed just below, the government omitted references in a government

report to its threat to charge Ms. Haney. And it later created, *after* we had complained to the

Department of Justice about USAO interference with defense access to witnesses, a revised version

of a report of a subsequent interview with Ms. Haney that affirmatively conceals that this threat

was made. Altering agent reports to conceal that wrongdoing, after the defense raised the issue, is

also grounds for a finding that the government committed misconduct. *See United States v. Omni

Int'l Corp.*, 634 F. Supp. 1414, 1425-27 (D. Md. 1986) (holding that government committed

---

[47] *Berger*, 295 U.S. at 86 (1935).

[48] *See* Decl. of Karen Haney, Ex. A, ¶¶ 2, 4.

misconduct by revising and creating new agent reports in response to concerns raised by defendant).

Ms. Haney's first proffer session was on November 19, 2015.  This was after she had already testified before the grand jury on four different days.  The prosecutor finally permitted a proffer session based upon an agreement that her attorney, Mr. Coffield, could not be present, but that her other attorney and Mr. Coffield's local counsel, Mr. Beckett, could be.  Mr. Coffield had objected to this arrangement but reluctantly agreed to it to help his client avoid more of the type of abuse she had suffered in prolonged grand jury appearances.  At the outset of that interview, Ms. Haney recalls that Mr. Bass gave an approximately five-minute long speech, stating in part that there were strong concerns from him and the grand jury about her and her candor and warning her that the grand jury had raised the possibility of removing her immunity.[49]

As the Supreme Court itself observed in the leading case of *Bank of Nova Scotia*, the government commits misconduct when it "threaten[s] to withdraw immunity from a witness in order to manipulate the witness' testimony," which has the potential to give "rise to a finding of prejudice."  487 U.S. at 262.  Being tough on a witness as to whom the prosecutor has a good faith belief that the witness is lying is not improper; but a pattern of threats and other intimidation designed to bend a witness's testimony to the prosecutor's will clearly is wrong.  Concealing that conduct compounds both the error and the prejudice to a defendant from it.

Further compounding this misconduct, the government failed to record its threat.  Although this threat constituted *Giglio* information, in that it could be used to impeach Ms. Haney at trial, the government's report of the interview states only:  "Prior to the interview, Assistant United States Attorney, Timothy Bass, instructed Haney to be 100% truthful with her answers and that

---

[49] *See* Decl. of Karen Haney, Ex. A, ¶ 2.

anything Haney provides could not be used against her pursuant to the proffer agreement Haney previously entered into."[50]  This conveys but a fraction of the five-minute speech that Mr. Bass gave, and it omits entirely the threat to revoke her immunity.

Worse still, it appears the government later took steps to add a statement to an existing interview report to state the opposite: that Ms. Haney had never been threatened.  After the November 2015 proffer session, Ms. Haney's next proffer was on April 21, 2016.  The government has produced two versions of a memorandum reporting on this interview.  The first, which was drafted the following day by the FBI's lead agent on the case, does not contain any discussion about whether or not anyone had ever threatened Ms. Haney's immunity or about an email that her counsel, Mr. Coffield, had sent to Mr. Schock's counsel stating that he feared the prosecutor would look unfavorably upon any of his clients meeting with Mr. Schock's counsel.[51]

The government drafted a revised version on July 22, 2016, which was after the first grand jury expired and after we had raised concerns with the Department of Justice regarding various issues of misconduct, including the treatment of Ms. Haney.  This new version is identical to the first except for the inclusion of the following paragraph:

> AUSA BASS began the interview discussing a March 1, 2016 email from WILLIAM COFFIELD to GEORGE TERWILLIGER with the permission of BECKETT.  BECKETT was provided with a copy of the email prior to the interview and was permitted to consult privately with HANEY about it before the interview began.  With the permission of BECKETT, AUSA BASS let HANEY read the email and HANEY advised that she had no knowledge about the email and that the email did not speak on her behalf.  *HANEY further advised that she has not been threatened by anyone nor has anyone threatened to revoke her agreement with the Government*.  HANEY also understands that she is free to speak to AARON SCHOCK'S attorneys if they request an interview and it is her decision.  AUSA

---

[50]  Dep't of Treasury, Memorandum of Interview of Karen Haney, Nov. 19, 2015 at 1 (AGENT_RPT_00000773).

[51]  FBI Form FD-302, Interview of Karen Haney, Apr. 21, 2016 (drafted Apr. 22, 2016) (AGENT_RPT_00000157).

BASS also received permission from BECKETT to question HANEY about the email in the Grand Jury.[52]

The representation that Ms. Haney "further advised that she has not been threatened by anyone nor has anyone threatened to revoke her agreement with the Government" is false.  As confirmed by Ms. Haney's attached affidavit, *see* Ex. A, Mr. Bass had repeatedly made this very threat.

As for the representation that Ms. Haney "also understands that she is free to speak to AARON SCHOCK'S attorneys if they request an interview and it is her decision," that is questionable at best, and in any event was the result of defense complaints about the government's hindering of witness communications.  Ms. Haney confirmed in her final grand jury appearance on June 1, 2016, which was after the April interview in question, that she did not believe she could even speak to *her own lawyer* (Coffield) about the proffer sessions.

Indeed, a review of the record makes it clear that the government went to great lengths to prevent Mr. Schock, through his lawyers, from obtaining information that would be useful to his defense.   At the conclusion of Ms. Haney's June 1, 2016 testimony, Mr. Bass turned the questioning over primarily to now-Acting United States Attorney Patrick Hansen, who interrogated Ms. Haney about how she had been treated and whether she understood that she was free to talk to anyone she chooses.  Ms. Haney ultimately demanded to have her attorney, Mr. Coffield, present for conversation on that subject matter, but she first confirmed repeatedly that she was under the impression that she could not talk to Mr. Coffield (her *own* attorney) about what was discussed during proffer sessions:

Q (by Mr. Hansen):  Has anybody asked you not to cooperate with the government?

A:  No.

---

[52] FBI Form FD-302, Revised, Memorandum of Interview of Karen Haney, Apr. 21, 2016 (drafted July 22, 2016) (AGENT_RPT_00000155).

Q:  Has anybody from the government asked you not to cooperate with anyone else?  It's that hesitation that makes me ask the question.

A:  I – yes, I feel like that.[53]

Upon further questioning, Ms. Haney explained that while no one had specifically asked her not to cooperate, she had believed that she was not permitted to talk to Mr. Coffield about certain things:  "But I will say I certainly was under the impression that I was not to talk to my own attorney about what was taking place in proffer sessions."[54]  Under still further questioning, she reiterated that same point several more times.[55]  During this questioning, a grand juror even chimed in to try to explain the government's motivation:  "they didn't want your lawyer – the other lawyer to be in the session, not that you couldn't talk to him, but *he didn't want the lawyer hearing everything*."[56]

Mr. Hansen and Mr. Bass persisted in questioning Ms. Haney regarding how the government had treated her despite her obvious discomfort.  Right after Mr. Hansen started questioning her about these topics, Ms. Haney asked to step out to talk to her attorney.[57]  Two pages later, she again informed Mr. Hansen that she felt like she needed to consult her attorney.[58]  She left to confer again.[59]  One page after that, Ms. Haney stated that she "would feel more

---

[53]  Transcript of Testimony of Karen Haney, June 1, 2016, 140:16-22 (GJ_TRANSCRIPT_00001971).

[54]  *Id.* at 143:4-7.

[55]  *See id.* at 143:17-18 (confirming one of her attorneys [Mr. Coffield] "wasn't allowed to be in my proffer sessions"); *id.* at 144:16-18 ("But then I also was told that I wasn't to discuss anything from the proffer with Mr. Coffield, who is co-counsel with Mr. Beckett."); *id.* at 145:18-20 ("I was definitely under the impression I couldn't tell him [Mr. Coffield] what took place in the proffer.").

[56]  *Id.* at 145:12-17 (emphasis added).

[57]  *See id.* at 139:18-21.

[58]  *Id.* at 141:4-6 ("I feel like I need to talk …. talk to my attorney.").

[59]  *Id.* at 141:16-17.

comfortable talking about this with [her] attorney—"[60]  Mr. Hansen kept saying that was "okay,"

but he also kept asking questions.  Mr. Bass shortly interjected to explain "the circumstances under

which the proffers were held."[61]  Finally, after several more pages of continued questioning on this

topic, Ms. Haney insisted that she "just [did not] know if it's the appropriate venue" to discuss

"any other issues or questions she wanted to raise."[62]  After Mr. Hansen asked if they could talk

outside the grand jury room, Ms. Haney replied, "That's fine.  I mean, I just really would prefer

my attorney be present, if that's allowable."[63]  Mr. Hansen finally agreed to discuss the matter

further outside.

> **d.      Perfecting the influence on the witness's testimony: after intimidating and providing Ms. Haney with false, negative information about Mr. Schock, the government sought to establish that her opinion of Mr. Schock had changed**

Ms. Haney was the final witness the government interviewed before presenting the

Indictment to the charging grand jury.  Even though the government by now had interviewed her

three times and she had appeared before the grand jury five times, the prosecutor and the agents

went through nearly all of the conduct that would be charged against Mr. Schock with Ms. Haney,

including conduct related to congressional MRA expenditures she was not a part of.  At the

conclusion of the interview—the last one the government conducted before seeking the

Indictment—Mr. Bass reminded Ms. Haney of a question that she had answered in an earlier grand

jury appearance, but this time, he finally received a different answer:

> Bass reminded Haney that in the first Grand Jury when asked the question if she
> thought Schock had done all he could to document mileage, she replied yes.  Bass
> then asked Haney if she would respond the same way now, *knowing all the*

---

[60] *Id.* at 142:23-24.

[61] *Id.* at 143:19-22.

[62] *Id.* at 147:15-23.

[63] *Id.* at 148:3-5.

*information she has been given and the misapplication by Schock.*  Haney replied
that after seeing it all, she would not answer those questions the same way.

U.S. Postal Inspector, Memorandum of Interview of Karen Haney, Nov. 2, 2016 (emphasis added)

(AGENT_RPT_00001006).

Mr. Bass had in fact succeeded in changing Ms. Haney's opinion about Mr. Schock's

conduct.  But this was premised on false information, abusive questioning, and harassment.

### 2.     The prosecutor threatened Sarah Rogers, provided her with false facts, and misled her on the law

Throughout the grand jury investigation, the prosecutor subjected Sarah Rogers, who was

Mr. Schock's third Executive Assistant, to much the same treatment as Ms. Haney.  This included

requiring Ms. Rogers to testify on four days before the grand jury and to participate in three proffer

sessions and follow-up questioning.  And as detailed below, the prosecutor's treatment of Ms.

Rogers within the grand jury—particularly her early appearances—was contentious if not outright

abusive.

More troubling still, the prosecutor presented Ms. Rogers with false information regarding

events outside her personal knowledge.  The chronology mirrors that of Ms. Haney's treatment

discussed above.  Faced with a key witness whose testimony was objectively favorable to Mr.

Schock on relevant issues, Mr. Bass responded by repeatedly subjecting Ms. Rogers to additional

inquiries (though often on the same topics discussed again and again) and to false information that

would have the predictable effect of influencing Ms. Roger's view of Mr. Schock and thus her

testimony.

### a.     The government subjected Ms. Rogers to hostile grand jury appearances instead of proffer sessions because the prosecutor did not want her attorney to participate

Just like with Ms. Haney, Mr. Bass denied Ms. Rogers the chance to proffer before her

initial grand jury appearances because the prosecutor did not want her attorney, William Coffield,

to learn and communicate information to the defense.  On June 3, 2016, which was exactly one

year after Ms. Rogers first appeared in the grand jury, Mr. Bass explained his reasoning:

> Q:  But you understood at that time that the government was unwilling – because
> of the concerns that the government laid out in the motion relating to Mr. Coffield's
> and Mr. Beckett's fees being paid by Mr. Schock and the fact that Mr. Coffield was
> communicating with Mr. Schock's counsel and possibly sharing information that
> you provided not only with Mr. Schock's counsel but might be required to share
> information that you provided in a proffer with his other clients?  Do you remember
> those were some of the concerns that we addressed in the motion that we filed?
>
> A:  Yes
>
> Q:  Okay.  And that was the reason why we were – do you understand that that was
> the reason why we were unable to conduct any meetings outside the grand jury at
> that time?
>
> A:  I did not understand that at the time, but I do now.[64]

Notably, the prosecutor later permitted Mr. Beckett to participate in proffer sessions, so Mr. Bass's

voiced concern about Mr. Schock's (actually Schock for Congress's) payment of staffer legal fees

was apparently not a principled basis for refusing the proffers.  Thus, Mr. Bass's only reason for

depriving Ms. Rogers of the chance to have one of her lawyers participate was the possibility that

he might share information with the defense.

Due to the lack of an initial proffer session, and without a lawyer in the grand jury room,

Ms. Rogers' initial grand jury sessions were trying experiences for her.  As an agent memorandum

for a much later proffer session reports:  "ROGERS did advise that she did feel uncomfortable

with the grand jury process in the beginning because the process is intimidating."[65]  Similarly,

when Mr. Bass later questioned Ms. Rogers in front of the grand jury about her treatment, she

---

[64]   Transcript   of   Testimony   of   Sarah   Rogers,   June   3,   2016,   5:16-6:9
(GJ_TRANSCRIPT_00008973).

[65] FBI Form FD-302, Interview of Sarah E. Rogers, May 3, 2016 at 1 (AGENT_RPT_00000168).

"strongly" agreed that her earlier grand jury appearances were uncomfortable.[66]  She explained

that she was in a "much better place" after finally being afforded a proffer session opportunity.[67]

During this discussion, Mr. Bass explained again that the government had finally agreed to this

less-confrontational option "provided that Mr. Beckett would be the attorney that would represent

you during these meetings and that he would not be sharing any information with Mr. Coffield or

with any other clients."[68]

Mr. Bass later returned to the subject of Ms. Rogers' treatment at the end of her grand jury

testimony and asked if the government had ever threatened her in any way:

> Q:  Has anyone ever – from the government ever threatened you in any way?
>
> A:  I think there was a lot of confusion in the beginning of this process because none of us have been through this before and you're told to not talk about it and there's a stigma around the case.  It was very clear in the beginning that you did not care for Mr. Coffield or that became clear through my first couple jury chances.  But with – but after the proffer things – proffer sessions, things are much more clear now.  So, no.  Now I know I can meet with Aaron's attorneys.  *Then I thought it was not okay for me to meet with Aaron's attorneys.*  Not because of anything specific that you had said but just because I was told – or, I thought that we couldn't talk about anything that happened.[69]

Ms. Rogers therefore had initially had the distinct impression that she could not meet with and talk

to Mr. Schock's counsel.  It is misconduct for the government to "instruct a witness not to speak

with the defense or otherwise artificially restrict the defense's access to a witness."  *United States*

*v. Linder*, No. 12 CR 22, 2013 WL 812382, at *43 (N.D. Ill. Mar. 5, 2013).

---

[66] Transcript of Testimony of Sarah Rogers, June 3, 2016, 7:7-12 (GJ_TRANSCRIPT_00008973).
[67] *Id.* at 7:18-19.
[68] *Id.* at 6:10-17.
[69] *Id.* at 73:13 – 74:4 (emphasis added).

### b.    Ms. Rogers provided exculpatory evidence regarding Mr. Schock, which was met by the prosecutor's dismissiveness

Ms. Rogers' initial grand jury sessions were not just uncomfortable; they were abusive. During those sessions, on multiple topics central to the Indictment, she provided significant exculpatory evidence as to Mr. Schock's actions and intent.  Mr. Bass met such testimony with confrontation and accusations of bias, evasiveness, and even threats of false statements and obstruction of justice.

For example, during Ms. Rogers' first grand jury appearance, she provided exculpatory evidence regarding Mr. Schock's receipt of private automobile mileage reimbursements.  During her testimony, she repeatedly explained to the grand jury that she submitted vouchers to the House Finance Office for reimbursement to Mr. Schock based on a monthly amount, which she adjusted up or down based on his time spent in district, which she understood was based on a historical average that had been figured out by her predecessors.[70]  She also testified she had no basis to doubt the historical average's accuracy because Mr. Schock worked constantly and drove all over his district.  In response to the prosecutor asking her how she knew "that he drove a single mile," she explained:

> I also knew that he kept a very busy schedule, so – I would talk to him quite frequently on the weekends.  He would be going from – [a grand juror left the room] – one farm bureau picnic to another speech to another – I mean, he – I don't think

---

[70]  *See, e.g.*, Transcript of Testimony of Sarah Rogers, June 3, 2015, 37:13 -38:14 (GJ_TRANSCRIPT_00004472) ("Mileage was figured out to be around 1200 a month.  It depended on how much he was in the district."); *id.* at 42:22 – 43:13 ("And so it was my understanding that that had been figured out that that was an average of what he did.  That's the way Pamela [Mattox] did it.  That's the way Jeanne [Etchart] did it.  Jeanne passed that on to me."); *id.* at 37:18-20 (explaining that she would adjust the amount based on Mr. Schock's time in district); *id.* at 54:14-17 ("Q:  And did you or specifically did Mr. Schock ever do anything to confirm whether or not that number was accurate?  A:  No.  I thought that had been done.").

I ever talked to him when he had a down day.  So I never second-guessed that he was driving.[71]

In addition to repeatedly expressing skepticism or dismissal of her testimony, Mr. Bass used the occasion to misleadingly inform Ms. Rogers that in addition to her submission of a voucher for MRA mileage reimbursement for Mr. Schock in September of 2014, Schock for Congress had, in August, reimbursed Mr. Schock $9,433, which equated to approximately 16,844.6 miles.  This was misleading because Mr. Bass implied that the Schock for Congress payment was for one month of driving, stating that with the September MRA payment, "[t]hat's a total of almost 20,000 miles that he was paid for in less than two months alone."[72]  Ms. Rogers did not know about that payment.  But what Mr. Bass failed to tell her was that Schock for Congress had not reimbursed Mr. Schock for campaign-related mileage since December 13, 2010, a span of nearly four years, which included the entire 2012 reelection cycle and part of the 2014 one.[73]

It is one thing to press a witness with hard and probing questions for the truth, it is quite another to give a witness false or misleading information about the subject matter and then badger the witness to provide the desired testimony.  Under almost any circumstance, the latter is at least an ethically questionable tactic.  But when performed by a prosecutor in the one sided context of grand jury proceedings, the line to impropriety is crossed.  And when the effect is to influence the testimony of a witness on matters material to the decision to indict, such misconduct must, we respectfully submit, not be left unaddressed, as it has prejudiced the due process rights of the putative defendant.

---

[71] *Id.* at 50:18-12; 51:3-12

[72] *Id.* at 58:18-59:4.

[73] *See* Schock for Congress FEC Form 3, Year End 2010, at 18.

Having provided this misleading and incomplete information about the campaign mileage, Mr. Bass pressed Ms. Rogers again regarding whether Mr. Schock took money for personal use. She continued to resist such a characterization, but it is clear the misleading Schock for Congress example was on her mind:

Q:  So, Ms. Rogers, how is that not Mr. Schock taking money for personal use?

A:  I don't really know how to answer that question.

Q:  Well, he's getting tax –

A:  I can't speak to the Schock for Congress payment at all.

Q:  If he didn't verify – didn't provide you with one piece of paper verifying the amount of mileage he actually drove but yet you continued to process these as you understood it was to be done, without any information from him, without any verification from him, how is that not—

A:  It was my understanding that this average of miles that he was driven – I mean, he was from – the man wakes up at 5:00 in the morning ready to go and works until, when he's in D.C., 11 or 11:30 at night, nearly every single day, all day.  So from – that average had been done.  I was told to continue that average.  That's all I knew.  That's all I had – I had responsibility over the MRA:  That's – I mean, I never second-guessed that he wasn't driving and doing stuff all of the time.

Q:  What do you think now?  What do you think now?

A:  I don't know the context of that Schock for Congress payment, so I can't –

Q:  Well, have you –

A:  -- speak to that.[74]

Ms. Rogers did not know the context of the Schock for Congress payment because Mr. Bass did not provide it to her.  In response to further questioning, Ms. Rogers acknowledged that during the media frenzy about Mr. Schock, she did have questions about the mileage, but she reaffirmed her belief in its accuracy:  "But was there – I still never doubt that he drove an excessive amount of

---

[74]   Transcript  of  Testimony  of  Sarah  Rogers,  June  3,  2015  at  59:18-60:21 (GJ_TRANSCRIPT_00004472).

miles doing official things every month.  Do I wish that I would have kept to and from or that I would have asked him to?  Maybe."[75]  Mr. Bass's response to this was to question Ms. Rogers' bias:  "Well, let me just ask you then – it sounds like you think very highly of Mr. Schock."[76]

As another example, during a discussion about Mr. Schock's government credit card the following day, Ms. Rogers explained that occasionally mistakes were made regarding what expenses were purchased on the card, but that she and Mr. Schock corrected those mistakes.  Mr. Bass responded by challenging the basis for her statements, but Ms. Rogers provided explanations:

Q:  And did Mr. Schock ever use the government card for personal expenses?

A:  Yes, sir.

Q:  What kind of personal expenses did he use the government card for?

A:  They were typically like a mistake when he put like a meal on the wrong card.  And we would – I would have Karen [Haney] get a personal check from him and mail it to AmEx or I would have him get a personal check and mail it to AmEx.  Or if it should have been a campaign, I would have Karen – tell her the charge and she would determine which committee – which account it came from and send a check to Citibank.

Q:  Why do you refer to it as a mistake?

A:  If you shouldn't have put that on one card.

Q:  So was Mr. Schock using his government credit card for personal and campaign purposes based on --

A:  Not intentionally that I know of.

Q:  Why do you say that?  How do you know what he intentionally did?

A:  Well, typically if it was a mistake and I said, hey, I think this is – should have been paid for otherwise, he would easily write a check.

Q:  To who?

---

[75] *Id.* at 61:14-18.

[76] *Id.* at 61:24-25.

A:  The Citibank.

Q:  How many times did this happen?

A:  I don't know.  Not – not terribly many that I remember.  More early on.[77]

This exchange recalls the one discussed above between Mr. Bass and Karen Haney regarding whether Mr. Schock did everything he could to ensure that campaign funds were not used for personal use.  In both instances, Mr. Bass challenged the basis for the witness's exculpatory statements as to Mr. Schock, and in both instances, the staffers gave specific responses demonstrating personal observations of Mr. Schock's actions.

And just like with Ms. Haney, Ms. Rogers' favorable testimony was met by confrontation, threats, and the presentation of false information about Mr. Schock.

### c.    The prosecutor threatened Ms. Rogers with obstruction of justice because of her confusion about his questions

Mr. Bass not only questioned Ms. Rogers sharply and aggressively, he threatened her by raising the specter of false statement and obstruction of justice accusations based solely on her difficulty answering his inartful questions.  For example, in Ms. Rogers' appearance on June 4, 2015, Mr. Bass quickly leapt to accusations of evasiveness and obstruction during questioning about redecoration of Mr. Schock's office, a project that spanned several months:

Q:  And did you have any conversations with Mr. Schock about that?

A:  Yes.

Q:  And what were those – what did those involve?  What did he tell you about it?

A:  I don't recall all of them.  It was a long process.

Q:  Do you recall any conversation you had with Mr. Schock about the redecoration of his office?

---

[77]   Transcript of Testimony of Sarah Rogers, June 4, 2015, 117:11 – 118:16 (GJ_TRANSCRIPT_00004305).

A:  Yes.

Q:  Tell us about your conversation with him.

A:  There were multiple.

Q:  We can sit here until 5:00 and I can ask you question after question.  I can ask you to come back and I'm going to ask you to come back.  But if there is a question that you don't understand, please tell me.  I'm just trying to ask you simple questions about what conversations you had with Aaron Schock.

Now, the question again is:  Did you have a conversation with Aaron Schock about the decoration of his office?

A:  Yes.

Q:  What was said during that conversation or those conversations, if there was more than one?

A:  There was a lot said.  Can you be more specific?

Q:  No.  I asked you a question.  What was your conversations?  What did you say to him and what did he say to you?

A:  Can I have a break?

Mr. Bass:  Sure.[78]

When Ms. Rogers returned, Mr. Bass resumed questioning, but first warned Ms. Rogers:

Q:  Please have a seat, Ms. Rogers.

Ms. Rogers, the grand jury has asked me to remind you that [you] are under oath.

A:  Yes, sir.

Q:  Do you understand that?

A:  I do.

Q:  I asked – I advised you yesterday that it was part of your rights and responsibilities that if you were to fail to provide truthful testimony you could be charged with the crimes of making a false statement or declaration.  Do you remember that?

---

[78]  Transcript of Testimony of Sarah Rogers, June 4, 2015, 31:23 – 33:6 (GJ_TRANSCRIPT_00004305).

A:  Yes, sir.

Q:  *In addition, if you are intentionally evasive in answering any questions, meaning you intentionally try to avoid or withhold information, you could also be charged with the crime of obstruction of justice*.  Do you understand that?

A:  Yes, sir.

Q:  *And that also carries a penalty of up to imprisonment or a fine or both*.  Do you understand that?

A:  Yes, sir.

Q:  Now let me ask the question again.  Did you have conversation – a conversation or conversations with Mr. Schock about the redecoration of his office?

A:  Yes, sir.

Q:  And could you describe what those – that conversation or those conversations – what occurred and what was said?

A:  Yes, sir.  The confusion in that question is that this is a very lengthy and complicated process for all members of Congress.  So there were a multitude of conversations along the way.[79]

After further discussing the office redecoration, Mr. Bass again "reminded" Ms. Rogers about

obstruction of justice after she responded to a question by saying that she could not recall:

Q:  Do you remember being asked by anyone about how the decoration of the office was paid for?

A:  I'm sure I was asked.  It was a – got lots of attention.  But it wasn't donated. So I don't know that that would have been my – I don't know.  I don't know.

Q:  Do you recall whether or not you were ever asked about how – by anyone about how the decoration of the office was paid for and what was your response?

A:  I don't recall.

Q:  *I want to remind you again about what obstruction of justice is*.

A:  Yes, sir.  I –

A:  I'm asking you about something that happened less than five months ago.

---

[79] *Id.* at 33:9 - 34:19 (emphasis added).

57

A:  Yes, sir.  I was asked about the office a lot.  It was in the newspaper.  I have
quite – I mean, I have friends in D.C.  It was the talk of the town for quite a bit.  I
was asked a lot about the office.  I don't recall an answer of saying it was ever
donated.  I do know that it was a constituent of his that had decorated other offices,
including his previous one.  She gave him advice as a friend.  But he paid for the
objects and stuff that were in there.  I – that's my understanding.[80]

Later in the same testimony, after Ms. Rogers advised Mr. Bass that she could not recall the cost

of Super Bowl tickets she had purchased for Mr. Schock, he told her he "want[ed] to give [her]

every opportunity to tell the truth," that he would give her "one more opportunity" to answer the

question, and that she had "one last chance to answer this question."[81]  Again, this treatment was

in response to Ms. Rogers explaining that she was having trouble recalling specific details – in this

case, about something that had happened well over a year earlier:  "Yes, sir.  And I'm really trying

to tell you the truth, but this is a lot to remember.  I've purchased quite a few things.  There are a

lot of numbers and there are a lot of names.  I'm doing my best to remember."[82]

At no point during these exchanges did Ms. Rogers refuse to answer a question or

irresponsibly try to evade a truthful answer.  Rather, as the examples demonstrate, the problem

was Mr. Bass's questioning.  Ms. Rogers was clearly trying to answer his questions, yet he jumped

straight to accusations of obstruction of justice.  In short, Mr. Bass bullied Ms. Rogers.  He also

provided her false information, as discussed next.

### d.     The prosecutor presented Ms. Rogers with false facts that impugned Mr. Schock

Like with Ms. Haney, Mr. Bass presented Ms. Rogers with the false connection between

the Super Bowl ticket proceeds and payment of Ms. Etchart's legal fees by showing her the

selective snippet of Mr. Schock's bank statement:

---

[80] *Id.* at 47:18 – 48:20 (emphasis added).

[81] *Id.* at 129:13 – 103:12.

[82] *Id.* at 130:13-17.

Q:  This is a copy of Mr. Schock's personal bank account statement.  Do you see the deposit of 12,150 on February 15th?

A:  I do.

Q:  Do you see that?  And do you see the balance in the account just prior to that on February 10th?  It's 1791.76.

A:  I do.

Q:  Which would be less than $7500.  Do you see that?

….

Q:  But Mr. Schock never told you that he had sold these tickets that you had bought on his behalf?

A:  No, he did not.

Q:  And deposited the proceeds into – and at the time he deposited the proceeds he didn't have the money in the account to cover that $7500 check that he later wrote to Mr. Etchart.  Do you see that check cleared on March 4th?

A:  I do.

Q:  None of this was information that Mr. Schock advised you of at any time; was it?

A:  No.[83]

But by the date of Ms. Rogers' testimony, she had already confirmed in a prior grand jury session she did not know Mr. Schock had sold the Super Bowl tickets.  In fact, during that earlier exchange, the prosecutor, without any predicate, informed Ms. Rogers that Mr. Schock had deposited the proceeds of the ticket sale "*and had his campaign account pay* the American Express charge that you incurred."[84]  Ms. Rogers was not aware of that.[85]  Mr. Bass's statement to Ms. Rogers about

---

[83]    Transcript of Testimony of Sarah Rogers, June 3, 2016, 29:12-30:19 (GJ_TRANSCRIPT_00008973).

[84]    Transcript of Testimony of Sarah Rogers, June 4, 2015, 138:10-16 (GJ_TRANSCRIPT_00004305).

[85] *Id.* at 138:17.

something outside of her personal knowledge thus directly, and falsely, represented to a key witness that Mr. Schock *caused* the campaign's payment of the ticket cost – a legal conclusion for which Mr. Bass lacked evidence.

Ms. Rogers also *twice* confirmed her lack of knowledge about the sale of the tickets during interviews, including with the prosecutor.[86]  Notably, the agent's descriptions of the questions and answers on this topic are *identical* in the agent reports for the two interviews, which were conducted more than five months apart, except the addition of one sentence.[87]

Because the prosecutor already knew that Ms. Rogers was unaware of the sale of the Super Bowl tickets, then *a fortiori* he knew by her final June 2016 appearance she would not know how the proceeds of such a sale were used. The only purpose for questioning her about what happened to the sale proceeds therefore was to present her with information that she did not know and that implied Mr. Schock had engaged in wrongdoing. What's worse, this information – presented in connection with her testimony before the grand jury – was affirmatively contradicted by documentary eveidence and thus was false.  The bank statement used by Mr. Bass proved on its face that Mr. Schock had over $130,000 in his bank account. There is no indication that Mr. Bass ever explained to Ms. Rogers that he had been mistaken or that Mr. Schock had not needed the money to pay the legal fees.

---

[86]   FBI Form FD-302, Interview of Sarah E.   Rogers, Nov. 24, 2015 at 3 (AGENT_RPT_00000328); FBI Form FD-302, Interview of Sarah E. Rogers, May 5, 2016 at 2 (AGENT_RPT_00000168 at -0169).
[87]   *Compare* FBI Form FD-302, Interview of Sarah Rogers, Nov. 24, 2015 (AGENT_RPT_00000328), *with* FBI Form FD-302, Interview of Sarah Rogers, May 5, 2016 (AGENT_RPT_00000168).

### e.   Mr. Bass misled Ms. Rogers regarding campaign finance laws in a manner that cast doubt on permissible conduct

Mr. Bass not only presented false or misleading factual information to Ms. Rogers, he misled her regarding the law, including related to conduct charged in the Indictment.   The government has charged Mr. Schock with causing Schock for Congress to falsify an FEC record in violation of 18 U.S.C. § 1519 by reporting the purchase of a Ford Fusion for use by District Chief of Staff Dayne LaHood as a "transportation expense."[88]   This purchase, however, was permissible and accurately disclosed.  A Member of Congress may use campaign funds to purchase a vehicle that will be used for official travel.  The House Ethics Manual expressly states as much:

> **Expenses of a Motor Vehicle That Is Used for Official House Travel.**  It is permissible for a Member to lease or purchase a motor vehicle with campaign funds and to use that vehicle on an unlimited basis for travel for *both* campaign *and* official House purposes.  Campaign funds may also be used to pay the expenses incurred in operating the vehicle, such as insurance, maintenance and repair, registration fees, and any property tax.[89]

The Manual further provides that Members may use campaign funds to defray "official or officially-related travel," including that of staff or even of job applicants, interns, or event guests.[90] The Rules of the House of Representatives likewise condone Members using campaign funds to defray official expenses.[91]

Although this was a campaign expenditure related to a District Office staff member, Mr. Bass nonetheless asked Ms. Rogers, a D.C. office staffer, questions about it.  In so doing, he implied that an official staff member's use of a campaign-purchased vehicle was impermissible:

---

[88] *See* Indictment, Count 17, Docket No. 1 at 45.

[89] House Ethics Manual at 174 (emphasis in original).

[90] *See id.* at 176.

[91] House Rule XXIV, cl. 1(b)(1) ("a Member . . . may defray official expenses with funds of a principal campaign committee of such individual under the Federal Election Campaign Act of 1971.").

61

Q:  Can you think of any reason why it would be appropriate for a House staff member like yourself or Mr. LaHood to be provided with a campaign car?

A:  I didn't have a campaign car.

Q:  Can you think of any reason why it would be appropriate for another staff member such as yourself to be provided with a campaign car?

A:  I don't know.[92]

Through such phrasing, the prosecutor left the distinct impression that Mr. LaHood's use of a campaign-purchased vehicle was impermissible, when in fact it was not.

Shortly thereafter, Mr. Bass continued to press an incorrect view of FEC personal use law by implying that Schock for Congress's payment of concert tickets to reward staff members and office interns for their work was illegal.  Ms. Rogers, however, did not acquiesce, and responded from experience that such use would be permissible:

Q:  Did you pay for your ticket to the Katy Perry concert?

A:  No, sir.

Q:  So that would be a personal expense, right?

A:  The congressman took – most members of Congress at the end of the month take all their interns out for dinner and the conversation was – Aaron brought me into the office the day before and said, 'Instead of taking the interns out to dinner, I want to take them to the Katy Perry concert and ice cream.  Can you see if there are any tickets available?'

Q:  And that would have been a personal expense of Mr. Schock and you and the other staff members; right?

A:  I'd been taken to dinner previously for like end-of-the-year stuff with previous bosses and paid for by the campaign as well.  So I don't know.[93]

---

[92]   Transcript of Testimony of Sarah Rogers, June 4, 2015, 99:22 – 100:5 (GJ_TRANSCRIPT_00004305).

[93] *Id.* at 123:14 – 124:12.

Yet Mr. Bass continued to press Ms. Rogers on whether the campaign's payment for Katy Perry tickets for the interns was personal use. She explained that she believed that while use of *government* money would have been inappropriate, she believed it was appropriate to use *campaign* funds and that she believed it "happens very often for them to be paid for by campaign funds." When asked why she thinks that, she noted for example that a recent news article had reported "that 19 members are hosting events at the Taylor Swift concert that's coming up in D.C." Demonstrating his continued legally-flawed and overly-constrained views about proper uses of campaign funds, Mr. Bass replied: a "concert is not a campaign event. There's no campaigning. There's no speaking by the member. It's a concert, right?"[94]

But the relevant campaign finance provisions are far more expansive than that in making allowance for campaign expenditures. In adopting its regulations governing the permissible use of campaign funds, the FEC explicitly rejected an approach that would require it to "draw conclusions as to which relationship [personal or campaign related] is more direct or significant."[95] The FEC has been "reluctant to make these kinds of subjective determinations," and therefore adopted a rule in order to "reduce piecemeal resolution of personal use issues and . . . provide more prospective guidance to the regulated community."[96] Thus, the FEC rejected an approach that would require an "explicit solicitation of contributions" or that guests be present for an entertainment expense to be permitted under FECA.[97] Instead, the FEC stated that "the rules do not require an explicit solicitation of contributions or make distinctions based on who participates

---

[94] *See id.* 125:4 – 126:24.

[95] Final Rule:  Expenditures; Reports by Political Committees; Personal Use of Campaign Funds, 60 Fed. Reg. 7,862, 7,864 (Feb. 9, 1995).

[96] *Id.*

[97] *Id.* at 7,866.

in the activity."[98]   The FEC declined to adopt a more restrictive rule along the lines of the government's apparent view of campaign finance law, because it would constitute "a significant intrusion into how candidates and officeholders conduct campaign business."[99]

Thus, Ms. Rogers was correct and the prosecutor was wrong.  Nevertheless, his persistence in questioning Ms. Rogers based on his flawed view of campaign finance law very well could have created the false impression that Mr. Schock, the campaign, or even she had broken the law.

### f.   Mr. Bass concluded his dealings with Ms. Rogers by planting a seed that she would be blamed for conduct at issue here

After three substantive proffer sessions, other interactions, and four days of testimony before the grand jury, including all of the intimidation, false information, and misleading statements of law discussed above, Mr. Bass chose to conclude his questioning of Ms. Rogers by sowing a seed that Mr. Schock or his counsel would blame her for the conduct at issue in this case:

Q:  And if that were to be the claim – if Mr. Schock or his attorneys were to say that these were clerical errors, staff mistakes, Sarah Rogers' errors, would that be true?

A:  No.[100]

Thus, just as Mr. Bass had done with Ms. Haney, he attempted to bring Ms. Rogers to question Mr. Schock and his actions despite, or perhaps on account of, her earlier testimony that was objectively exculpatory as to Mr. Schock's alleged offense conduct.

---

[98] *Id.*

[99] *Id.*   Indeed, campaign committees routinely expend funds or hold fundraisers connected to concerts or sporting events.  *See,* supra, note 19.

[100]   Transcript of Testimony of Sarah Rogers, June 3, 2016, 79:19-23 (GJ_TRANSCRIPT_00008973).

### 3.     Mr. Bass similarly misled other witnesses or provided witnesses with negative information about Mr. Schock outside of their knowledge

Karen Haney and Sarah Rogers are two of the key witnesses in this matter, and the government has spent more time with them than nearly anyone else.  The misconduct outlined above is thus particularly troubling given their centrality to the case.

But the government influenced other witnesses by the same misconduct as well, reflecting further that misconduct has permeated this investigation.  For example, Mr. Bass provided false information to Rachel Honegger, who was one of Mr. Schock's first campaign staffers.  He did so by yet again presenting the false connection between the sale of Super Bowl tickets and the payment of legal fees.  As Mr. Bass knew, Ms. Honegger had no role with Schock for Congress in 2013 or 2014, so there was no basis for assuming that she knew anything about either the payment of Ms. Etchart's legal fees or the sale of Super Bowl tickets, let alone a connection between them.  After establishing her lack of any knowledge of that subject matter, Mr. Bass nevertheless went further, directly and falsely connecting the ticket sale to the legal fees:

Q:  *Or that he sold Super Bowl tickets to cover the check*?

A:  No.  Nothing about that.[101]

As explained above, however, Mr. Schock's bank statement contradicts this assertion.  Mr. Bass yet again had presented this false information to a witness.

This repetitious pattern of providing factually wrong information that appears to show previously undisclosed wrongdoing by Mr. Schock to material witnesses who know Mr. Schock well can only have the effect of shaking their confidence in both their knowledge of him and discourage any testimony by them to the effect that Mr. Schock was forthright in his dealings with

---

[101] Transcript of Testimony of Rachel Honegger, June 22, 2016 at 42:7-9 (emphasis added) (GJ_TRANSCRIPT_00001072).

expenses and reimbursements.  And for no apparent reason other than to influence the witness in her opinion of Mr. Schock.

As another repetition of this pattern, Mr. Bass misled both Darren and Rebecca Frye, two close friends of Mr. Schock's, about the facts and the law.  When questioning them about Mr. Schock's occasional use of their condominium in Chicago, the prosecutor misleadingly informed both of them that there is an absolute prohibition on members of Congress receiving gifts, implying that such use constituted an improper gift.[102]  He declined to inform either that the House Ethics Manual expressly permits Members to accept a gift of personal hospitality from an individual, including lodging, even if the lodging is a second home: "It is not required that the host be present; thus, use of a personally owned vacation home is permissible even if the owner is not present."[103]

Mr. Bass also repeatedly presented Ms. Frye with examples of Mr. Schock's alleged spending that were outside her personal knowledge and presented, as an established fact, that Mr. Schock had "used $2,200 worth of campaign funds to buy stereo equipment that was installed in [his] garage,"[104] despite the fact that he presented her no evidence that Mr. Schock knew that campaign funds had been used for such a purpose, let alone that he directed it or intended for it to happen.  Instead, he presented the erroneous legal conclusion that Mr. Schock had broken the law.

Meanwhile, just as he had with Ms. Rogers, Mr. Bass misled Schock for Congress Treasurer Paul Kilgore regarding the campaign's purchase of a vehicle for use by District Chief of Staff Dayne LaHood.  Mr. Bass did so by making the legally erroneous statement that campaign

---

[102]  *See* Transcript of Testimony of Darren Frye, June 23, 2016, 19-27 (GJ_TRANSCRIPT_00009125); Transcript of Testimony of Rebecca Frye, June 23, 2016, 40-41, 45-46 (GJ_TRANSCRIPT_00009233).

[103] House Ethics Manual at 62.

[104]  Transcript of Testimony of Rebecca Frye, June 23, 2016, 68:7-9 (GJ_TRANSCRIPT_00009233).

funds and official expenses can never overlap, without mentioning the House Ethics Manual's express permission for the use of campaign funds to purchase a vehicle for unlimited travel for both campaign and official purposes;[105] that campaign funds may defray "official or officially-related travel";[106] or that the Rules of the House of Representatives likewise condone use of campaign funds to defray official expenses.[107]

Mr. Bass also falsely implied to Mr. Kilgore that Mr. Schock impermissibly used the 2015 Tahoe purchased by Schock for Congress after he resigned, despite the government's knowledge that the campaign had sold the vehicle. Mr. Bass stated that campaign funds cannot be converted to personal use and then established that Mr. Kilgore was unaware "that after Mr. Schock resigned from Congress that he continued to drive that Tahoe that was purchased with Schock for Congress funds." He then asked if Mr. Kilgore could "think of any legitimate reason why a resigned Congress member would drive a campaign-paid-for vehicle."[108] Mr. Kilgore said it could be legitimate if he was "driving to his attorney's office for campaign-related stuff, for example."[109]

This questioning falsely implied that Mr. Schock was continuing to drive a campaign vehicle post-resignation. In fact, and as the government already knew, Schock for Congress promptly sold the Tahoe back to Green Chevrolet on April 6, 2015, just days after Mr. Schock's resignation. A week *before* Mr. Bass questioned Mr. Kilgore, several government agents had

---

[105] House Ethics Manual at 174.

[106] *Id.* at 176.

[107] House Rule XXIV, cl. 1(b)(1) ("a Member . . . may defray official expenses with funds of a principal campaign committee of such individual under the Federal Election Campaign Act of 1971.").

[108] Transcript of Testimony of Paul Kilgore, June 5, 2015, 106:8-17 (GJ_TRANSCRIPT_00006606).

[109] *Id.* at 106:16-17.

interviewed Mr. Green, wherein he confirmed that Green Chevrolet had repurchased the Tahoe,

but that Mr. Green was allowing Mr. Schock, as a friend, to continue driving the vehicle:

> Green explained that on April 6, 2015 his dealership repurchased the 2015 Tahoe for $46,000 from Schock for Congress. However, Schock continued to personally use the vehicle until May 22, 2015 . . . . Green explained that he did not charge Schock anything for using these vehicles because he just wanted to help friend [sic] who is going through hard times.[110]

Indeed, the following day, the FBI followed-up with Mr. Green to photograph the Tahoe's

odometer—thus obviously knowing it was in his possession.[111]  Accordingly, either Mr. Bass knew

that the campaign had resold the vehicle, in which case he knowingly misled Mr. Kilgore, or he

had not bothered to check with his own investigatory team before telling a witness that Mr. Schock

had done something illegal when he indisputably had not.

### C.   Mr. Schock was prejudiced as a result of the government's misconduct before the grand jury

Through its treatment of Ms. Haney, Ms. Rogers, and other witnesses, the government

materially misled the grand jury as to facts and law that were critical to the Indictment.  Moreover,

the government's efforts to mislead and intimidate Ms. Haney and Ms. Rogers effectively deprived

the grand jury of their testimony, which was exculpatory towards Mr. Schock.  Every count in the

Indictment depends upon Mr. Schock's intent; it is the most important factor in this case and the

most critical determination that the grand jury had to make.

The government's treatment of Ms. Haney and Ms. Rogers, as well as other witnesses,

demonstrated a systematic and deliberate effort to mislead the grand jury and overbear its

independent function.   Mr. Schock need not demonstrate that, absent the government's

---

[110]   FDIC Memorandum of Interview of Jeffrey Green, May 26, 2015 at 3 (AGENT_RPT_00000581).

[111] *See* FBI Form FD-302, May 27, 2015 (AGENT_RPT_00000227) (reporting that FBI Special Agent Spencer met Jeff Green "to take a photo of a 2015 Chevrolet Tahoe's mileage").

misconduct, he would not have been indicted.  Mr. Schock need only show that the "decision to indict was substantially influenced, or that there is 'grave doubt' that the decision to indict was substantially influenced, by testimony which was inappropriately before it."  *Useni*, 516 F.3d at 656 (quoting *United States v. Feurtado*, 191 F.3d 420, 424 (4th Cir. 1999)).

> ### 1.  The prosecutor deliberately misled the grand jury as to the most crucial element in this case: Mr. Schock's intent

"The government's knowing use of false testimony, or failure to correct testimony, violates due process."  *United States v. Burke*, 425 F.3d 400, 412 (7th Cir. 2005).  Moreover, "a prosecutor may not deliberately mislead a grand jury or instill false impressions to it in an effort to obtain an indictment."  *Red Elk*, 955 F. Supp. at 1182.  There can be no doubt that Mr. Bass knew that the information he was presenting to the grand jury was misleading.  As noted, Mr. Schock's intent was the key element the government had to show in order to indict him.  In short, the government had to convince the grand jury to believe that the transactions it alleged were criminal were the result of fraud, and were not oversights, mistakes, or otherwise innocent conduct.  And it did so by fabricating intent from false facts.

For example, to demonstrate Mr. Schock's intent to retain the Super Bowl ticket sale proceeds, the government concocted a theory that Mr. Schock needed money to pay legal fees, so he used campaign funds to buy Super Bowl tickets, sold them, and used the profit to pay off the fees.  The key evidence that the government presented to Ms. Haney and the grand jury to substantiate this narrative, which is charged in the Indictment, was that Mr. Schock did not have sufficient funds in his account to cover the legal fees.

This was false.  Mr. Schock had over $100,000 in his account.  The only reasonable inference is that the government knew its narrative was false, because it selectively presented an incomplete portion of a document to witnesses that *concealed* the fact that Mr. Schock had over

$100,000 dollars in his account so as to support its theory of intent.  Common sense and logic tells anyone that by such conduct the grand jury would be deprived of the witnesses' untainted testimony, which just happened to be exculpatory.  Had a private citizen undertaken these actions, they would face potential prosecution for obstruction of justice.  *See* 18 U.S.C. § 1503.

It bears emphasis that Mr. Schock is not challenging the competency or sufficiency of the evidence before the grand jury.[112]  Instead, Mr. Schock's objection "is not to the insufficiency of the evidence but to the prosecutor's knowledge of its insufficiency, which makes the case one of prosecutorial misconduct."  *United States v. Roth*, 777 F.2d 1200, 1204 (7th Cir. 1985).  "What makes the government's knowing use of perjured testimony different is that it involves an element of deceit, which converts the issue from the adequacy of the indictment's evidentiary basis to fraudulent manipulation of the grand jury that subverts its independence."  *Id.*

Nor is Mr. Schock asserting that the government failed to present exculpatory information to the grand jury.  *See Williams*, 504 U.S. at 51.  Mr. Schock's contention, as in the seminal case of *United States v. Samango*, is "that the prosecutor's behavior was so improper and prejudicial that it created a biased grand jury."  607 F.2d at 880-81.  There is clear evidence here that the government used false and misleading information to advance its theory of the case, which deprived Mr. Schock of his right to have an independent grand jury return the Indictment.[113]

Although the deliberately misleading presentation of the account statement is the starkest example of the government's misconduct, the government did the same thing with regard to the

---

[112] Mr. Schock recognizes that such challenges are generally out of bounds.  *See Calandra*, 414 U.S. at 345.

[113] We have through both a discovery request to the government and, after its refusal, a motion to the Court, sought certain of the government's colloquies with the grand jury, which may bear further on the issue of its independence having been compromised.  The Court denied this motion, however.  Docket No. 95.

payment to Green Chevrolet and its recitation of the applicable law regarding campaign finance expenditures. The government simply had no factual basis to persist in its theory, seeking instead to influence the grand jury with fictional innuendo. While the government is afforded great latitude in conducting grand jury proceedings, there is a line which, when crossed, defines misconduct that needs a remedy.

The government's conduct closely resembles the misconduct that led to the dismissal of the indictment in *United States v. Lawson*, 502 F. Supp. 158 (D. Md. 1980). In that case, the government knew of information that directly contradicted its theory, and yet engaged in "a grueling-cross examination of [the witness] apparently designed to give the jurors the impression" that the government's theory was correct, regardless of the contradictory information. *Id.* at 162. The government could offer no basis for its line of questioning, leading the court to conclude that it had deliberately misled the grand jury. *Id.* at 162-63. The same is true in this case: there is no basis for the government's assertion that Mr. Schock sold the Super Bowl tickets to cover the legal fees, or that the payment to Green Chevrolet was improper, aside from its own conjecture. Such testimony by the prosecutor is impermissible. *See United States v. Birdman*, 602 F.2d 547, 551-54 (3d Cir. 1979); *Breslin*, 916 F. Supp. at 443 (dismissing indictment where "the prosecutor improperly characterized the evidence and inserted his opinions regarding the strength and weight of the evidence"). Where the government has only its own suspicions, which are directly contradicted by the evidence in its possession, the presentation of those suspicions as facts is inherently misleading.

Therefore, the question before the court is whether there is a grave doubt that the government's deception substantially influenced the grand jury's decision to indict. Unlike other defendants, Mr. Schock need not speculate. One purpose of the government's conduct was to

show that Mr. Schock had fraudulent intent with respect to the purchase of the Super Bowl tickets. One of the grand jurors who served on the grand jury identified to a third party that the Super Bowl tickets were one of the "areas of the case" that the grand jury considered.  Ex. B.  This is prima facie evidence that Mr. Schock was prejudiced by the government's misconduct.  In a broader sense, the government's misleading and false presentation was aimed at proving intent, not just for the specific transactions at issue but to taint and undermine the testimony of witnesses who directly refuted the government's intent evidence.  Intent was and is the most critical element of this case; the prosecutor's deliberate and systematic efforts to mislead the grand jury as to the evidence of Mr. Schock's intent raise a grave doubt that the grand jury's decision to indict was improperly influenced.

### 2.       The prosecutor intimidated and harassed witnesses

The prosecutor's harassment of Ms. Haney and Ms. Rogers was not merely poor form; it was apparently calculated to persuade them to change their testimony and undermine their prior testimony.  Particularly egregious was the prosecutor's threat to charge Ms. Rogers with obstruction of justice if she did not testify to his liking.  Courts have admonished the government not to overstep its bounds in threatening a witness in front of the grand jury with criminal sanctions, noting that "prosecuting attorneys should exercise considerable restraint when advising potential witnesses of the consequences of committing perjury."  *United States v. Risken*, 788 F.2d 1361, 1371 (8th Cir. 1986); s*ee United States v. Pino*, 708 F.2d 523, 531 (10th Cir. 1983); *Red Elk*, 955 F. Supp. at 1180.  This admonishment is even more pertinent when the government threatens a witness with obstruction of justice.  A warning regarding the dangers of perjury essentially urges the witness to tell the truth.  Here, the government's repeated threats to Ms. Rogers that she could be charged for obstruction of justice for not having a specific recollection or not understanding the

government's question was more likely to communicate that her liberty was in danger if she did not testify as the government desired.

Moreover, the government could not have charged Ms. Rogers for obstruction of justice merely because she did not offer a direct answer to the government's inartful questioning. As four judges on the Ninth Circuit's en banc panel observed in *United States v. Bonds*, "[t]he truth-seeking function of the grand jury may be impaired by lax questioning as much, if not more than, an inarticulate or wandering answer." 784 F.3d 582, 588 (9th Cir. 2015) (en banc) (N.R. Smith, J., concurring).[114] Thus, before the government may charge a grand jury witness with obstruction of justice for an answer that the government deems to be unresponsive, it "is obligated to do all it can to obtain a direct statement in response to its questioning." *Id.* In other words, the government made an empty threat to a witness that she could face ten years in prison for not testifying to the government's liking. In addition, the government communicated to the grand jury that it considered Ms. Rogers's testimony to be obstructive.

As noted above, both Ms. Haney and Ms. Rogers were key witnesses who offered extensive exculpatory testimony. The government's efforts to intimidate them was misconduct, and combined with its other efforts to undermine and taint their testimony, there is a grave doubt that this misconduct substantially influenced the grand jury's decision to indict.

### 3. The cumulative effect of the prosecutor's misconduct warrants dismissal, and has tainted favorable witnesses for trial

Even if the Court concludes that none of these instances of misconduct, standing alone, was sufficient to prejudice Mr. Schock, viewed together they present a picture of a prosecutor who

---

[114] No opinion commanded the six-judge majority necessary to become the opinion of the en banc court. Therefore, the en banc court issued a per curiam opinion, without analysis, finding the evidence insufficient to support a conviction for obstruction of justice where the defendant "gave a rambling, non-responsive answer to a simple question." *Bonds*, 784 F.3d at 582.

abused the grand jury process and sought to overbear its independence by presenting misleading testimony, making incorrect statements of the law, and harassing and intimidating witnesses.  The Court may view the prejudice from these violations cumulatively when determining whether to dismiss the indictment.  *See Breslin*, 916 F. Supp. at 446.

In addition, "[a] clearly established additional basis for finding prejudice is the weakness of the Government's case."  *Aguilar*, 831 F. Supp. 2d at 1207.  For all the sound and fury of the Indictment, the government's case against Mr. Schock is weak.  It relies entirely on Mr. Schock's state of mind when navigating a complex and ambiguous web of rules and regulations.  There is no allegation of corruption, or that Mr. Schock sold his office; there is no smoking gun and no cash in the freezer.  The question of intent is the critical factor in this case, and to the extent the government deliberately misled the grand jury and tainted critical intent witnesses, the Indictment must be dismissed.  Without credible evidence that Mr. Schock intentionally set out to defraud the Congress or intentionally mislead the FEC, there should be no indictment in this case.

In addition to the prejudice from the government's misconduct before the grand jury, there is a substantial question that the government's conduct in tainting the memories of Ms. Haney and Ms. Rogers has prejudiced Mr. Schock's rights at trial.  Had a private citizen done what the government did, present misleading evidence to a witness with the intent to alter their testimony, they could be charged with obstruction of justice.  An individual who "knowingly . . . engages in misleading conduct toward another person, with intent to influence, delay, or prevent the testimony of any person in an official proceeding," is guilty of obstruction of justice.  *See* 18 U.S.C. § 1512(b)(1).  As one court has observed, liability under this statute may attach "where a defendant approaches a witness and attempts to prompt a false recollection of an event obscured by the passage of time and imperfect perception."  *United States v. Kulczyk*, 931 F.2d 542, 547 (9th Cir.

1991).  This is precisely what happened here.  The government's conduct therefore implicates Mr.

Schock's due process rights, as it is a due process violation for the government to engage in "an

unwarranted attempt . . . to bias a witness against a defendant."  *Martin v. Allison*, No. 2:11-cv-

0870 LKK GGH, 2014 WL 3058442, at *18 (E.D. Cal. July 3, 2014), *sub. Aff'd*, 671 F. App'x

4479 (9th Cir. 2016) (observing "if it is a federal crime to corruptly influence a witness, it would

strain credulity to find that nevertheless, it is not a due process violation when undertaken by the

prosecution") (internal citations omitted).

        As a commentator has observed,

> Science now tells us that  . . .[t]he mind not only distorts and
> embellishes memories, but a variety of external factors can affect
> how memories are retrieved and described. [. . .]  This finding has
> troubling implications for criminal trials where witnesses are
> questioned long and hard by police and prosecutors before the
> defense gets to do so—if ever. There is thus plenty of opportunity to
> shape and augment a witness's memory to bring it into line with the
> prosecutor's theory of what happened.

Hon. Alex Kozinski, *Criminal Law 2.0*, 44 Geo. L.J. Ann. Rev. Crim. Proc. III, vi-vii (2015).

Judge Kozinski noted an example where a key witness had confessed after a trial "that her memory

may have been distorted by the prosecutor's crafty questioning."  *Id.* at vii.  Courts already

jealously guard a witness's memory from prosecutorial suggestion in the context of photo arrays

and lineups.  *See United States v. Griffin*, 493 F.3d 856, 865 (7th Cir. 2007); *Gregory-Bey v. Hanks*,

332 F.3d 1036, 1044-45 (7th Cir. 2003); *United States v. Curry*, 187 F.3d 762, 768 (7th Cir. 1999).

Thus, the prejudice that Mr. Schock stands to suffer from the government's misconduct extends

beyond the grand jury and has irreparably affected the trial itself.

        In essence, what the government has done is to frustrate Mr. Schock's ability to present a

complete defense by destroying exculpatory evidence that was available to Mr. Schock prior to the

government's efforts to taint the witness's memory: their favorable testimony at trial.  *See*

75

*McCarthy*, 656 F.3d at 485.  That the government acted in bad faith can be inferred for the same reasons that the destruction of the evidence is prejudicial.  The government must have known that the witness's testimony to Mr. Schock was favorable; testimony from those closest to the reimbursement process to the effect that Mr. Schock lacked the requisite intent to be found guilty of the crimes of which the government sought to charge him was obviously exculpatory.  Indeed, the government's effort to alter and taint that testimony through presentation of misleading facts and improper threats further demonstrates the prosecutor's intent to prejudice Mr. Schock.  Therefore, if the Court determines that dismissal is not warranted in this case, the government should nevertheless be denied the fruits of its misconduct and be prohibited from calling these witnesses as part of its case-in-chief.

### III.    The Prosecutor and Federal Agents Have Repeatedly Asked Irrelevant and Highly-Invasive Questions about Mr. Schock's Sexual Orientation and Relationships

The above violations alone are sufficient to warrant the dismissal of the Indictment.  Additional misconduct, however, demonstrates the extent of the government's efforts to prejudice Mr. Schock and impugn his character to other witnesses.

The government has investigated nearly every facet of Mr. Schock's professional, political, and personal life.  This even includes his sex life.  It is no secret that there has long been speculative gossip in the media about Mr. Schock's sexual orientation.  For no apparent reason, the government has felt itself compelled to investigate this too.  Indeed, from the very inception of this investigation, the government has discussed with witnesses whether Mr. Schock is gay, whether he really "dated" his ex-girlfriend (a highly-accomplished diplomat and attorney), and whether he spent the night or shared hotel rooms with her.

The government's inquiries into Mr. Schock's sexuality and romantic relationships were not just distasteful and offensive.  They were prejudicial.  As discussed below, some of these

inquiries occurred directly before the grand jury, thus potentially prejudicing Mr. Schock through salacious innuendo. Others occurred during interviews of witnesses who later testified before the grand jury, thus potentially prejudicing them or shaping their opinions of Mr. Schock in much the same way as the prosecutor did with Karen Haney and Sarah Rogers (discussed above). These inquiries are relevant here because (1) they could have prejudiced the witnesses themselves, and thus affected their testimony; and (2) they reveal the government's malicious intent to impugn Mr. Schock's character. "Evidence of homosexuality is extremely prejudicial" *when offered for no reason except to generate bias against the defendant. United States v. Gillespie*, 852 F.2d 475, 479 (9th Cir. 1988). As one judge has observed, evidence that the defendant is gay can have "a tremendous negative impact on jurors," and attempts to prejudice a defendant by such evidence "ha[ve] no place in the courtrooms of a civilized society." *Neill v. Gibson*, 263 F.3d 1184, 1199, 1201 (10th Cir. 2001) (Lucero, J., dissenting).

Even the questioning of witnesses who did not go on to appear before the grand jury is relevant here because it further confirms that these questions were not accidental or isolated. They reflect a consistent approach and strategy that could reasonably be expected to influence the opinions of potential witnesses.

The government's apparent obsession with Mr. Schock's sexuality and whether or not he "dated" Karla Gonzalez was fueled from the very first conversation with the government's confidential informant: "C/S [Confidential Source] did not know for sure Schock's relationship status, but heard gossip that 'something was going on' with Shea Ledford. . . . C/S believed Schock's ex-girlfriend Karla Gonzalez was not a 'real girlfriend,' and was a 'beard.'"[115] As with

---

[115] Illinois State Police, Interview of USPIS Confidential Source #900001831, Mar. 18, 2015 at 2 (AGENT_RPT_00000791).

so many other things, the government's CI was wrong.  But that did not stop the government from trying to prove him right for the next two years.

Indeed, the government asked *twelve additional witnesses* questions on these topics.  We have detailed below where the grand jury transcripts or government reports of interviews make clear that these topics were discussed with ten of those witnesses.  But troublingly, it appears based on our own investigation that government reports for two other witnesses omit information regarding these types of inquiries.

Turning to the record, Shea Ledford's grand jury testimony reflects that the prosecutor questioned him for six and a half pages regarding Mr. Schock's relationship with Ms. Gonzalez.  After the prosecutor asked what Mr. Schock had said about his relationship with Ms. Gonzalez, Mr. Ledford responded:  "They were hanging out.  I mean, I'm sure we had many conversations where she was brought up, I'm sure.  I know he told me when he started hanging out with her.  I don't know at what point they were dating, if they were dating, when they weren't.  I know it was kind of on again, off again."[116]  Mr. Bass then mined the minutia of whether or not they were really "dating," leading to his apparent incredulity that Mr. Ledford distinguished between "going on dates" and "dating":

Q:  Were they dating?

A:  I don't know if they were – I know they would go on dates.  I don't know if they were dating boyfriend-girlfriend.  I know that it was a – what are those – what do the kids nowadays say?  It was complicated.

Q:  I don't – I'm just asking you if they were dating.  And you said they went out on dates, but you don't know if they were dating.  *Now explain that to me.  How do you go out on dates and not be dating?  I'm just asking you a simple question if you had conversations with Aaron Schock and Karla Gonzalez and were they – did he*

---

[116] Transcript of Testimony of Shea Ledford, Apr. 27, 2016, 58:13-19 (GJ_TRANSCRIPT_00002259).

*tell you they were dating?*  It's a simple question.  Did you have communications with him about that?"[117]

Mr. Bass further inquired if Ms. Gonzalez also had a boyfriend,[118] and asked if Mr. Schock and Ms. Gonzalez "stayed in the same hotel room" on a trip to Jamaica.[119]  Indeed, so important was the question of whether Mr. Schock and Ms. Gonzalez had stayed in the same hotel room in Jamaica to Mr. Bass that he *asked it again* in the afternoon session of Mr. Ledford's grand jury testimony:  "And did Mr. Schock and Ms. Gonzalez share the same room?"[120]

The government asked three other witnesses about who stayed in hotel rooms:

- Adam Vitale:  "SCHOCK and Gonzalez were considered a couple and stayed in the same room."[121]

- Keith Siilats:  "Everyone had his own room, except for maybe LaHood and his wife who probably shared a room."[122]  Indeed, the report of Mr. Siilats' interview also states: "Siilats believed Schock was being scandalized because reporters think he's gay."[123]

- Dayne LaHood:  "LAHOOD also remembered a June 24, 2013 weekend get together in Chicago with his wife, SCHOCK, KARLA GONZALES and SAM and JULIE HOERR . . . . LAHOOD believes that SCHOCK, GONZALES and the HOERR'S may have stayed at the Peninsula Hotel."[124]

The government asked Tania Hoerr, who is Mr. Schock's sister and who later testified before the grand jury, questions about her brother's relationship with Ms. Gonzalez:  "HOERR

---

[117] *Id.* at 58:25 – 59:14 (emphasis added).

[118] *Id.* at 61:1-7.

[119] *Id.* at 62:25 – 63:3.

[120] *Id.* at 111:13-14.

[121] Dep't of Treasury, Memorandum of Interview of Adam Vitale, May 11, 2016 at ¶ 15 (AGENT_RPT_00000686).

[122] FBI Form FD-302, Memorandum of Interview of Keith Siilats, June 18, 2015 at 5 (AGENT_RPT_00000255).

[123] *Id.* at 7.

[124] FBI FD-302, Interview of Dayne LaHood, Feb. 10, 2016 at 3 (AGENT_RPT_00000013).

advised that KARLA GONZALEZ was dating SCHOCK for a short time.  HOERR met her three

times in Peoria:  HOERR was aware that she and SCHOCK went on a Mediterranean cruise with

friends from Peoria.  HOERR was unaware of any trips they took to Chicago together."[125]

The government also asked Representative Jason Smith, *a sitting Member of Congress*,

about Mr. Schock's relationship with Ms. Gonzalez and whether the two had shared a room

together on a vacation:   "SMITH advised that in May of 2015, he, SCHOCK, KARLA

GONZALES, SHEA LEDFORD and two other individuals vacationed in Jamaica:   SMITH

believes SCHOCK and GONZALES shared a room."[126]  The same document reports:  "SMITH

believes that SCHOCK liked [Karla Gonzales] and they dated for a period of time."[127]

The government even went so far as to interview James Merrill, *a man who has never met

Mr. Schock and who has no connection to this case*, but who had been in a romantic relationship

with Karla Gonzalez around or during part of the time period that she and Mr. Schock were

involved.  The FBI report states in part:  "MERRILL has never met SCHOCK in person and

believed he was 'gay'.  GONZALEZ told MERRILL that she didn't think SCHOCK was 'gay.'

MERRILL believes that GONZALEZ had her own cabin on the cruise and SCHOCK furnished a

ticket for her."[128]  The report later notes:  "MERRILL did not believe that GONZALEZ dated

SCHOCK."[129]  That the government interviewed a man *who had never met* Mr. Schock regarding

Mr. Schock's relationship with Ms. Gonzalez is astonishing and inappropriate in its own right.

---

[125] FBI Form FD-302, Interview of Tania Hoerr, Mar. 9, 2016 at 1 (AGENT_RPT_00000018).

[126] FBI Form FD-302, Memorandum of Interview of Jason Smith, Mar. 30, 2016 at 2 (AGENT_RPT_00000056).

[127] *Id.* at 3.

[128] FBI Form FD-302, Memorandum of Interview of James Merrill, May 25, 2016 at 1 (AGENT_RPT_00000212).

[129] *Id.* at 2.

The issue of Mr. Schock's sexuality also arose in an interview with Jeannie Etchart, Mr. Schock's second Executive Assistant.  Although witnesses have confirmed Ms. Etchart's strong feelings for Mr. Schock, she attempted to minimize her feelings for Mr. Schock and added her own allegation that she thought Mr. Schock was gay during an interview:

> When questioned about her feelings for SCHOCK, ETCHART advised that in February of 2011 or early in her employment with SCHOCK, she saw that SCHOCK was a young, attractive and exciting person.  The thought of "could there be something there" between she and SCHOCK did cross her mind.  As time went on they became good friends/buddies and ETCHART saw that SCHOCK was 'high maintenance". ETCHART thought SCHOCK was gay.[130]

Federal agents not only asked Steven Shearer, Mr. Schock's first Chief of Staff, questions about Mr. Schock and Ms. Gonzalez's relationship, they appear to have extensively discussed allegations regarding Mr. Schock's sexuality, *including whether Mr. Shearer had "evidence" of Mr. Schock being gay (which he did not)*:

> When questioned about the relationship between SCHOCK and GONZALEZ, SHEARER advised that SCHOCK met her in May of 2013. The relationship got more serious but SHEARER left soon after that. ETCHART may have confided in MARK ROMAN about being jealous of GONZALEZ.
>
> SHEARER advised that SCHOCK was upset with the blogs and media comments about his sexuality. SCHOCK denied the allegations and resented the accusations but SHEARER believes that SCHOCK did things that seemed "gay". SHEARER criticized SCHOCK on behaving in a way that would make people question his sexuality. SHEARER has no evidence of SCHOCK being "gay."[131]

Despite all this testimony, nothing appears in the record to show that these questions were relevant to any legitimate issue in a criminal investigation.

Finally, Mr. Schock's sexuality again came up directly in front of the grand jury during Jonathon Link's testimony.  Following questions by the prosecutor probing whether Mr. Link was

---

[130] FBI Form FD-302, Interview of Jeannie Etchart, Oct. 25, 2016 at 1 (AGENT_RPT_00000316).
[131] FBI Form FD-302, Interview of Steven Shearer, Apr. 25, 2016 at 4 (AGENT_RPT_00000159).

Mr. Schock's "personal photographer," Mr. Link volunteered that he eventually decided to arrive at events separately from Mr. Schock because of "rumors out there where I was like his personal companion or something like that."  Mr. Link elaborated:

> I was thinking about it, I was like okay, if I'm going to be known as like Aaron's gay lover, I may not really want to be seen with him anymore because, you know, it's like – obviously like for me it's not true but like now like this rumor is starting to get out there.[132]

It is true that Mr. Bass had not directly asked about Mr. Schock's sexuality and did not elicit that specific response.  *But he did follow up on it*:

> Q:  And just to finish – just to ask a couple questions since you brought it up.  You were spending a lot of time with Mr. Schock on a daily basis, at least when he was in the district; is that right?
>
> A:  Yeah.
>
> Q:  You would accompany him almost everywhere he went?
>
> A:  Pretty much, yeah.  I mean, I was – I was always there working.
>
> Q:  So you would have been one of the people that worked most closely with – with him and –
>
> A:  Yeah, I mean like –
>
> Q:  You were with him the most?
>
> A:  Yeah.  It seemed like it was me – me and Shea definitely spent probably like the most time with him.
>
> Q:  And the allegations that you raised that I didn't ask you about, you affirmatively said not true; right?
>
> A:  Yeah, it's not true.[133]

---

[132]   Transcript of Testimony of Jonathon Link, Aug. 6, 2015, 71:7-24 (GJ_TRANSCRIPT_00007133).

[133] *Id.* at 72:9 – 73:5.

The prosecutor has denied that these types of questions have been asked despite the documentary record set forth above confirming exactly the opposite. And because of that denial, the government has never explained the relevance of these discussions.

Perhaps that is because there is no justification. Questioning witnesses about Mr. Schock's sexuality, *including in front of the grand jury*, is outrageous and highly prejudicial. It cannot possibly be relevant to anything. Yet too many people have been asked for it not to be intentional. And it provides another compelling reason to determine that the government has engaged in prejudicial misconduct here that merits dismissal.

## CONCLUSION

For the reasons stated above, Aaron J. Schock respectfully requests that the Court enter an order dismissing the Indictment with prejudice. In the alternative, Mr. Schock requests that the Court enter an order barring the government from calling Karen Haney and Sarah Rogers as witnesses in its case-in-chief, while permitting Mr. Schock the option of calling them as witnesses if he presents a defense case.

Dated: August 1, 2017

Respectfully submitted,

*/s/ George J. Terwilliger III*
_____
George J. Terwilliger III
Robert J. Bittman
Benjamin L. Hatch
Nicholas B. Lewis
**MᴄGᴜɪʀᴇWᴏᴏᴅꜱ LLP**
2001 K Street N.W., Suite 400
Washington, D.C. 20006-1040
Tel: 202.857.2473
Fax: 202.828.2965
Email: gterwilliger@mcguirewoods.com

/s/ Christina M. Egan
_____
Christina M. Egan
**MCGUIREWOODS LLP**
77 West Wacker Drive
Suite 4100
Chicago, IL 60601-1818
Tel: 312.750.8644
Fax: 312.698.4502
Email: cegan@mcguirewoods.com


/s/ Jeffrey B. Lang
_____
Jeffrey B. Lang
**LANE & WATERMAN LLP**
220 N. Main Street, Suite 600
Davenport, Iowa 52801-1987
Tel: 563.333.6647
Fax: 563.324.1616
Email: jlang@L-WLaw.com

*Counsel for Aaron J. Schock*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing instrument was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record at their respective email addresses disclosed on the pleadings on this 1st day of August, 2017.

*/s/ George J. Terwilliger III*

George J. Terwilliger III