## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

---

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | **Case No. 16-CR-30061** |
| ) | |
| **AARON SCHOCK,** ) | |
| ) | |
| **Defendant.** ) | |

## OPINION

This case is currently before the court for rulings on Defendant's Motions to Dismiss (#76), (#78), and (#86). The court has thoroughly reviewed the motions as well as the consolidated response and reply filed by the Government and Defendant respectively. For the following reasons, Defendant's Motion to Dismiss (#76) is GRANTED in part and DENIED in part; Defendant's Motion to Dismiss (#78) is DENIED; and Defendant's Motion to Dismiss (#86) is GRANTED.

## BACKGROUND

On November 10, 2016, the Government filed a twenty-four count indictment ("Indictment") against Defendant, Aaron Schock ("Defendant"). The Indictment included nine counts of wire fraud, six counts of filing false federal tax returns, five counts alleging the falsification of Federal Election Commission filings, two counts of making false statements, and one count each of mail fraud and theft of government funds. The alleged conduct all occurred while Defendant was a member of the United States House of Representatives.

At a hearing on May 19, 2017, the court set a deadline of August 1, 2017 for the filing of all non-evidentiary pretrial motions. Numerous motions were filed by the parties by that deadline. The court has already ruled on some of the motions. Others were just recently fully briefed. This order will address three motions, Defendant's Motions to Dismiss (#76), (#78), and (#86).

Defendant's first Motion to Dismiss (#76) is premised on the United States Constitution and argues that the Indictment fails to state an offense because the prosecution of this case is barred by the Rulemaking Clause, Speech or Debate Clause, or Due Process Clause.

Defendant's second Motion to Dismiss (#78) argues that counts fourteen through eighteen (which allege the fabrication of FEC filings) fail to state an offense because they upset the careful legal and regulatory framework Congress has crafted in the Federal Election Campaign Act and infringe upon Defendant's constitutional rights.

Defendant's third Motion to Dismiss (#86) argues that Count 11 should be dismissed as duplicitous.

On June 2, 2017, the Government filed a consolidated response to the three motions to dismiss outlined above. Defendant filed a consolidated reply on June 23, 2017. Defendant's Motions to Dismiss (#76), (#78), and (#86) are therefore fully briefed and ready for a ruling.

ANALYSIS

I. Motion to Dismiss Standard

Rule 12(b)(1) of the Federal Rules of Criminal Procedure allows a party to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Motions, which allege a defect in the indictment such as those currently before the court, must be made before trial. Fed.R.Crim.P. 12(b)(3)(B)(i), (v).

In order "[t]o successfully challenge the sufficiency of an indictment, a defendant must demonstrate that the indictment did not satisfy one or more of the required elements and that he suffered prejudice from the alleged deficiency." *United States v. Vaughn*, 722 F.3d 918, 925 (7th Cir. 2013). One way a defendant can establish that the indictment fails to state an offense is "if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States v. Carroll*, 320 F.Supp.2d 748, 752 (S.D.Ill. 2004), quoting *United States v. Panarella*, 277 F.3d 678, 685 (3rd Cir. 2002).

Importantly, pretrial motions to dismiss test only the "sufficiency to charge an offense, regardless of the strength or weakness of the government's case." *United States v. Risk*, 843, 1059, 1061 (7th Cir. 1988). Therefore, this order should not be read in any manner as an attempt by the court to decide the underlying merits of the charges contained in the Indictment. *Id.*

II. Speech or Debate Clause, Rulemaking Clause, Due Process Clause

Defendant's first Motion to Dismiss (#76) raises three separate constitutional grounds for dismissal.

The first two grounds, brought under the Rulemaking Clause and the Speech or Debate Clause, are premised on the constitutional principle of separation of powers. This important principle ensures that the three branches of federal government are able to act independently of each other. This principle serves to limit the power of any one branch over another. This case, as charged, appears to test this principle; Defendant, a former member of the legislative branch, is being prosecuted by the executive branch in the courts of the judicial branch. Thus, the case is rife with potential issues related to the separation of powers. See *Gravel v. United States*, 408 U.S. 606, 617 (1972) (the constitution seeks "to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary").

Defendant's third constitutional argument is premised on the Due Process Clause. The court will address each of Defendant's concerns in turn.

A. Rulemaking Clause

Defendant contends that numerous counts contained within the Indictment are non-justiciable because their prosecution would require the invocation and interpretation of ambiguous rules of the House of Representatives. Because of this, Defendant argues that prosecution of these counts would violate the Rulemaking Clause contained in Article I, Section 5, Clause 2 of the United States Constitution.

The Rulemaking Clause states:

> Each House may determine the Rules of its Proceedings, punish its
> members for disorderly Behavior, and, with the Concurrence of two
> thirds, expel a Member.

U.S. Const. art. I, § 5, cl. 2.

In this case, the House Rules mentioned in the Indictment all relate to administrative functions of the House and its members and do not deal directly with legislative proceedings. Due to the language of the clause, specifically its reference to "Rules of its Proceedings," the court questioned whether the Rulemaking Clause should apply to administrative rules at all. Unfortunately, neither the court nor the parties were able to find a case where the United States Supreme Court applied the Rulemaking Clause to administrative rules. Instead, it appears the Supreme Court's application of the Rulemaking Clause has so far been limited to rules directly related to legislative proceedings or the punishment of a member. See *U.S. v. Ballin*, 144 U.S. 1 (1892) (voting issues in the House); *Christoffel v. U.S.*, 338 U.S. 84 (1949) (use of parliamentary practice); *Yellin v. U.S.*, 374 U.S. 109 (1963) (rules for committee hearings); *U.S. v. Brewster*, 408 U.S. 501 (1972) (punishing members).

Despite the court's concern, other courts, most notably, the United States Court of Appeals for the District of Columbia, applied the Rulemaking Clause to administrative rules of the legislative branch. *See U.S. v. Durenberger*, 48 F.3d 1239 (D.C. Cir. 1995); *U.S. v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995). Based on those decisions, and a lack of authority from the Supreme Court and the Seventh Circuit Court of

Appeals, this court will proceed under the premise that the Rulemaking Clause is applicable to the administrative House Rules at issue in this case.[1]

The Rulemaking Clause is not an absolute bar to judicial interpretation of House Rules. *Rostenkowski*, 59 F.3d at 1305. It also does not allow Members of Congress to "defraud the Government without subjecting themselves to statutory liabilities." *Durenberger*, 48 F.3d at 1245, citing *Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C.Cir. 1981). However, any time a House Rule is used in a prosecution, there is a potential that the prosecution may run afoul of the Rulemaking Clause. See *Rostenkowski*, 59 F.3d at 1306 ("judicial interpretation of an ambiguous House Rule runs the risk of the court intruding into the sphere of influence reserved to the legislative branch under the Constitution").

*Rostenkowski* stands for the proposition that a House Rule that is sufficiently ambiguous is non-justiciable; while a rule that requires no interpretation, i.e. one that is "sufficiently clear that [a court] can be confident in [its] interpretation," is justiciable. *Rostenkowski*, 59 F.3d at 1306. However, even if the Government cites to ambiguous House Rules in an indictment, the case may be justiciable if the underlying charge is grounded in a substantive federal statute and a conviction does not rely on an interpretation of the ambiguous rule. See *Durenberger*, 48 F.2d at 1245.

---

[1] Even if the Rulemaking Clause were not applicable, the court's interpretation of ambiguous House Rules, even those related to administrative tasks, would violate the constitutional principle of separation of powers. See generally *Baker v. Carr*, 369 U.S. 186, 217 (1962). Thus, the court is certain that its conclusion and analysis are correct regardless of the means used to arrive at these determinations.

In determining whether a prosecution which invokes House Rules violates the Rulemaking Clause, *Rostenkowski* and *Durenberger* suggest that the court must answer the following questions. First, does the success of the prosecution require the Government to rely on the application of any House Rule? If the answer to that question is no, then the case is justiciable since a conviction may be obtained without utilizing, let alone interpreting, House Rules. See *Durenberger*, 48 F.2d at 1245-46. However, if the answer to that question is yes, then the court must answer a second question: are the House Rules at issue ambiguous? See *Rostenkowski*, 59 F.3d at 1307. If the rules are ambiguous, the case is non-justiciable. *Id.* at 1306. However, if the rules are sufficiently clear that a court can be confident in its interpretation, it is possible that the prosecution can proceed. *Id.*

In order to determine whether the Rulemaking Clause is a bar to prosecution in this case, the court must first determine whether the counts, as charged in the Indictment, require the application of House Rules. In this case, there are ten counts which Defendant argues invoke House Rules (Counts 1-5, 8-10, 12-13). All ten counts are premised on federal statutes. Seven of the ten counts allege wire fraud pursuant to 18 U.S.C. § 1343. The remaining counts allege mail fraud pursuant to 18 U.S.C. § 1341, and the making of false statements pursuant to 18 U.S.C. §§ 1001(a)(2)and (c)(1). Following *Rostenkowski* and *Durenberger*, the court will address each category of charges in order to determine whether any count requires the use of House Rules. If House

Rules are necessary for the success of the prosecution, the court will then determine whether the rules at issue are ambiguous.

*Wire Fraud (Counts 1-5, 8-9)*

Counts 1-5 and 8-9 charge Defendant with wire fraud under 18 U.S.C. § 1343. Section 1343 states:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343

Here, in order to succeed in its prosecution of Counts 1-5 and 8-9, the Government must prove that Defendant devised or intended to devise a scheme to obtain money by means of false or fraudulent pretenses or representations.[2] The court's initial inquiry is whether the counts charged under § 1343 require the application of any House Rule.[3]

---

[2] "To convict a person under § 1343, the government must prove that he '(1) was involved in a scheme to defraud; (2) had an intent to defraud; and (3) used the wires in furtherance of that scheme.'" *United States v. Weimar*, 819 F.3d 351, 354 (7th Cir. 2016).

[3] Defendant has not argued, and the court does not find, that House Rules are necessary for the Government to prove that Defendant used "wires" in furtherance of the alleged scheme. Therefore, although the Government must prove this element at trial in order to obtain a conviction on Counts 1-5 and 8-9, the court need not analyze this particular element here.

*-Counts 1-5-*

The first five counts contained in the Indictment charge Defendant with wire fraud based on Defendant's receipt of funds following his submission of allegedly fraudulent mileage reimbursement claims to the House of Representatives. These counts include the following reimbursements:

Count 1 - January 21, 2012 - $1,292.85

Count 2 - July 9, 2012 - $1,428.00

Count 3 - September 9, 2013 - $1,925.00

Count 4 - April 17, 2014 - $1,313.76

Count 5 - October 14, 2014 - $1,218.00

All five counts rest on the assertion that Defendant submitted false mileage reimbursement claims to the House in order to obtain money. The House Rules provide the mechanism by which Defendant received the money. Also important is the fact that the House Rules determine the appropriateness of mileage reimbursements. To this end, Defendant argues that the Government cannot proceed on these counts without interpreting ambiguous House Rules and running afoul of the Rulemaking Clause. As Defendant has argued: "How much documentation is required for mileage vouchers? Ambiguous. When is travel official as opposed to personal? Ambiguous."

The court agrees with Defendant that determining whether each transaction outlined above represented a proper distribution of House money pursuant to House

Rules would necessitate the application and interpretation of House Rules. However, for the reasons outlined below, the court concludes that it is possible that the appropriateness of the disbursements at issue need not be established in order to obtain a conviction on Counts 1-5. Thus, as pled in the Indictment, the Government need not interpret House Rules in order to succeed on these counts.

In order to obtain a conviction on Counts 1-5, the Government can prove that Defendant submitted false claims in an effort to obtain money. This can conceivably be accomplished without any reliance on House Rules. The Government can prove that the mileage claims submitted by Defendant were false simply by establishing the amount of mileage claimed by Defendant and then producing evidence that the mileage claims were not truthful.

For instance, the Government can succeed on this element if it can produce evidence that Defendant's mileage reimbursement form claimed Y miles when, in fact, Defendant only traveled X miles. In doing so, the Government would rely on evidence related to the claim itself, and would not need to rely on any interpretation of House Rules. In fact, it would be of no consequence whether the claims underlying the mileage reimbursement submissions would be covered under House Rules. Instead, the veracity of the claim itself, and not the House Rules related to reimbursement, would be all that is necessary to establish whether the claims were truthful.

Likewise, the fact that Defendant made the reimbursement claims in order to obtain money can also be established without any reliance on House Rules. Such a determination would presumably be apparent from the face of the mileage reimbursement forms submitted by Defendant. Even if the Government must establish that the form was used to obtain money from the House, such a finding would not depend on an application or interpretation of House Rules.

Lastly, the Government may be able to show that Defendant sought to obtain money by establishing that Defendant did in fact receive money in the amounts listed above. If the Government can prove that the House issued money to Defendant in response to his reimbursement claims, a jury could conclude that Defendant used those claims in an effort to obtain money. Such a conclusion is possible without any reliance on House Rules.

The court finds the prosecution of Counts 1-5 very similar to the circumstances presented in *Durenberger*. In that case, the D.C. Circuit Court allowed the prosecution of a Senator who provided false information on claims for reimbursements for lodging. Although the prosecution required reference to Senate Rules, the court concluded that the interpretation of Senate rules was not necessary. Therefore, the court held that maintenance of the action did not place the court in the position of political overseer of the another branch of government. *Durenberger*, 48 F.3d at 1245.

As explained by the court in *Durenberger*,

> The question is not whether Durenberger was entitled to reimbursement if he had submitted truthful vouchers, but whether the false statements in his vouchers were material because they were "capable of influencing" the Senate's reimbursement decision.

*Durenberger*, 48 F.3d at 1244 (citations omitted)

The court in *Durenberger* went on to find that the prosecution "does not require the district court to 'develop rules of behavior for the Legislative Branch,' nor does it ask the court to 'interject itself into practically every facet of [a coordinate] Branch of the federal government, on a continuing basis.' Rather, the district court is called upon simply to determine whether untruths in a Senator's travel vouchers could influence the Senate's reimbursement decision." *Durenberger*, 48 F.3d at 1245 (internal citations omitted).

Here, similar to *Durenberger*, in Counts 1-5, the court is simply called upon to determine whether Defendant made false statements in his mileage reimbursement claims and whether those false statements were part of a scheme for obtaining money. See 18 U.S.C. § 1343. As discussed above, these findings can be made without any reliance on, let alone an interpretation of House Rules.[4]  Therefore, as in *Durenberger*, Counts 1-5 do not automatically force the court to oversee the rules of the legislative branch or to develop that branch's rules of behavior. See *Durenberger*, 48 F.3d at 1245.

---

[4] Of course, this presumes that the Government's case is *not* premised upon its own interpretation of the House Rules concerning the type of mileage subject to reimbursement.

In finding that the case is similar to *Durenberger*, the court is not concluding that *Rostenkowski* was wrongly decided. Instead, the court concludes that the concerns related to the Rulemaking Clause as explained in *Rostenkowski* simply do not apply to Counts 1-5. In *Rostenkowski*, the court outlined its concern as follows:

> At trial, the Government will almost certainly rely upon the House Rules in its effort to prove the statutory violations it has alleged. Often, in a prosecution for fraud or embezzlement, the Government must show that the defendant diverted the funds of an institution—such as his employer—from an authorized to an unauthorized purpose. In order to make that showing it is typically necessary to enter into evidence the institution's internal rules governing the expenditure of funds. * * * A congressman's prosecution for fraud and embezzlement of official funds is no different: in order to prove several of the counts against Rostenkowski, the Government must show that he diverted congressional funds from authorized to unauthorized purposes. As the regulations governing the use of official funds by a congressman, the House Rules are necessary and proper evidence to make that showing.

*Rostenkowski*, 59 F.3d at 1305 (internal citations omitted).

Here, as explained above, in order to obtain a conviction on Counts 1-5, the Government is not required to prove whether the House disbursements at issue were appropriate under House Rules. Thus, contrary to Defendant's argument, the prosecution of Counts 1-5 would not require the court to determine the proper amount of documentation required for mileage vouchers nor to determine the types of travel for which mileage reimbursements are allowed. Further, unlike in *Rostenkowski*, the prosecution of Counts 1-5 does not necessarily require the Government to prove that Defendant diverted congressional funds from authorized to unauthorized purposes. For these reasons, the court finds the prosecution of Counts 1-5 (if it proceeds as outlined

above) does not raise the same concerns as those found in *Rostenkowski*. Still, the court wants to be clear that it finds *Rostenkowski* distinguishable, not erroneously decided.[5]

For all of the reasons stated herein, the court finds that the prosecution of Counts 1-5 does not require the application of any House Rule. Therefore, the prosecution of these counts, as charged in the Indictment, is not prohibited by the Rulemaking Clause. See *Durenberger*, 48 F.2d at 1245-46. However, before moving on, the court must make an important point.

This court's ruling does not foreclose the possibility that the prosecution of Counts 1-5 may ultimately run afoul of the Rulemaking Clause. At this stage in the litigation, the court is simply concerned with the sufficiency of the Indictment. See *Vaughn*, 722 F.3d at 925-26. Thus, because Counts 1-5 can be established without reliance on House Rules, as outlined above, they are not subject to dismissal under the Rulemaking Clause at this time. However, because the court is not yet privy to the evidence the Government will rely upon during trial, it is possible that this issue may need to be revisited.

---

[5] The court acknowledges that separation of powers is an important constitutional principle. Therefore, its analysis necessitates serious consideration. However, as stated above, the Rulemaking Clause itself does not allow Members of Congress to "defraud the Government without subjecting themselves to statutory liabilities." See *Durenberger*, 48 F.3d at 1245, citing *Cannon*, 642 F.2d at 1385. Where, as here, the prosecution does not necessitate the interpretation of any internal House Rules, the concerns expressed in *Rostenkowski* are not applicable. Without such concerns, the clause simply does not protect legislators from prosecution for fraudulent behavior.

If the Government's evidence seeks only to establish that the claimed mileage did not accrue, as explained above, the Rulemaking Clause will not be implicated. However, if the Government's evidence instead focuses on the appropriateness of certain mileage claims as they relate to House Rules, the prosecution will likely run afoul of the Rulemaking Clause. For example, if the Government seeks to establish that Defendant submitted a mileage voucher for 1,000 miles, and then asserts that 200 of those miles were falsely claimed because, under House Rules, those miles involved personal, non-reimbursable travel, the prosecution would likely fall within the scope of *Rostenkowski*.

At this stage, it is simply too early to determine the evidence the Government will produce to establish the elements contained in § 1343. For the reasons contained herein, Defendant's motion to dismiss as it relates to Counts 1-5 is denied. However, if at any time it becomes apparent that the prosecution will rely upon evidence that requires the interpretation of House Rules, Defendant may resubmit this issue to the court for consideration at that time.[6]

*-Count 8-*

Count 8 charges Defendant with wire fraud as it relates to a House interstate payment of $15,000 to an Illinois designer/decorator. The Indictment claims that as part of the submission of vouchers and claims related to the designer/decorator, Defendant,

---

[6] To be clear, if the Government attempts to rely on any House Rule in order to establish that a statement made by Defendant was false, this court will be forced to reevaluate the issue. This is true for Counts 1-5 as well as Counts 8, 10, and 12-13.

"through his Executive Assistant, made false representations that the claims were 'for services to assist the member in setting up our district and DC offices' and 'includes using materials from our district and rearranging/designing/structuring the space to best suit the member and staff's needs.'" Thus, the Indictment alleges that Defendant's submissions to the House for reimbursement were false and that the House did in fact make a payment to the designer/decorator based on these representations.

Defendant argues that this count should be barred by the Rulemaking Clause because its prosecution would require the interpretation of ambiguous House Rules. As an example, Defendant notes that House Rules allow for the reimbursement of decorations of "nominal value." Defendant then ponders: "What does 'nominal' value mean? Ambiguous." However, for similar reasons as those stated above, the court finds that prosecution of Count 8 does not require the interpretation of this or any House Rule.

As with Counts 1-5, a conviction under Count 8 can be achieved if the Government can show that the submission of vouchers and claims for reimbursement related to the designer/decorator contained false statements or misrepresentations and that the statements contained therein were used in an effort to obtain money. In order to show that the vouchers or claims contained false statements, the Government can simply rely on the submitted documentation and evidence surrounding the truthfulness of the statements contained in the documents. Such evidence would not necessitate the application or interpretation of any House Rule. Further, as with Counts 1-5, the fact

that Defendant's statements were made in an effort to obtain money could be proven by the face of the document or by the fact that payment was made in accordance with the voucher or claim. Again, these facts can be established without any reference to House Rules.

By use of the evidence explained above, a conviction on Count 8 can be obtained without any determination of whether the House payment at issue was appropriate under House Rules. Therefore, the court need not bother itself with the meaning of terms such as "nominal value" contained within the rules. Instead, what is important in this case is whether Defendant made false statements in an attempt to obtain money. Because the veracity of Defendant's statements and the fact that money was sought or obtained can be established without reliance on House Rules, the concerns contained in *Rostenkowski* are not found here. See *Rostenkowski*, 59 F.3d at 1305. Since the application of House Rules is not necessary, the court finds the prosecution of Count 8 is appropriate and is not barred by the Rulemaking Clause. See *Durenberger*, 48 F.2d at 1245-46. However, as with Counts 1-5, if the Government seeks to establish any element with evidence that necessitates the application of House Rules, this issue may be revisited at the appropriate time.

*-Count 9-*

Count 9 charges Defendant with wire fraud as it relates to his participation in an annual "Congressman Aaron Schock Washington, DC Fly-In" event. The Government alleges that the event, which began in 2011, invited constituents to travel to Washington

D.C., at their own expense, and attend various meetings with political leaders arranged by Defendant and his staff. As part of the solicitation for the fly-in events, Defendant distributed an advertisement which represented that event participants would be charged a "Fly-in Conference Fee" to cover the two day event, meals, and program materials. It was not disclosed to the public that Defendant intended to personally profit from the payment of excess registration fees.

The Government alleges that funds recovered from the 2011 event were placed into a bank account in Florida which Defendant had asked a friend to establish and which was setup under the fictitious name "Global Travel International." In September of 2011, Defendant allegedly caused $4,482.21 in excess funds from the event to be paid to himself personally. In doing so, the Government alleges that Defendant "violated the House Rules, which prohibited him from using his official position for personal gain and which required him to return any excess funds to the fly-in participants or donate such funds to charity." The Government further alleged that Defendant "failed to disclose this additional income on his annual financial disclosure form."

The Indictment goes on to allege that by 2014, the Florida bank account was closed and Defendant asked another friend in Illinois to utilize her account to administer receipt of event fees and payment of event expenses. In December of 2014, Defendant allegedly "attempted to personally profit again from the fly-in event by submitting a false and fraudulent invoice in the amount of $11,000 for 'Services

Rendered' in the name of his limited liability corporation, Menards Peoria LLC, for payment from excess fly-in funds." Pursuant to the invoice, Defendant directed a check for $11,000 to be mailed to him at his residence in Peoria, Illinois.

As with the other counts brought under § 1343, in order to obtain a conviction for wire fraud on Count 9, the Government must establish that Defendant devised or intended to devise a scheme to obtain money by means of false or fraudulent pretenses or representations. 18 U.S.C. § 1343. Defendant argues that, as charged in the Indictment, the only way the Government can prove that he devised a scheme to obtain money by means of false of fraudulent pretenses is with reliance on House Rules. For the following reasons, the court agrees.

In Count 9, the Government outlines the scheme to defraud using the allegations stated in the above paragraphs. The indictment then goes on to specifically allege wire fraud based upon Defendant's invoice for $11,000, which the Government claims was false or fraudulent.[7] As with other counts in the Indictment, the court finds that

---

[7] In its response, the Government claims that the Indictment also alleges that, as part of the scheme, Defendant lied "to his own constituents by fraudulently soliciting funds from them for registration fees and diverting the excess funds to his personal use." However, the court does not read the Indictment the same way as the Government. Indeed, although the Indictment makes the claim that Defendant intended to personally profit from the fly-in fees, there are no allegations that Defendant's failure to disclose this fact was fraudulent. The simple fact that Defendant could have profited from fees is not sufficient to allege fraud. Finding so would mean that all individuals who profit from fees anonymously could be violating § 1343. Almost all events, whether political, sporting, or otherwise, in the current time frame, charge those buying tickets certain fees. There are always individuals who profit from those fees, however, the identity of these individuals is rarely, if ever, disclosed. Further, in this case, the Government has specifically alleged that Defendant and his staff arranged various

establishing the veracity of the claim made in Defendant's invoice would be apparent from the invoice itself and evidence related to the claim. Here, the invoice was for "Services Rendered" by Defendant's corporation, Menards Peoria LLC. If the Government can prove that Menards Peoria LLC did not render services for which the $11,000 could apply, then it could establish that the claim is false without any reliance on House Rules. However, while House Rules may not be necessary to establish the veracity of the claim, the facts pled in the Indictment suggest that House Rules are necessary to establish that the claim was part of a scheme to obtain money through false or fraudulent pretenses.

The Government's reliance on House Rules to prove that the claim contained in the $11,000 invoice was part of a scheme to obtain money through false or fraudulent pretenses is evident from the facts pled in the Indictment. As the following paragraphs illustrate, the facts provided by the Government establish that the sole purpose of the claim was to allow Defendant to circumvent House Rules which, according to the Government, would have prevented him from profiting from the annual fly-in event. For this reason, the Government's reliance on House Rules is absolutely necessary.

---

meetings and otherwise participated in the fly-in events. Based on his participation, it should not surprise anyone that some of the fees might have gone to Defendant. Simply put, the Indictment does not sufficiently plead fraud on event participants or Defendant's constituents. Therefore, the court will not entertain the Government's revisionist pleading as expressed in its response. Thus, the only allegation of fraud properly pled in the Indictment relates to the $11,000 invoice.

According to the Government's theory of the case, the $11,000 at issue in Count 9 originated from a bank account belonging to Defendant's friend. The Government alleged that Defendant instructed his friend to utilize her account to "administer receipt of fly-in fees and payment of fly-in expenses" and that it was Defendant, not the friend, who directed the $11,000 check be mailed to Defendant's residence. These facts establish that Defendant's friend was involved in the alleged scheme at the direction of Defendant. As such, Defendant would have had no reason to submit a false claim in order to obtain money from his friend's account. In fact, there are no allegations in the Indictment that Defendant needed to make such a claim in order to receive a payment from the account. These facts distinguish Count 9 from all other counts analyzed herein.

Unlike Counts 1-5, 8, and 10, which allege that Defendant received money from the United States Congress as a result of fabricated reimbursement claims, the allegations contained in Count 9 suggest that Defendant did not have to make a false claim in order to obtain the funds at issue. Instead, as pled, a false claim was necessary for the sole purpose of converting money Defendant already controlled through a third party to his personal use without triggering the prohibitions allegedly contained in House Rules. In fact, the only allegations in the Indictment related to the need for a false claim stem from Defendant's alleged desire to circumvent the House Rules cited by the

Government. As such, the facts alleged in the Indictment establish that the Government must rely on House Rules in order to prove that the claim contained in the $11,000 invoice was part of a scheme to obtain money through false or fraudulent pretenses.[8]

The Government's reliance on House Rules is also evident from the wording of the allegations themselves. While describing the alleged scheme giving rise to Count 9, the Government specifically claims that Defendant "violated the House Rules, which prohibited him from using his official position for personal gain," and that Defendant "failed to disclose this additional income on his annual financial disclosure form." The court assumes that the language used by the Government in an indictment is not superfluous. Therefore, the reference to House Rules directly in Count 9 shows that the rules are important in establishing the alleged scheme.

For all of the reasons stated herein, and after a thorough review of the allegations contained in the Indictment, this court concludes that the House Rules cited by the Government in Count 9 provide the only basis for determining whether the claim contained in the $11,000 invoice was part of a scheme to obtain money by means of false or fraudulent pretenses.  As such, it will be necessary for the Government to rely upon and interpret House Rules in order to obtain a conviction on Count 9. Therefore, the

---

[8] If the House Rules cited by the Government prohibited Defendant from receiving money from the fly-in events, the Government could establish that the claim was an attempt to fraudulently circumvent House Rules in order to obtain money. However, if House Rules allowed Defendant to profit from the fly-in events, the Government would not be able to establish a scheme to obtain money by false or fraudulent pretenses since there are no other allegations which would necessitate a false claim being made by Defendant in order to receive the $11,000 from his friends account.

court must shift its focus to a discussion of whether the House Rules at issue are ambiguous. If the rules are not sufficiently clear, the court must conclude that Count 9 is non-justiciable. See *Rostenkowski*, 59 F.3d at 1306; *Durenberger*, 48 F.2d at 1245; *Baker*, 369 U.S. at 217.

After a review of the Indictment, the court concludes that the House Rules relied upon by the Government are ambiguous for two reasons. First, the Government does not provide any citation to or quotations from the specific rules it references in the Indictment. In fact, the Government simply states that House Rules "prohibited [Defendant] from using his official position for personal gain" and "required [Defendant] to return any excess funds to the fly-in participants or donate such funds to charity." The Government also claims that Defendant "failed to disclose this additional income on his annual financial disclosure form." However, despite these allegations, the court is left to speculate as to which House Rules the Government is relying upon. This is not acceptable. The Government's failure to identify the specific House Rules at issue renders the application of any rule ambiguous as pled in the Indictment.

Second, even assuming that the Government correctly stated the wording of the rules upon which it relied, the application of those rules is ambiguous. The wording the Government provided related to the rule which would prohibit Defendant from "using his official position for personal gain," is lacking in specifics.[9] Whether Defendant's

---

[9] Although not cited by the Government, Defendant believes that the actual rule the Government is relying upon is House Rule XXIII(3) which states:

receipt of excess fly-in event fees is a situation where Defendant is "using his official position for personal gain" is not sufficiently clear. While it is certainly one conclusion which the House could make, it is possible the rule is meant to apply to more serious situations, such as a member receiving or demanding a bribe.[10] However, because it is unclear, determining whether the House meant the rule to apply to the facts pled in the Indictment would place the court in the position of political overseer of the legislative branch and require it to develop that branch's rules of behavior. This is something which the court may not do. See *Durenberger*, 48 F.3d at 1245; *Baker*, 369 U.S. at 217.

Also ambiguous is the rule requiring Defendant to "disclose this additional income on his annual financial disclosure form." The Government failed to state with specificity the detailed information this rule allegedly requires members to disclose in their annual financial disclosures. Without more, the court must conclude that the rule, as pled by the Government, is clearly ambiguous and again would require the court to develop rules of behavior for the legislative branch. Thus, its application in this prosecution is not appropriate. See *Durenberger*, 48 F.3d at 1245; *Baker*, 369 U.S. at 217.

As pled, the prosecution of Count 9 requires the interpretation of ambiguous House Rules. For this reason, the prosecution of Count 9 violates both the Rulemaking

---

A Member, Delegate, Resident Commissioner, officer, or employee of the House may not receive compensation and may not permit compensation to accrue to the beneficial interest of such individual from any source, the receipt of which would occur by virtue of influence improperly exerted from the position of such individual in Congress.

[10] This is especially true if the Government is relying upon House Rule XXIII(3).

Clause and the constitutional principle of separation of powers. See *Durenberger*, 48 F.3d 1239; *Rostenkowski*, 59 F.3d 1291; *Baker*, 369 U.S. at 217. Therefore, Count 9 must be dismissed.

*Mail Fraud (Count 10)*

Count 10 charges Defendant with mail fraud in violation of 18 U.S.C. § 1341.

Section 1341 states:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises * * * places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341.

As part of the court's analysis, § 1341 contains similar elements to § 1343 which the court considered above.  Applied in this prosecution, under both statutes, the Government must prove that Defendant devised or intended to devise a scheme for obtaining money by means of false or fraudulent pretenses, representations, or promises. See 18 U.S.C. §§ 1341, 1343. The primary difference between the two statutes is that in order to be convicted under § 1341, a defendant must use a postal service

instead of wire, radio, or television communications.[11] With similar elements to those found in § 1343, the court's analysis of the Rulemaking Clause's application to Count 10 follows a similar path as its analysis of Counts 1-5 and 8-9 above.

In Count 10, the Government alleges that Defendant committed mail fraud when he "knowingly caused to be delivered by UPS * * * a shipment/mailing, from B & H Photo in New York to Defendant Schock's Congressional Office in Peoria, Illinois." The factual allegations contained in the Indictment allege that: (1) Defendant used his personal credit card to purchase $29,021.45 in camera equipment from B & H Photo in New York; (2) thereafter, Defendant submitted false invoices for "multimedia services" in the amount of $29,021.45 to the House for reimbursement; (3) as a result of the representations in the false voucher and invoices, the House authorized a payment of $29,021.45 on December 15, 2014; and (4) the funds were deposited in a staff member's bank account and then used to make direct payments to Defendant's personal credit card.

The Government can obtain a conviction on Count 10 if it can prove that the claims contained on vouchers submitted by Defendant (or at his direction) were false and that the vouchers were used to obtain money. Establishing the truthfulness of the claims does not rely on an interpretation of any House Rule. Instead, the claim itself and

---

[11] Like the wire fraud counts, there is no argument that House Rules are necessary for the Government to prove the element that Defendant used the postal service or any private or commercial interstate carrier. Therefore, the court will focus its analysis of the Rulemaking Clause on the other elements contained in § 1341.

evidence surrounding the claim is all that is needed. As with Counts 1-5 and 8 discussed above, the court need not concern itself with the appropriateness of the claims as they relate to House Rules. In fact, whether the camera equipment was reimbursable under House Rules is of no consequence. What is important in establishing whether the claim was false or fraudulent is whether Defendant was truthful when he made his claim for reimbursement. See *Durenberger*, 48 F.3d at 1245.

Still, Defendant argues that in order to determine whether his voucher submission was truthful, the Government must prove that the voucher contained a label choice that was inaccurate under the applicable Voucher Documentation Standards established by House Rules. The court does not agree.

While the label choice certainly goes to the veracity of Defendant's claim, it is the label Defendant used in the voucher, and not a label he *could have* used, which is important. Whether the label and claims contained within the voucher could describe camera equipment will be a question for the jury and their conclusion will be based upon the claims made by Defendant and the evidence surrounding the actual use of the money. If the jury finds that the money was spent on camera equipment and that the claims made in the voucher submission did not represent such an expenditure, then the veracity of the statements will be evident from the voucher claims themselves. Concluding that the claimed expenditure and the actual expenditure are the same or different requires no interpretation of House Rules and does not depend on the various labels Defendant could have used in accordance with such rules.

House Rules are also not necessary to establish whether the allegedly untruthful vouchers were used by Defendant as part of a scheme for obtaining money. Instead, this element can be proven simply by establishing that Defendant submitted a voucher request for $29,021.45 and received a payment from the House for $29,021.45. As with the counts above, the fact that the House made a payment to Defendant is a fact in and of itself and no interpretation of House Rules is necessary to establish that a payment was made. If the Government can establish the above facts, it is possible for a jury to conclude that the vouchers submitted by Defendant were part of a scheme for obtaining money through false or fraudulent pretenses. The jury could make that conclusion without any discussion of House Rules.

For all of the reasons stated herein, the court concludes that the elements necessary for a conviction on Count 10 can be established without the application of House Rules. As such, the prosecution of this count does not place the court in the position of political overseer of another branch of government. See *Durenberger*, 48 F.3d at 1245. It also does not raise the same concerns expressed by the D.C. Circuit Court in *Rostenkowski*. See *Rostenkowski*, 59 F.3d at 1305. Therefore, the Rulemaking Clause does not bar prosecution of Count 10. However, as with the counts above, if the Government seeks to establish any element with evidence that necessitates the interpretation of House Rules, this issue may be revisited at the appropriate time.

_False Statements (Counts 12-13)_[12]

Counts 12 and 13 charge Defendant with the making of false statements in violation of 18 U.S.C. §§ 1001(a)(2), (c)(1). In order to obtain a conviction on these counts, the Government must prove that Defendant knowingly and wilfully made a materially false, fictitious, or fraudulent statement or representation in any matter within the jurisdiction of any branch of the federal government. 18 U.S.C. § 1001(a)(2). Because this matter is within the jurisdiction of the legislative branch, the Government must also prove that the statements at issue apply to administrative matters such as "a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch." 18 U.S.C. § 1001(c)(1).

As charged in the Indictment, Count 12 relates to Defendant's allegedly false statement regarding the $29,021.45 voucher submission labeled"WEB DEV HST, EMAIL & RELTD SERV" which the Government contends was actually spent on camera equipment. Count 13 relates to the $15,000 voucher submission labeled"NON-

---

[12] Defendant's arguments regarding the Rulemaking Clause's application to Counts 12 and 13 are slightly confusing. In his Memorandum in Support (#77), Defendant did not argue that Counts 12 and 13 require the interpretation of House Rules but that they should be dismissed simply because they incorporate and rely upon counts that do. However, in his Consolidated Reply Memorandum (#99), Defendant did argue, albeit briefly, that Counts 12 and 13 themselves require the interpretation of House Rules and thus invoke the Rulemaking Clause. Therefore, despite the confusion in his filings, the court will err on the side of caution and address the application of the Rulemaking clause on Counts 12 and 13.

TECHNOLOGY SERVICE CONTR" which was paid to an Illinois designer/decorator and which, according to the Government, was actually used to pay Defendant's personal expenses associated with the design and furnishing of his Congressional Office. Both counts allege that Defendant made false, fictitious, and fraudulent statements and representations when submitting documentation related to his claims for payment to the legislative branch.

Here, in order to succeed on Counts 12 and 13, the Government only needs to prove that Defendant made materially false, fictitious, or fraudulent statements or representations on his claims for payment to the legislative branch. Determining whether the statements are false or fictitious requires reliance on the claims themselves and evidence surrounding their veracity.[13] Concluding that the claim was submitted to the legislative branch for payment requires reliance only upon the voucher claim itself. Neither finding requires any interpretation or discussion of House Rules. Therefore, the court finds that the prosecution of Counts 12 and 13 does not automatically violate the Rulemaking Clause. See *Durenberger*, 48 F.3d at 1245. However, for the reasons addressed above, if, at any time, the Government seeks to establish the veracity of any claim with evidence that necessitates the application of House Rules, this issue may be revisited.

---

[13] For reasons stated above, the court does not agree with Defendant's argument that Count 12 requires the court to interpret ambiguous House Rules regarding how media services should be labeled (as in Count 10) or that Count 13 requires the interpretation of House Rules regarding what "nominal" value means (as in Count 8).

B. Speech or Debate Clause

Defendant next argues that the prosecution of this case implicates the Speech or

Debate Clause, which states:

> The Senators and Representatives [] shall in all Cases, except Treason,
> Felony and Breach of the Peace, be privileged from Arrest during their
> Attendance at the Session of their respective houses, and in going to and
> returning from the same; and for any Speech or Debate in either House,
> they shall not be questioned in any other Place.

U.S. Const. art. I, § 6, cl. 1.

"The Speech or Debate Clause was designed to assure a co-equal branch of the

government wide freedom of speech, debate, and deliberation without intimidation or

threats from the Executive Branch." *Gravel v. United States*, 408 U.S. 606, 616 (1972). As

such, the clause "protects Members [of Congress] against prosecutions that directly

impinge upon or threaten the legislative process." *Gravel*, 408 U.S. at 616.

The protections provided by the Speech and Debate Clause extend to all matters

that are "an integral part of the deliberative and communicative process by which

Members participate in committee and House proceedings with respect to the

consideration and passage or rejection of proposed legislation or with respect to other

matters which the Constitution places within the jurisdiction of either House." *Gravel*,

408 U.S. at 625; see also *Rostenkowski*, 59 F.3d at 1302. However, the clause's extension to

matters beyond pure speech or debate is limited to situations where such protection is

"necessary to prevent direct impairment of such deliberations." *Gravel*, 408 U.S. at 625

(internal quotations omitted). Thus, while the Speech or Debate Clause is a member of

Congress's primary source of constitutional protection from criminal prosecution, its protection does not extend beyond what is necessary to preserve the integrity of the legislative process itself. See *Rostenkowski*, 59 F.3d at 1302.

In *Gravel*, the Supreme Court noted that, "[w]hile the Speech or Debate Clause recognizes speech, voting, and other legislative acts as exempt from liability that might otherwise attach, it does not privilege either [Congressman] or aide to violate an otherwise valid criminal law in preparing for or implementing legislative acts." *Gravel*, 408 U.S. at 626. The Court added that "legislators ought not to stand above the law they create but ought generally" be bound by it "as are ordinary persons." *Gravel*, 408 U.S. at 615. For this reason, the Court has concluded that "[t]he Speech or Debate Clause does not prohibit inquiry into illegal conduct simply because it has some nexus to legislative functions." *United States v. Brewster*, 408 U.S. 501, 528 (1972). Instead, to be privileged, the speech must be part of the legislative process itself. *Brewster*, 408 U.S. at 528.

Defendant argues that the Speech or Debate Clause prohibits the prosecution of this case because it would require Defendant to answer for his speech on matters within the jurisdiction of the House of Representatives. Defendant's argument is based on two theories. First, Defendant claims the allegations in the Indictment rely on his speech undertaken in accordance with his authority as a member of Congress to engage in congressional rulemaking. Second, Defendant claims that the prosecution of this case requires evidence related to his speech regarding his understanding of House Rules related to the submission of vouchers. The court will address each theory in turn.

Defendant's first theory is based on a legal principle that has no application to the facts alleged in the Indictment. Defendant cites to *Consumers Union of United States, Inc. v. Periodical Correspondents' Association*, 515 F.2d 1341 (D.C. Cir. 1975), for the proposition that rulemaking is just as much a legislative act as voting on bills and, therefore, a member's participation in rulemaking enjoys the protections provided by the Speech or Debate Clause. While this legal theory may be sound, its application is only appropriate when a member is actually participating in congressional rulemaking.

In *Consumers Union*, the D.C. Circuit Court concluded that the Periodical Correspondents' Association (Association) was enforcing internal rules of Congress when it refused to accredit Consumers Union's publication and allow its representative access to the Association's congressional press galleries. *Consumers Union*, 515 F.2d at 1350. Because the Association was tasked with enforcing congressional rules and because the challenged conduct related to the "execution of internal rules," the D.C. Circuit Court found that the Association's actions were immune from inquiry under the Speech or Debate Clause. *Consumers Union*, 515 F.2d at 1351.

Here, by contrast, Defendant is not alleged to have engaged in any conduct related to the "execution of internal rules." In fact, the Indictment does not allege any facts in which Defendant, or anyone else, was acting within their authority or the authority of Congress to make or enforce congressional rules. Instead, Defendant's conduct, as charged in the Indictment, would be better characterized as rule-breaking, not rulemaking. While the Constitution gives Congress the authority to make and

enforce its own rules, it does not provide members of Congress with the authority to circumvent those rules unilaterally through lies or false statements. Such conduct, much like bribery, "is, obviously, no part of the legislative process or function; it is not a legislative act." *Brewster*, 408 U.S. 501. Therefore, because this case does not involve any allegations related to Defendant's actual participation in congressional rulemaking, Defendant's claim, as it relates to *Consumers Union*, that his alleged conduct was within the legislative sphere, is not convincing.

Defendant next claims that the prosecution of this case would require the production of evidence related to his speech with aides regarding the proper submission of vouchers pursuant to House Rules. The court has already concluded that the Government need not establish the appropriateness of the House disbursements at issue in determining whether Defendant violated 18 U.S.C. §§ 1343, 1341, 1001(a)(2), (c)(1). Therefore, evidence related to Defendant's speech regarding his interpretation or application of House Rules is not necessary. To the extent that Defendant himself chooses to present evidence related to his discussions regarding House Rules, "the constitutional protection against his being 'questioned' for his legislative acts 'does not prevent [him] from offering such acts in his own defense, even though he thereby subjects himself to cross-examination.'" *Rostenkowski*, 59 F.3d at 1303, quoting *United States v. McDade*, 28 F.3d 283, 295 (3rd Cir. 1994); see also *United States v. Myers*, 635 F.2d 932, 942 (2nd Cir. 1980).

For the reasons stated above, and after a thorough and comprehensive review of the Indictment, the court concludes that the prosecution of Defendant does not require any inquiry into speech which occurred in the House or any speech which is necessary to preserve the integrity of the legislative process itself. See U.S. Const. art. I, § 6, cl. 1.; *Rostenkowski*, 59 F.3d at 1302. Nor does the prosecution of this case require any inquiry into legislative acts or the motivation for legislative acts. See *Brewster*, 408 U.S. at 525. Therefore, the court finds that the prosecution of Defendant, under the Indictment in this case, is not prohibited by the Speech or Debate Clause.

## C. Due Process Clause

Defendant's final constitutional argument contained in his first motion to dismiss is based on the fifth amendment's Due Process Clause. See U.S. Const. amend. V.[14] Defendant's argument rests upon his contention that the prosecution of the fraud and false statement counts contained in the Indictment are premised on allegations that Defendant violated ambiguous House Rules. However, the court finds Defendant's argument fails for one simple reason. As stated above, the fraud and false statement counts which have survived Defendant's motion to dismiss may not rely on the application or interpretation of House Rules. Therefore, even if those rules are

---

[14] In his second Motion to Dismiss (#78), Defendant has argued that the counts brought under 18 U.S.C. § 1519 also violate the Due Process Clause. The court will address that argument, and all arguments regarding § 1519, in the next section.

ambiguous, the Due Process Clause is not implicated. For this reason, the court

concludes that the prosecution of the remaining fraud and false statement counts does

not violate the Due Process Clause.

### D. Incorporation of Unconstitutional Allegations

Defendant has argued that Counts 14-24 should be dismissed because they

incorporate and rely upon the allegedly unconstitutional allegations contained in the

counts before them. While this argument may have been convincing had the court

dismissed Counts 1-13, that is not the case. Because the court has found that only one

count, Count 9, should be dismissed based on the constitutional concerns raised in

Defendant's first motion to dismiss, the court does not believe that the remaining counts

warrant dismissal for the reasons stated in Defendant's brief.

For all the reasons stated herein, Defendant's Motion to Dismiss (#76) is

GRANTED in part and DENIED in part. Count 9 of the indictment is hereby dismissed.

### III. Failure to State an Offense, Counts 14-18

Defendant's second Motion to Dismiss (#78) argues that Counts 14-18 should be

dismissed for failure to state an offense. Counts 14-18 rest upon allegations that

Defendant participated in the falsification of Federal Election Commission (FEC) filings.

Despite their reliance on documents filed with the FEC, Counts 14-18 do not allege

violations of the Federal Election Campaign Act (FECA). Instead, these

counts are premised on 18 U.S.C. § 1519. Section 1519 states:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

18 U.S.C. § 1519.

Defendant argues that the prosecution of Counts 14-18 under § 1519 is improper as it would upset the careful legal and regulatory framework Congress crafted in the FECA and would infringe upon Defendant's constitutional rights. Defendant has made many arguments to support these two contentions. The court will address each argument in turn.

Defendant first contends that the application of § 1519 to the facts contained in Counts 14-18 would upset the carefully crafted balance Congress sought to achieve with the FECA. To support this claim, Defendant argues that, unlike § 1519, the FECA was designed to safeguard against concerns related to the separation of powers and core political speech protected by the First Amendment. Also, unlike § 1519, the FECA takes into account that mistakes in FEC filings are inevitable. Further, Defendant argues that adjudication under the FECA is more appropriate because the FECA contains a lesser proof requirement and provides less serious penalties than § 1519; and because there is no established practice for applying § 1519 to the passive receipt of FEC documents.

For the reasons that follow, although the court agrees with Defendant's characterization and purpose of § 1519, the court concludes that Defendant's arguments do not support the dismissal of Counts 14-18 for failure to state an offense. Most of the arguments advanced by Defendant, as outlined above, support Defendant's contention that the allegations contained in Counts 14-18 would be more appropriate if brought under the FECA as opposed to § 1519. However, even if this is true, the court cannot dismiss these counts simply because a more appropriate avenue of prosecution exists. The United States Supreme Court has long recognized that the decision "to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion." *United States v. Batchelder*, 442 U.S. 114, 124 (1979). Accordingly, "when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants." *Batchelder*, 442 U.S. at 123-24.

A prosecutor's discretion extends to cases involving two distinct statutes with different proof requirements and penalties. In *Batchelder*, the Court concluded that "there is no appreciable difference between the discretion a prosecutor exercises when deciding whether to charge under one of two statutes with different elements and the discretion he exercises when choosing one of two statutes with identical elements." *Batchelder*, 442 U.S. at 125. The Court went on to find that, while a "prosecutor may be influenced by the penalties available upon conviction, [] this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause." *Batchelder*,

442 U.S. at 125. "Just as a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution neither is he entitled to choose the penalty scheme under which he will be sentenced." *Batchelder*, 442 U.S. at 125.

Based on the precedent outlined in *Batchelder*, the court cannot concern itself with the many options available to the Government in a criminal prosecution, nor with the fact that one option may have a greater proof requirement and a more serious penalty. Instead, when dealing with a motion to dismiss for failure to state an offense, the court must focus on whether the specific facts alleged in the charging document are within the scope of the relevant criminal statute. See *Carroll*, 320 F.Supp.2d at 752. Where as here, Defendant's arguments do not address the appropriateness of § 1519, but instead only support his claim that adjudication under the FECA is superior, dismissal is not warranted. See *Batchelder*, 442 U.S. at 123-24.

To the extent that Defendant's arguments reach beyond matters committed to the sound discretion of the prosecutor, the court is not convinced by Defendant's claims. Counts 14-18 charge Defendant with the knowing falsification of FEC documents. Such allegations negate Defendant's arguments with respect to the First Amendment since, as the Seventh Circuit has noted, "[s]peech which is false and misleading is not protected by the First Amendment's right to freedom of speech." *United States v. Cueto*, 151 F.3d 620, 634 n. 11 (7th Cir. 1998). Allegations of knowing falsification also render moot Defendant's numerous arguments related to the FECA's protections for errors,

mistakes, and omissions in FEC filings. While it may be true that the FECA anticipated errors, mistakes, and omissions, this prosecution does not deal with such incidents. Instead, this prosecution centers on allegations of *knowing* falsehoods. Neither the FECA nor § 1519 protects against a knowing falsehood.

Also not convincing is Defendant's claim that dismissal is warranted because there is no established practice of applying § 1519 to the passive receipt of FEC filings.[15] Defendant argues that, without an established practice, there is no support for the application of § 1519 to the allegations in the Indictment. The court does not agree. The lack of an established practice alone does not support a conclusion that the application of certain facts to a statute is improper. If this were the case, every statute would be found wanting during its first attempted application. As a common colloquialism notes, there is a first time for everything. Therefore, when ruling on a motion to dismiss for failure to state an offense, the court is not as concerned with the lack of an established practice as much as it is concerned with the proper scope of the statute. See *Carroll*, 320 F.Supp.2d at 752. Here, because Defendant's argument on this point relates solely to the lack of an established practice, and not to the proper scope of § 1519, dismissal for failure to state an offense is not warranted.

_____

[15] Despite this claim, Defendant cites two cases where § 1519 *was used* in a prosecution related to FEC filings. See *United States v. Fattah*, 223 F.Supp.3d 336 (E.D.Pa. 2016); Superseding Indictment, *United States v. Jesse Benton*, No. 4:15-CR-103 (S.D. Iowa Nov. 19, 2015).

For all of the reasons stated above, the court is not convinced by Defendant's argument that dismissal is appropriate because the prosecution of Counts 14-18 under § 1519 would upset the balance created by Congress in the FECA. Therefore, the court will turn its attention to Defendant's second contention.

Defendant's second contention is that, as applied in this prosecution, Counts 14-18 violate his constitutional right to due process. See U.S. Const. amend. V. Defendant's argument is premised on his assertion that, as applied, § 1519 is unconstitutionally vague. According to Defendant, the application of § 1519 to the facts charged in the Indictment would require Defendant, and all political candidates and politicians, to comply with "the unannounced reporting standards of nearly a hundred different prosecutorial offices" and would allow for "arbitrary and discriminatory enforcement in an arena already ripe for political gamesmanship." Defendant argues that there are "many errors that could support a prosecution on the government's theory of the case." And that allowing the application of § 1519 to the allegations in the Indictment would give "prosecutors extraordinary leeway to arbitrarily pick candidates to target under Section 1519." For the following reasons, the court does not agree with Defendant.

Due process requires that criminal statutes provide "a person of ordinary intelligence fair notice that his contemplated conduct is forbidden." *United States v. Harriss*, 347 U.S. 612, 617 (1954). "The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Harriss*, 347 U.S. at 617. The Due Process Clause also protects against

statutes which provide inadequate direction to law enforcement authorities and, thereby, "authorize [or] encourage arbitrary and discriminatory enforcement." *Chicago v. Morales*, 527 U.S. 41, 56 (1999). Where, as here, First Amendment rights are potentially involved, an even "greater degree of specificity" is required. *Smith v. Goguen*, 415 U.S. 566, 573 (1974).

In determining whether a statute is unconstitutionally vague, the court must first consider whether the statute provides fair notice to a person of ordinary intelligence. To this end, the Supreme Court "has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*." *Colautti v. Franklin*, 439 U.S. 379, 395 (1979). Where a statute contains a scienter requirement (requiring that a person act with intent or knowledge of wrongdoing), concerns regarding the notice to an individual with ordinary intelligence are ameliorated. *Hill v. Colorado*, 530 U.S. 703, 705 (2000).

Applying this standard to the case at hand, the court concludes that an individual of ordinary intelligence would have been on notice that the allegations contained in the Indictment were forbidden by § 1519. Section 1519 clearly requires that a person act knowingly and with intent. See 18 U.S.C. § 1519. Based on these requirements, and the plain language of § 1519, it is "unlikely that anyone would not understand the common words used in the statute." *Hill*, 530 U.S. at 705.

It is also unlikely that anyone would not understand that the allegations, as charged in Counts 14-18, represent conduct proscribed by § 1519. Unlike the

hypothetical situations presented by Defendant, the Indictment clearly alleges *intentional* falsification, not mistakes or errors.[16] Further, despite Defendant's claims to the contrary, the prosecution does not allege a violation of FEC (or an individual prosecutor's) reporting standards. Instead, the Indictment simply alleges that Defendant knowingly filed documents containing false entries with a government agency with the intent to influence that agency's proper administration of a matter within its jurisdiction. This is exactly the type of situation forbidden by the plain language of § 1519.

The court is also not convinced by Defendant's claim that § 1519 provides inadequate direction to law enforcement authorities. Defendant's argument is based on his assertion that, as applied in this case, § 1519 would allow for the arbitrary prosecution of any error, omission, or misstatement in any document filed with a government agency. This application, according to Defendant, would authorize, or even encourage, a prosecutor to arbitrarily use § 1519 to prosecute political adversaries and anyone who does not meet their individualized reporting standards for government filings. However, for the reasons that follow, the court does not interpret § 1519 the same way as Defendant.

_____

[16] The hypothetical situations presented by Defendant do "not support a facial attack on a statute that is surely valid in the vast majority of its intended applications." *Hill*, 530 U.S. at 705; see also *United States v. Philips*, 645 F.3d 859, 863 (7th Cir. 2011) ("when we are presented with an as-applied challenge, we examine only the facts of the case before us and not any set of hypothetical facts under which the statute might be unconstitutional").

By its plain language, § 1519 only allows for the prosecution of an individual who "knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object." 18 U.S.C. § 1519. As such, the statute does not allow for the prosecution of mistakes, errors, or unintentional omissions. The statute also does not allow for a prosecution based on filings that, although truthful, are in violation of the reporting standards of a federal agency. Therefore, contrary to Defendant's claims, § 1519 does not allow a prosecutor to establish individualized reporting standards for FEC filings.

Section 1519 also states that the knowing action, outlined in the above paragraph, must be made "with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States." 18 U.S.C. § 1519. This requirement further provides direction to law enforcement authorities and limits their ability to arbitrarily enforce the statute. For all of these reasons, and based on its plain language and limitations, the court finds that § 1519 provides adequate direction to law enforcement authorities and does not authorize or encourage arbitrary and discriminatory enforcement.

Having concluded that § 1519 provides adequate notice that the allegations contained in Counts 14-18 were forbidden by the statute, and having concluded that the statute provides adequate direction for law enforcement authorities, the court finds that

the application of § 1519 in this case is not unconstitutionally vague.[17] Therefore, the

court rejects Defendant's as-applied vagueness challenge under the Due Process Clause.

However, before moving on, the court must address a secondary argument raised by

Defendant.

Defendant has argued that the application of § 1519 in this case further violates

his rights to due process because, when properly constructed, § 1519 does not apply to

the allegations in the Indictment. Defendant's position is based on his assertion that the

FEC's passive receipt of documents does not constitute the "proper administration" of a

"matter" as required under § 1519. Instead, Defendant argues that the term "matter" in

§ 1519 should be construed to mean a "formal exercise of governmental power that is

similar in nature to a lawsuit before a court, a determination before an agency, or a

hearing before a committee." See *McDonnell v. United States*, 136 S.Ct. 2355, 2372 (2016).

And that "proper administration" as used in § 1519 requires more than passive receipt

and must include active enforcement or adjudicative processes. However, while

Defendant raises interesting points, his argument contains one major flaw.

---

[17] Although the court does not agree with Defendant's argument that Counts 14-18 are unconstitutionally vague, the court does agree with Defendant that some allegations contained therein are confusing. For instance, in Count 15, the Government claims that Defendant's FEC filing labeled "PAC Legal Fees" was actually a payment made to Defendant and a "Washington DC law firm." Similarly, in Count 17, the Government alleges that an FEC filing which was labeled as a "transportation expense" was actually for the purchase of vehicles used by Defendant and his District Chief of Staff. The court is not sure how the Government seeks to prove that a payment to a law firm should not be labeled as a legal fee or that labeling the purchase of vehicles as "transportation expenses" is false. However, these are issues that the jury, not the court, will take up.

Counts 14-18 do not allege that the passive receipt of documents by the FEC is a matter within the commission's jurisdiction. Instead, all five counts simply allege that Defendant "with the intent to impede, obstruct, or influence the proper administration of a matter within the jurisdiction of the FEC and in contemplation of such matter" filed documents containing false entries with the commission. Based on the construction of the Indictment, the "proper administration" of a "matter" for which Defendant is alleged to have attempted to impede, obstruct, or influence is not clear and will only become apparent at trial. Thus, while it is possible the Government's evidence will focus solely on the FEC's passive receipt of documents, it is also possible that the Government will attempt to prove that Defendant filed documents containing false entries with the intent to impede an FEC audit or field investigation. See 52 U.S.C. § 30111(b). Audits and field investigations, unlike the passive receipt of documents, would certainly fit under Defendant's proposed construction of "matter" and "proper administration" as contained in § 1519.

Based upon the information currently before the court, it is simply too early to determine whether the Government's evidence regarding the "proper administration" of a "matter" within the jurisdiction of the FEC fits within the confines of § 1519. Instead, as with the cases cited by Defendant, this issue would be better addressed at the conclusion of the trial. See *Yates v. United States*, 135 S.Ct. 1074 (2015); *McDonnell v. United States*, 136 S.Ct. 2355 (2016). Therefore, the court finds that Defendant's request

to limit the construction of § 1519 is premature. As such, the court declines to address the issue. However, if necessary, Defendant may raise the issue at a more appropriate time.

For all the reasons stated herein, Defendant's second Motion to Dismiss (#78) is DENIED.

## IV. Duplicitous, Count 11

Defendant's third Motion to Dismiss (#86) argues that Count 11 of the Indictment should be dismissed as duplicitous pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(i). "An indictment is duplicitous if it charges two or more offenses in a single count." *United States v. Pansier*, 576 F.3d 726, 734 (7th Cir. 2009). The Seventh Circuit has stated that "[t]he dangers of a duplicitous indictment are that the defendant may not understand the charges against him, might be convicted by less than a unanimous jury, may be prejudiced by evidentiary rulings at trial, or may be subjected to double jeopardy." *United States v. Davis*, 471 F.3d 783, 790 (7th Cir. 2006).

In this case, Count 11 charges a single offense of theft of government funds in violation of 18 U.S.C. § 641. The Indictment alleges that this single count occurred "[f]rom in or about 2010, and continuing to on or about March 31, 2015, in the Central District of Illinois and elsewhere" and that Defendant "did knowingly embezzle, steal, purloin, and convert to the use of another more than $1,000 of money of the United

States." Other than incorporating by reference "[p]aragraphs 1 through 74 of Counts 1 through 8," the Indictment does not provide any further information related to the charged offense.

Defendant argues that Count 11 is an improper attempt by the Government to lump five years' worth of alleged thefts into a single count. As such, Defendant contends that Count 11 is duplicitous. The Government's consolidated response does not address Defendant's arguments regarding duplicity. Instead, the Government's sole contention is that "[e]ven assuming any of [Defendant's] arguments are correct, dismissal of Count 11 is not the appropriate remedy."[18]

The court agrees with Defendant that Count 11 is duplicitous. As charged, Count 11 is an attempt to group numerous transactions into a single theft count. The allowable unit of prosecution under § 641 "is each individual transaction in which government money is received, even if the transaction is a part of an overarching scheme." *United States v. Reagan*, 596 F.3d 251, 254 (5th Cir. 2010). As such, offenses under § 641 cannot last for a period of years. *Reagan*, 596 F.3d at 254; see also *United States v. Yasher* 166 F.3d 873, 875 (7th Cir. 1999); *United States v. Hendrikson*, 191 F.Supp.3d 999, 1004 (D.S.D. 2016) ("[t]heft of government property as contained in the first paragraph of § 641 does not constitute a continuing offense"). Instead, each theft of government funds occurs at a single point in time, when the funds are received by a defendant. See *Reagan*, 596 F.3d at

---

[18] While the Government's consolidated response to Defendant's motions to dismiss consists of 92 pages, only one page is devoted to this issue.

254. Here, because the Government alleged that a single offense under § 641 occurred "[f]rom in or about 2010, and continuing to on or about March 31, 2015, in the Central District of Illinois and elsewhere," it is clear that the Government seeks to charge Defendant with multiple violations of § 641.

Further supporting the court's conclusion that Count 11 is duplicitous is the fact that the Government did not allege specific facts related to the individual charge. Instead, the Government incorporated by reference "[p]aragraphs 1 through 74 of Counts 1 through 8." Those 74 paragraphs contain numerous allegations relating to various requests for reimbursement which resulted in multiple disbursements of government funds. Any one of those disbursements could have given rise to the alleged violation of § 641 contained in Count 11. By incorporating all 74 paragraphs, the Government has made it impossible for Defendant (and the court) to determine which disbursement gave rise to the allegations contained in Count 11. The Indictment, therefore, does not give Defendant fair notice of the charged offense and the dangers expressed by the Seventh Circuit in *Davis* are clearly present. See *Davis*, 471 F.3d at 790.

In its consolidated response, the Government suggests that it could "limit its evidence as to Count 11 only to conduct that occurred after November 10, 2011 (within five years of the indictment), and that it will further limit its proof of Count 11 to evidence of false mileage claims and the fraudulent purchase of and payment for the camera equipment in 2014." However, in crafting the Indictment, the Government made a choice as to what conduct it would prosecute. That choice, as it pertains to

Count 11, included a lack of specific facts and a claim that the alleged theft of government funds occurred "[f]rom in or about 2010, and continuing to on or about March 31, 2015, in the Central District of Illinois and elsewhere." The Government chose the language contained in Count 11. The Government cannot now edit that language in order to avoid dismissal of the count as duplicitous.

For the reasons stated above, the court concludes that, as pled, Count 11 seeks to charge two or more offenses in a single count. As such, Count 11 is duplicitous and dismissal is warranted. See *Pansier*, 576 F.3d at 734; *United States v. Bessigano*, 2008 WL 4833110 (N.D. Ind. Nov. 4, 2008) ("because defendant properly raised this issue before trial, the proper remedy is dismissal of the duplicitous count"). Defendant's Motion to Dismiss (#86) is therefore granted and Count 11 is hereby dismissed.

IT IS THEREFORE ORDERED THAT:

(1) Defendant's Motion to Dismiss (#76) is GRANTED in part and DENIED in part. Count 9 of the indictment is hereby dismissed.

(2) Defendant's Motion to Dismiss (#78) is DENIED.

(3) Defendant's Motion to Dismiss (#86) is GRANTED. Count 11 of the indictment is hereby dismissed.

(4) Numerous motions remain pending before the court. The court will address these motions in due time.

(5) This case remains set for a final pretrial conference on January 12, 2018 and a jury trial beginning on January 22, 2018.

ENTERED this 23rd day of October, 2017.

s/COLIN S. BRUCE
U.S. DISTRICT JUDGE